MORGAN, LEWIS & BOCKIUS LLP
CHRISTOPHER J. BANKS (Bar No. 218779)
PHILLIP J. WIESE (Bar No. 291842)
LOUIS Y. LEE (Bar No. 315753)
One Market, Spear Street Tower
San Francisco, California 94105-1126
Telephone: 415.442.1000
Facsimile:  415.442.1001
christopher.banks@morganlewis.com
phillip.wiese@morganlewis.com
louis.lee@morganlewis.com

*Attorneys for Plaintiff*
MICHELLE-LAEL B. NORSWORTHY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE-LAEL B. NORSWORTHY,<br><br>Plaintiff,<br><br>v.<br><br>KATHLEEN ALLISON, JANEL ESPINOZA, MICHAEL PALLARES, IKWINDER SINGH, ROBERT MITCHELL, and ROSELLE BRANCH,<br><br>Defendants. | Case No. 1:20-cv-00813-DAD-HBK<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATION OF 42 U.S.C. § 1983** |

Plaintiff Michelle-Lael B. Norsworthy ("Plaintiff" or "Ms. Norsworthy"), for her Complaint against Kathleen Allison in her official capacity as the Secretary of the California Department of Corrections and Rehabilitation ("CDCR"), Janel Espinoza, Michael Pallares in both his individual capacity and official capacity as Warden of Central California Women's Facility ("CCWF"), Ikwinder Singh, Robert Mitchell, and Roselle Branch (collectively, "Defendants"), alleges as follows:

## NATURE OF THIS ACTION

1.      Plaintiff Michelle-Lael Bryanna Norsworthy brings this civil rights action under 42 U.S.C. § 1983 for damages, injunctive relief, and other appropriate relief based upon Defendants' deliberate indifference toward Ms. Norsworthy and their failure to provide her with medically necessary care in violation of the Eighth Amendment to the U.S. Constitution.  Ms. Norsworthy is a post-operative, transgender woman, a founder of a nonprofit that provides transitional services for former transgender inmates, and a small business owner.  Unfortunately, since March 25, 2019, Ms. Norsworthy has also been housed at CCWF in Chowchilla, California, by CDCR based on a finding that she violated the conditions of her 2015 parole from CDCR.

2.      Ms. Norsworthy brings this action because, since CDCR took her back into custody, Defendants have repeatedly violated Ms. Norsworthy's civil rights.  Specifically, Defendants failed to provide Ms. Norsworthy in a timely manner with pain medication, antibiotics, and hygiene products that were prescribed by her doctors.  Defendants further failed to provide a private space for Ms. Norsworthy to dilate properly pursuant to her doctors' orders, causing her pain, suffering, possibly irreversible damage to her body (including a dramatic loss of depth in her vagina), and loss of consortium with her husband.  Moreover, even after Ms. Norsworthy received revision surgery on August 13, 2019 in connection with her original sex reassignment surgery ("SRS"), Defendants failed to provide sufficient post-operative medical care.  These failures have caused Ms. Norsworthy extreme pain and hardship and will require that she undergo additional surgery to repair the harm caused to her body.

3.      Ms. Norsworthy currently requires medically necessary surgery to repair the loss of depth she experienced as a result of Defendants' previous failures to provide her appropriate

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

care and access to space to dilate as prescribed.  This surgery was recommended by the surgeon who has been treating Ms. Norsworthy to date, Thomas Satterwhite, M.D., and on December 17, 2019, CDCR approved Ms. Norsworthy for consultation for the surgery.  Since that time, CDCR, through the California State Attorney General's office, represented that it was searching for a surgeon to perform the surgery, but as of the date of this filing, no surgery has been scheduled.  Although that news was disappointing at the time—it should not have taken nearly a year to have this surgery scheduled to repair the damage done by CDCR's own improper actions—that disappointment was nothing compared to the news delivered to Ms. Norsworthy on March 12, 2020.

4.     On March 12, 2020, Ms. Norsworthy was advised by a doctor working at CCWF, Chris Glass, Psy.D., that her paperwork had changed.  Whereas the papers originally showed that the follow-up surgery had been "Approved" since at least December 2020, the word "Approved" was now crossed-out and replaced, in handwriting, with the word "denied."  Dr. Glass further informed Ms. Norsworthy that she was being referred to another doctor to get a second opinion for the surgery.  Dr. Glass said that this was shocking and indicated he had never seen anything like it.

5.     The only explanation provided came from the Attorney General's office, which forwarded notes from Dr. Satterwhite indicating that the surgery he recommended could either be a colovaginoplasty or a peritoneum-vaginoplasty, and a February 25, 2020 recommendation that Defendants had procured from another doctor, Marci Bowers, M.D., that CDCR decided to consult with to second-guess Dr. Satterwhite's recommendation.  CDCR originally approached Dr. Bowers in approximately November or December 2019, ostensibly about the surgery that Dr. Satterwhite had recommended.  After Dr. Bowers responded that she did not perform the type of surgery that Dr. Satterwhite recommended, CDCR asked Dr. Bowers to review Ms. Norsworthy's file.  They then sent Ms. Norsworthy's medical file to Dr. Bowers in Burlingame, CA.  Notably, this did not include any documentation explaining why Ms. Norsworthy had lost vaginal depth or why the current surgery was needed.  Dr. Bowers then wrote her recommendation on stationary with her office's Burlingame address on the top, and sent the recommendation to CDCR.  Dr.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

Bowers admittedly did not see Ms. Norsworthy or even review any pictures of the results of her previous surgery in issuing the letter.  Instead, as Dr. Bowers' admitted, she conducted her review "based upon chart review, operative records, reports and office examinations 2015-2019.  I have not seen this patient nor have I seen pictures of any outcomes."  Dr. Bowers then questioned the quality of Dr. Satterwhite's prior work, and, apparently misapprehending the reason for the surgery and incorrectly believing its purpose was to correct problems caused by the prior surgeries, recommended, "Prior to engaging in a qualitatively similar 3rd or 4th surgical procedure, I would recommend a second opinion with a new surgeon, if possible."  Since the filing of the initial Complaint in this action, Dr. Bowers has confirmed that she misunderstood the reason the surgery was needed, has amended her earlier report and, as of July 17, 2020, now supports providing the surgery prescribed by Dr. Satterwhite.

6.      However, based on the original, February 25, 2020 report CDCR obtained from Dr. Bowers based on incomplete and incorrect information it had provided to Dr. Bowers, CDCR decided to revoke its earlier approval for Ms. Norsworthy's surgery and require Ms. Norworthy to go see yet another doctor, for an invasive medical examination in the middle of the current coronavirus outbreak, for yet another medical opinion.  Requiring Ms. Norsworthy to participate in such a medical examination at this point is particularly unreasonable and dangerous in light of the coronavirus outbreak, for which prisoners like Ms. Norsworthy are particularly susceptible due to crowded living conditions, lack of protections, and her own underlying medical conditions that make her more vulnerable to the epidemic.  Indeed, the California Attorney General's office indicated on March 16, 2020, that it agreed with Ms. Norsworthy's decision not to go forward with the medical exam at that time in light of the coronavirus outbreak, and indicated that the visit to the new doctor would not be rescheduled until after the coronavirus situation is under control. And even then, the California Attorney General's office that, even if the new doctor also recommends the surgery that Ms. Norsworthy requires, she would then need to go through the approval process again, which would take another approximately 90 days to lead to a new approval.  In other words, it could be until 2021 or later before Ms. Norsworthy can get back to where she was in December 2019, with approval for this necessary surgery.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

7.     Enough is enough.  CDCR is a repeat violator who has already been found to have violated Ms. Norsworthy's constitutional rights in prior litigation, and had to be ordered by the Court to provide her with previous medical care.  Ms. Norsworthy was previously incarcerated by CDCR from April 15, 1987 until she was released on parole on August 12, 2015.  During that period, Ms. Norsworthy requested, and CDCR refused to provide, medically necessary SRS to treat her gender dysphoria.  Ms. Norsworthy filed suit against the doctors and CDCR staff who denied her request, and in that case, she was granted a preliminary injunction ordering CDCR "to provide Ms. Norsworthy with access to adequate medical care, including sex reassignment surgery as promptly as possible." *See Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1195 (N.D. Cal. 2015).  The Court found that Ms. Norsworthy presented compelling evidence "suggesting that prison officials deliberately ignored her continuing symptoms of gender dysphoria and the recognized standards of care" and that "they were deliberately indifferent to the recommendations of her treating health care provider." *Id.* at 1189.  Ms. Norsworthy was released on parole four months after the preliminary injunction issued and while the appeal of that order by the underlying action's defendants was pending, but before she was provided the court-ordered surgery.

8.     While on parole, Ms. Norsworthy navigated the Medi-Cal insurance system to secure the previously ordered SRS in February 2017.  Due to complications from that original surgery, however, Ms. Norsworthy had to undergo three corrective surgeries or revisions while she was on parole.  Ms. Norsworthy was in the process of having a fourth required revision surgery scheduled when she was arrested for possessing pepper spray in a restaurant that served alcohol, where she had been distributing business cards for her personal aerial photography business after receiving her pilot's license.  After spending time in the Solano County jail, Ms. Norsworthy was returned to CDCR custody based on a finding that her presence in the restaurant and possession of the pepper spray had violated her parole.

9.     While in CDCR's custody, Ms. Norsworthy was provided the required, fourth revision surgery, but only after she filed complaints and sought to have the preliminary injunction from her prior case enforced.  Moreover, during Ms. Norsworthy's incarceration, Defendants

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

1  have failed to provide her with the following medically necessary care: (a) sufficient

2  accommodations to dilate; (b) painkillers, prescribed by her surgeon, to treat the excruciating pain

3  that would be alleviated by the revision surgery; (c) antibiotics to treat recurring vaginosis; (c)

4  hygiene products, including vaginal douches as recommended by her doctor following her SRS

5  and the subsequent revisions; and (d) now, the surgery required to repair the harm caused to her

6  by CDCR's prior failures.  These failures caused regular bouts of pain and suffering.  Most

7  critically, failure to provide sufficient dilation accommodations resulted in what might be

8  irreparable loss of depth and function with respect to Ms. Norsworthy's vagina.

9        10.      Thus, Ms. Norsworthy filed a complaint in the United States District Court for the

10  Northern District of California on March 16, 2020 (Case No. 4:20-cv-01859-JST, ECF No. 1), to

11  obtain the necessary surgery, ensure that she receives proper treatment going forward, and for

12  damages and other relief to compensate her for the harm she has suffered and will suffer due to

13  Defendants' actions.

14                               **PARTIES**

15        11.      Plaintiff Michelle-Lael Bryanna Norsworthy is a post-operative transgender

16  woman, a founder of a nonprofit that provides transitional services for former transgender

17  inmates, and a small business owner.  She is a citizen of California and has been housed at CCWF

18  since March 25, 2019, in CDCR custody.  Ms. Norsworthy was previously in CDCR custody

19  from April 15, 1987 to August 12, 2015, at which time she was released on parole.  She is

20  currently in CDCR custody for violating the conditions of her parole.

21        12.      Upon information and belief, Defendant Kathleen Allison is a resident of

22  California.  Since her appointment by Governor Gavin Newsom on October 1, 2020, Allison has

23  served as Secretary of CDCR.  In her position as Secretary, Allison possesses ultimate

24  responsibility and authority regarding CDCR's operations, including the implementation of

25  policies governing medical care.  Upon information and belief, Defendant Allison has ultimate

26  authority for implementing CDCR's policies regarding medically necessary treatment and would

27  be able to respond to an order granting injunctive relief.  Accordingly, Allison is a proper

28  defendant in her official capacity.  *See, e.g.*, *Rouser v. White*, 707 F. Supp. 2d 1055, 1066 (E.D.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

1    Cal. 2010) (proper defendant for injunctive relief in suit seeking implementation of CDCR policy

2    is the CDCR Secretary in official capacity).

3         13.     Upon information and belief, Defendant Janel Espinoza is a resident of California.

4    Upon information and belief, Espinoza was appointed as Warden of CCWF in July 2017 and

5    served in that position until around September 2019.  During her time as Warden of CCWF,

6    Espinoza oversaw CCWF's policies governing inmates' medical care and custodial conditions.

7    Upon information and belief, Warden Espinoza was aware of, but did not remediate, deficiencies

8    in the medical care provided to Ms. Norsworthy, and, during the time that Defendant Espinoza

9    was warden at CCWF, is responsible for the actions of CDCR towards Plaintiff as alleged herein

10   during that time.  Ms. Norsworthy's chief complaint against Warden Espinoza is her failure to

11   ensure that Ms. Norsworthy had adequate accommodations to dilate, even though, as discussed in

12   further detail below, Espinoza was made aware of Ms. Norsworthy's inability to dilate for

13   months.

14        14.     Upon information and belief, Defendant Michael Pallares is a resident of California.

15   California.  Pallares has served as Warden of CCWF since 2019 and prior to that, served as Chief

16   Deputy Warden to Warden Espinoza.  As Warden of CCWF, Pallares oversees CCWF's policies

17   governing inmates' medical care and custodial conditions.  During his time as both Warden and

18   Chief Deputy Warden, Pallares was aware of, but did not remediate, deficiencies in the medical

19   care provided to Ms. Norsworthy.  As with Defendant Espinoza, Ms. Norsworthy's chief

20   complaint against Pallares is his failure to ensure that Ms. Norsworthy had adequate

21   accommodations to dilate, even though, as discussed in further detail below, Pallares was made

22   aware of Ms. Norsworthy's inability to dilate for months.  For these reasons, and by virtue of his

23   role as Deputy Warden and then Warden of CCWF, during which time he was responsible for

24   Plaintiff's medical care, Defendant Pallares is responsible for the actions of CDCR and the other

25   Defendants towards Plaintiff as alleged herein.  Upon information and belief, Ms. Norsworthy

26   also brings suit against Pallares in his official capacity as Warden of CCWF, to the extent that

27   Pallares has the authority to implement an order from the Court granting injunctive relief.  *See*

28   *McQueen v. Brown*, 2018 U.S. Dist. LEXIS 66377, *10-11 (E.D. Cal. Apr. 18, 2018).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

15.     Upon information and belief, Defendant Ikwinder Singh, M.D., is a resident of California.  Upon information and belief, at all relevant times, Dr. Singh was the Chief Physician and Surgeon at CCWF.  Dr. Singh's regular duties include evaluating inmates' medical care issues, reviewing medical records, diagnosing inmate complaints, providing direct and supervised medical care, and facilitating recommendations for medical treatments.  Upon information and belief, Dr. Singh, along with Defendant Dr. Mitchell, is responsible for Ms. Norsworthy's medical care.  Upon information and belief, Dr. Singh consulted with Ms. Norsworthy's primary care physician Dr. Branch and other of Ms. Norsworthy's medical practitioners at CCWF regarding Ms. Norsworthy's medical care.  Upon information and belief, Dr. Singh also participated in decisions concerning Ms. Norsworthy's medical care, including with respect to Ms. Norsworthy's requests for surgery and decisions regarding CDCR 602 Patient/Inmate Health Care Appeals submitted by Ms. Norsworthy.  Consequently, Dr. Singh is responsible for the failure at CDCR to provide Ms. Norsworthy with medically necessary care, as alleged herein, in violation of the Eighth Amendment to the U.S. Constitution.

16.     Upon information and belief, Defendant Robert Mitchell, M.D., is a resident of California.  Upon information and belief, at all relevant times, Dr. Mitchell was the Chief Medical Executive of CCWF.  Upon information and belief, Dr. Mitchell participated in decisions concerning Ms. Norsworthy's medical care, including with respect to Ms. Norsworthy's requests for surgery and decisions regarding CDCR 602 Patient/Inmate Health Care Appeals submitted by Ms. Norsworthy.  Consequently, Dr. Mitchell is responsible for the failure at CDCR to provide Ms. Norsworthy with medically necessary care, as alleged herein, in violation of the Eighth Amendment to the U.S. Constitution.

17.     Upon information and belief, Defendant Roselle Branch, M.D., is a resident of California.  At all relevant times, Dr. Branch served as Ms. Norsworthy's primary care physician at CCWF.  As described in further detail below, Dr. Branch deprived Ms. Norsworthy of suitable care by not providing her with appropriate prescription pain medications and by restricting Ms. Norsworthy's access to post-surgical needs, including access to a wheelchair.  Consequently, Dr.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

Branch is responsible for the failure at CDCR to provide Ms. Norsworthy with medically necessary care, as alleged herein, in violation of the Eighth Amendment to the U.S. Constitution.

**JURISDICTION AND VENUE**

18.     This court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 1331 and 1343(a)(3).

19.     Ms. Norsworthy filed her original complaint in the Northern District of California on the basis that a substantial part of the events giving rise to the claim occurred in the Northern District, including, specifically, the actions of Defendants to send Ms. Norsworthy's records to Burlingame, California, for Dr. Bowers to review Dr. Satterwhite's recommendations, and for Defendants to rely on the letter Dr. Bowers generated from her Burlingame office to justify the revocation of their prior approval of Ms. Norsworthy's surgery and decision to make Ms. Norsworthy obtain a second opinion for the previously approved surgery.  Defendants filed a Rule 12(b)(3) motion to dismiss or transfer the action.  On June 10, 2020, the court denied Defendants' motion to dismiss but granted Defendant's request to transfer the action.  The case was transferred to this Court on June 11, 2020.

**FACTUAL BACKGROUND**

**I.     MS. NORSWORTHY'S HISTORY OF GENDER DYSPHORIA**

20.     Ms. Norsworthy was born in 1964 in Detroit, Michigan.  While she was still an infant, her parents divorced, and she was sent to live with her grandmother.  Approximately ten years later, Ms. Norsworthy's mother retook custody of her and moved the family to the West Coast, eventually settling in California.  Throughout childhood and adolescence, Ms. Norsworthy never felt comfortable in the male gender assigned to her at birth.  She attempted to overcompensate for feeling weak and less than a man as a result of her feminine characteristics and gender confusion by acting out aggressively, owning guns and turning to alcohol.  At age sixteen, Ms. Norsworthy dropped out of high school and moved to Hollywood, California, eventually working as a police informant in her late teens and joining the military.

21.     On December 4, 1985, Ms. Norsworthy encountered a male acquaintance at a bar in Fullerton, California.  Ms. Norsworthy and this acquaintance had a contentious history due to

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

Ms. Norsworthy's work as an informant.  While both were intoxicated, an argument began in the bar and Ms. Norsworthy left the bar to go to her car.  The acquaintance followed Ms. Norsworthy to the car, and Ms. Norsworthy retrieved a loaded rifle from the car.  She fired a warning shot but the acquaintance reached for the gun and a struggle ensued.  During the struggle, the acquaintance was shot in the neck.  Ms. Norsworthy immediately attempted to administer first aid and, upon police arriving, stated "I shot my friend."  The acquaintance was taken to the hospital, but died a few days later as the result of a blood clot from the gunshot wound.  Ms. Norsworthy was convicted of second degree murder and sentenced to seventeen years to life.  She was placed under the custody of CDCR on or about April 15, 1987.

22.     Since at least adolescence, Ms. Norsworthy has experienced significant distress and anxiety as a result of the discrepancy between the male sex assigned to her at birth and her own female gender identity.  In the 1990s, her feelings and understandings surrounding her gender began to consolidate and Ms. Norsworthy came to understand and accept that she is a transsexual woman.

23.     In 1999, Ms. Norsworthy underwent several weeks of testing by a psychologist, Dr. Carl Viesti, at a CDCR facility.  "The results of all test instruments were consistent with the profile of a transsexual" and she was diagnosed with gender identity disorder – "the only DSM-IV diagnosis available for this condition."  Subsequent to her initial diagnosis, the American Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") in 2013, which replaced the "gender identity disorder" diagnosis with "gender dysphoria."  The DSM-V characterizes the diagnosis of gender dysphoria as follows: "[i]ndividuals with gender dysphoria have a marked incongruence between the gender they have been assigned to (usually at birth, referred to as natal gender) and their experienced/expressed gender."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 453 (5th ed. 2013) ("DSM-V").  In addition to this marked incongruence, "[t]here must also be evidence of distress about this incongruence."  Id.  Hereinafter this Complaint will generally refer to the condition as gender dysphoria even when referring to diagnoses prior to 2013.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

24.     Upon receiving this diagnosis in early 2000, it was determined that it was medically necessary for Ms. Norsworthy to receive treatment for her condition that would help to bring her body into greater conformity with her gender identity.  Toward this end, Ms. Norsworthy was prescribed feminizing hormone therapy and injections of a progestin (Depo-Prevera) to accomplish chemical castration.  She received these treatments beginning in January 2000.

25.     In 2012, Ms. Norsworthy's treating psychologist, Dr. Reese, expressly prescribed SRS as medically necessary for Ms. Norsworthy, finding that "it is clear that clinical medical necessity suggest and mandate a sex change medical operation before normal mental health can be achieved for this female patient."  Dr. Reese repeatedly renewed his opinion with regard to the necessity of SRS for the following six months, at which time she was removed from his care by CDCR.

26.     By early 2014, Ms. Norsworthy had not received the medically necessary SRS, and so she filed a lawsuit against the CDCR doctors who denied her request for the surgery.  *See Norsworthy v. Beard*, No. 14-cv-695-JST (N.D. Cal. 2014).  Ms. Norsworthy sought, and on April 2, 2015 was granted, a preliminary injunction requiring CDCR to promptly provide her with SRS.  *See Norsworthy*, 87 F. Supp. 3d at 1195.

27.     The Defendants in *Norsworthy* appealed the preliminary injunction order and, while that appeal was pending, CDCR granted Ms. Norsworthy's parole and she was released August 12, 2015.  After her release, the parties entered into a settlement agreement in which CDCR agreed to give Ms. Norsworthy monetary compensation.

28.     Upon her release, Ms. Norsworthy experienced success both personally and professionally and took pride in engaging with her community.  Ms. Norsworthy attained ham radio and drone pilot's licenses and started an aerial photography business that specializes in drone photography.  She also founded a nonprofit organization, Joan's House Shelter, with the goal of providing support and services to transgender women.  She also married and secured a job at the University of California, San Francisco.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

29.     After being released, in February 2017 Ms. Norsworthy successfully navigated Medi-Cal and received SRS.  Following the initial surgery, she underwent three follow-up surgeries or revisions to treat complications from the original surgery.  Ms. Norsworthy's surgeon recommended a fourth follow-up surgery to treat complications related to the original surgery, which surgery Ms. Norsworthy anticipated undergoing in the winter or early spring of 2019.

30.     On October 17, 2018, Ms. Norsworthy entered a bar & restaurant near her home in Suisin City, CA to distribute business cards for her new aerial photography business.  Because Ms. Norsworthy had previously been physically attacked on multiple occasions and orally threatened for being a transgender woman, Ms. Norsworthy had a habit of carrying pepper spray for protection.  While inside the establishment, multiple other patrons started verbally harassing Ms. Norsworthy and the pepper spray was inadvertently discharged when Ms. Norsworthy backed into a pool table.  To prevent the situation from escalating, Ms. Norsworthy exited, but several patrons followed and aggressively approached her.  Concerned for her safety, Ms. Norsworthy sprayed her pepper spray at the ground in front of her to create some distance between herself and the hostile group.  She then immediately returned home.

31.     Local police came to the establishment and spoke to one of the patrons, who alleged that Ms. Norsworthy sprayed him in the face with the pepper spray.  The patron told the police that he knew where Ms. Norsworthy lived and directed them to her home.  Despite Ms. Norsworthy denying that she sprayed the patron, she was arrested and held in Solano County Jail.

32.     At Ms. Norsworthy's preliminary hearing, the same patron testified that Ms. Norsworthy did *not* spray him in the face with pepper spray, but that the mist created by the spray irritated his eyes.  Nonetheless, Ms. Norsworthy was found have violated her parole because she entered an establishment that allegedly had a primary purpose of serving alcohol and was in possession of the pepper spray.  Ms. Norsworthy pleaded to a misdemeanor count in violation of Penal Code Section 22900.  Ms. Norsworthy served time in Solano County Jail until she was transferred to CDCR custody and sent to the Central California Women's Facility (CCWF) in Chowchilla, California on March 25, 2019.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

## II.     MS. NORSWORTHY RECEIVED INSUFFICIENT MEDICAL CARE IN THE MONTHS LEADING UP TO HER MOST RECENT SURGERY.

33.     Promptly upon arrival at CCWF, Ms. Norsworthy requested revision surgery to correct a complication from the prior surgery and to relieve her intense, persistent pain.  At that time, Ms. Norsworthy notified CDCR officials that the surgery had been already approved by her treating surgeon, Dr. Thomas Satterwhite.

34.     On March 29, 2019 Ms. Norsworthy met with a CDCR psychologist pursuant to the Prison Rape Elimination Act.  A few days later, on April 3, 2019, Ms. Norsworthy was evaluated by CDCR gynecologist Dr. Richard Graves, an evaluation prompted by her request for revision surgery, which had already been approved by her doctor.  During this appointment, Ms. Norsworthy was diagnosed with vaginosis and prescribed antibiotics.  Dr. Graves noted in that appointment that Ms. Norsworthy was to douche twice weekly but had not been able to because she had not been provided with sufficient douches.  CDCR has claimed that it initiated the surgical consultation process that same day, on April 3, 2019.

35.     Antibiotics are widely recognized as a medically necessary treatment for vaginosis.  Dr. Satterwhite prescribing Ms. Norsworthy antibiotics to treat vaginosis is in line with a wide ranging and near universal sentiment shared by health care providers and researchers that antibiotics are a genuine a necessary treatment for a person suffering from vaginosis.  A host of studies from leading clinics has found that while vaginosis may clear up on its own, if available a doctor should always prescribe antibiotics to treat the vaginosis.

36.     On April 5, 2019, a request for further revision surgery was submitted by CCWF's chief physician and surgeon.  On April 9 and 16, 2019, Ms. Norsworthy met with Dr. Glass, CDCR's psychologist who specializes in treatment of transgender inmates.  Dr. Glass also recognized Ms. Norsworthy's need for additional revision surgery.

37.     Despite two CDCR doctors recommending surgery, in addition to the doctor who previously operated on Ms. Norsworthy, Ms. Norsworthy's request for a consultation with an outside specialist was not approved by CDCR until May 10, 2019.  On May 13, 2019, counsel for

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

1   Defendants asserted in a joint case management statement that the request for revision surgery

2   was still "under review at CDCR headquarters."

3         38.     In addition, in early April 2019, Ms. Norsworthy submitted two grievances

4   (CDCR 602 Patient/Inmate Health Care Appeals) to CDCR.  One request sought the revision

5   surgery that Dr. Satterwhite had already recommended, a decision with which the CCWF chief

6   physician and CDCR psychologist agreed.  The other request sought appropriate accommodations

7   to dilate her vagina, which was prescribed by her doctor and necessary to ensure that wounds

8   from her SRS and subsequent revisions healed properly.

9         39.     Post-SRS vaginal dilation is an integral part of recovery and maintenance of Ms.

10   Norsworthy's neovagina.  Without proper post-operative dilation, Ms. Norsworthy suffered from

11   further vaginal stenosis, a condition in which the vaginal canal becomes narrower and shorter,

12   causing intense pain.  Accordingly, Dr. Satterwhite previously directed Ms. Norsworthy to dilate

13   three times per day.  Further, the only way to regain depth after vaginal stenosis is for the patient

14   to get another surgical procedure.  As a result, dilation is typically done for life following SRS as

15   a way to maintain proper vaginal depth and avoid the excruciating pain and loss of function

16   associated with vaginal shortening.

17         40.     Indeed, in a letter written by Dr. Satterwhite dated November 7, 2018 and included

18   in Ms. Norsworthy's medical file at CDCR, Dr. Satterwhite advised the following:

19
20             Michelle-Lael Norsworthy has been under my care for several
years.  She has undergone gender confirmation surgery
21             (vaginoplasty), and as a crucial part of her post-operative care,
patient needs to be able to dilate the vagina.  Without self-dilation,
22             the vagina will close in on itself completely, resulting in a
disastrous result.  To maintain the size of the vaginal canal,
23             Michelle will require the use of her dilators (they come in a set of
long plastic rods), lubrication, and privacy 3 times a day for 45
24             minutes to allow herself to self-dilate.

25             Once again, it is medically necessary that she be allowed to dilate,
otherwise, she can have very serious consequences.

26         41.     Despite the clear instructions in Dr. Satterwhite's letter included in Ms.

27   Norsworthy's file, Defendants did not provide Ms. Norsworthy with sufficient accommodations

28   to dilate for at least several months following her arrival at CCWF.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

42.     From March 25, 2019, when Ms. Norsworthy arrived at CCWF, through early June 2019, Defendants housed Ms. Norsworthy in a cell in the reception building with one other woman.  Ms. Norsworthy had no privacy, and these conditions were insufficient.  As a result, Ms. Norsworthy was only able to dilate approximately once per day, and this was during her daily showers.  Not only could Ms. Norsworthy not dilate as frequently as needed, but having to dilate while standing was also unnecessarily painful and likely not as effective.  Ms. Norsworthy estimates that she informed Healthcare Captain Dill about her inability to dilate approximately 20 times in this period.  Captain Dill attended almost daily meetings among then-Warden Espinoza, then-Chief Deputy Warden Pallares, the associate wardens, and other staff captains.  Although Ms. Norsworthy asked Captain Dill to raise these issues at these meetings, Defendants did not take any action that improved Ms. Norsworthy's conditions.

43.     On May 31, 2019, Dr. Singh interviewed Ms. Norsworthy about her medical complaints, including the fact that she still could not dilate.  Ms. Norsworthy understood that Dr. Singh was interviewing her in connection with evaluating the CDCR 602 Appeal she had filed the month before.  During that meeting, Dr. Singh asked Ms. Norsworthy a series of questions relating to the condition of her vagina, pain level, and surgical history.  Based on that conversation, Dr. Singh was presumably put on notice (if he was not already) that Ms. Norsworthy was in severe pain, unable to sufficiently dilate, and dissatisfied with her medical care.

44.     However, Defendants, primarily Dr. Singh, failed to act swiftly in response to Ms. Norsworthy's dilation-related 602 to transfer Ms. Norsworthy to appropriate housing.  In fact, in early June 2019 Defendants made the situation worse by moving Ms. Norsworthy to an *eight-person* unit in CCWF Building 509.  Defendants purported to accommodate Ms. Norsworthy by providing her with a room in the central kitchen at 7 a.m. and space in the primary health clinic at lunchtime.  But practically speaking, these accommodations were inadequate.

45.     At the central kitchen in the morning, there was generally only one officer on site, and that officer was responsible for handing out medicine to the many women who have prescriptions.  For Ms. Norsworthy to dilate, that officer had to leave the medicine line,

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

1   accompany Ms. Norsworthy to the dilation room, wait outside for her to dilate (which is supposed

2   to take 45 minutes), and then return to the medicine line.  Meanwhile, the dozens of women or

3   more who needed to pick up medicine had to wait for the officer to return.  It was Ms.

4   Norsworthy's experience that the officer running the line demanded that Ms. Norsworthy wait

5   until the medicine has been handed out before allowing Ms. Norsworthy to dilate, but Ms.

6   Norsworthy was unable to wait because she had to be at her job at 7:30 a.m.  As a result, Ms.

7   Norsworthy frequently had no practical ability to dilate in the morning.

8       46.    Defendants' offer for Ms. Norsworthy to use the primary health clinic was no

9   better.  While Ms. Norsworthy had access to a room at the clinic to dilate at lunchtime, she did

10  not have priority to that room, because it was located in the emergency room, and Ms.

11  Norsworthy therefore had to wait for all other patients to be seen.  On some days, this took hours.

12  Other days, she was not able to use the room at all.

13      47.    Throughout June 2019 and early July 2019, in which Ms. Norsworthy lived in the

14  eight-person cell, she estimates that she was only able to dilate at most once per day for

15  approximately 10 minutes, during her brief showers.  Ms. Norsworthy estimated that she

16  complained to Captain Dill and other custody staff *dozens of times* about not being able to dilate

17  during this time.

18      48.    Defendants nevertheless continued not to provide Ms. Norsworthy adequate

19  accommodations for dilation and did not even schedule Ms. Norsworthy for an appointment with

20  Dr. Satterwhite until June 10, 2019.   During that appointment, Dr. Satterwhite wrote in his notes

21  that Ms. Norsworthy had not been able to dilate for *1.5 months* and only had a vaginal canal depth

22  of 4 inches.  He further wrote that absent regular dilation, Ms. Norsworthy would require a

23  deepening procedure using her colon.  As discussed below, the lack of sufficient dilation

24  accommodations would continue and later lead to a significant, possibly irreparable loss of depth.

25  Dr. Satterwhite also diagnosed Ms. Norsworthy with a reoccurrence of vaginosis at that

26  appointment.

27      49.    In addition, after Ms. Norsworthy returned to CDCR custody, Defendants did not

28  provide her with the medications that were prescribed by her doctors.  First, because of the pain

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

caused by her last SRS revision, Dr. Satterwhite had prescribed Ms. Norsworthy with gabapentin to address pain and blood pressure issues.  Upon her arrival at CDCR, however, Dr. Branch declined to provide Ms. Norsworthy with gabapentin because it was not on the CDCR formulary for pain.  Instead, Dr. Branch prescribed tegretol, a seizure medication that was completely unrelated to Ms. Norsworthy's needs.  Ms. Norsworthy did not need medication for seizures, and the tegretol did not alleviate her pain.  After that failed attempt, CDCR gave Ms. Norsworthy ibuprofen, an over the counter drug, for her pain symptoms.  This was a far cry from the prescription pain medication (gabapentin) that she needed.  To achieve a similar affect, Ms. Norsworthy resorted to taking as much as one *bottle* of ibuprofen every two days.

50.     Defendants also did not take sufficient steps to ensure that Ms. Norsworthy had enough douches to clean her vagina, which was required by Dr. Satterwhite and her CDCR gynecologist Dr. Graves.  During Ms. Norsworthy's first meeting with Dr. Graves in early April 2019 while in CDCR custody, Dr. Graves prescribed a one-year supply of douches.  Ms. Norsworthy received the douches for the first couple of weeks in custody, but CDCR abruptly stopped providing them in approximately mid-May 2019.  Ms. Norsworthy confirmed with Dr. Graves that the prescription had been sent to the pharmacy and the pharmacy was sending the douches, but Ms. Norsworthy did not receive them for more than a month.  As a result, Ms. Norsworthy has suffered from recurring bacterial vaginosis.  She received one round of antibiotics to treat the infection in early April, but because she could not properly clean her SRS wound, the infection returned by early June 2019.  She then had another appointment with Dr. Graves, who immediately diagnosed the vaginosis infection and prescribed another round of antibiotics.

III.    **DEFENDANTS CONTINUED TO BE DELIBERATELY INDIFFERENT TO MS. NORSWORTHY'S MEDICAL NEEDS FOLLOWING HER SURGERY.**

51.     On August 13, 2019, Ms. Norsworthy finally received further revision surgery, performed by Dr. Satterwhite.  However, Defendants failed to provide Ms. Norsworthy with adequate post-operative care as directed by Dr. Satterwhite and CDCR's own physicians.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

52.     For example, Dr. Satterwhite directed that Ms. Norsworthy be allowed to shower as frequently as needed following her surgery, in order to keep the surgical site clean.  But during the first several days after Ms. Norsworthy's return to CCWF on August 16, CCWF custody staff only permitted her to shower at most once per day, and none of the Defendants did anything to remedy the situation.

53.     In addition, per Dr. Satterwhite's orders, Ms. Norsworthy was to douche daily for the first two weeks following surgery, and twice per week thereafter.  However, Defendants only provided Ms. Norsworthy with two douches *total* until after a follow-up appointment with Dr. Graves on August 29, when Dr. Graves ordered that sufficient douches be provided.

54.     Defendants, particularly Dr. Branch, also failed to provide Ms. Norsworthy with all prescribed pain medications as directed by her surgeon.  Dr. Branch did not consistently provide Ms. Norsworthy with the correct dosage of gabapentin or opioids recommended by Dr. Satterwhite.  Defendants' failure to ensure that Ms. Norsworthy received sufficient pain medication affected Ms. Norsworthy so severely that in the weeks following the surgery, she had difficulty controlling her bladder.

55.     During Ms. Norsworthy's follow-up appointment with Dr. Satterwhite on September 16, 2019, Dr. Satterwhite observed that the depth of Ms. Norsworthy's vagina was "quite limited."  He further recommended "eval[uation] and treatment with Dr. Maurice Garcia in Cedars Sinai for colovaginoplasty procedure to reconstitute depth."  Dr. Satterwhite noted that Ms. Norsworthy's vaginal canal depth was only 5 centimeters, or approximately 2 inches—about *half the depth Ms. Norsworthy had only three months earlier*.  As a result of her lost vaginal depth, Ms. Norsworthy can now no longer engage in meaningful sexual relations with her husband, who was visiting Ms. Norsworthy regularly until the current coronavirus outbreak prevented visitations.

56.     Defendants did not schedule any appointments for Ms. Norsworthy with Dr. Branch until September 16, 2019.  During that appointment, in which Dr. Branch saw Ms. Norsworthy via telemedicine only and thus did not physically examine Ms. Norsworthy's vaginal area (and has not done so to this day), Dr. Branch declined to provide Ms. Norsworthy with pain

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

1    medications prescribed by Dr. Satterwhite because she did not believe that Ms. Norsworthy was

2    genuinely in pain.

3          57.    Dr. Branch also refused to extend Ms. Norsworthy's rest period and wheelchair

4    use by another 30 days.  Fortunately, Ms. Norsworthy had an appointment with Dr. Graves on

5    September 18, 2019, who rightfully extended Ms. Norsworthy's rest period and wheelchair

6    restriction, even though those issues were within Dr. Branch's purview.

7          58.    On December 17, 2019, CDCR approved Ms. Norsworthy for consultation related

8    to colovaginoplasty.  A few weeks later, Dr. Satterwhite revised his initial recommendation, and

9    indicated on January 13, 2020 that the surgery could be either a "colon-vaginoplasty or

10   peritoneum-vaginoplasty."  Throughout the winter, and until March 12, 2020, CDCR, through the

11   California State Attorney General's office, represented that it was searching for a surgeon to

12   perform the surgery, even advising Ms. Norsworthy that the surgery would take place in

13   November 2020.  Although that news was disappointing at the time—it should not take nearly a

14   year to have this surgery scheduled to repair the damage done by CDCR's own improper

15   actions—at least Ms. Norsworthy understood that relief would eventually be coming.

16         59.    That all changed on March 12, 2020, when, as discussed, Dr. Glass advised Ms.

17   Norsworthy that her paperwork had changed.  Whereas the papers originally showed that the

18   follow-on surgery had been "Approved" since at least December 2019, Dr. Glass advised her that

19   the word "Approved" was now crossed-out and replaced, in handwriting, with the word "denied."

20   Dr. Glass further informed Ms. Norsworthy that she was being referred another doctor to get a

21   second opinion for the surgery.  Dr. Glass said that this was shocking and indicated he had never

22   seen anything like it.

23         60.    The only explanation came from the Attorney General's office, which forwarded

24   notes from Dr. Satterwhite indicating that the surgery he recommended could either be a

25   colovaginoplasty or a peritoneum-vaginoplasty and the February 25, 2020 recommendation that

26   Defendants had procured from Dr. Bowers second-guessing Dr. Satterwhite's recommendation.

27   As noted above, CDCR originally approached Dr. Bowers in approximately November or

28   December 2019, ostensibly about the surgery that Dr. Satterwhite had recommended.  After Dr.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

Bowers responded that she did not perform the type of surgery that Dr. Satterwhite recommended, CDCR asked Dr. Bowers to review Ms. Norsworthy's file. They then sent Ms. Norsworthy's medical file to Dr. Bowers in Burlingame, CA. Notably, this did not include any documentation explaining why Ms. Norsworthy had lost vaginal depth or why the current surgery was needed. Dr. Bowers then wrote her recommendation on stationary with her office's Burlingame address on the top, and sent the recommendation to CDCR.

61. Dr. Bowers admittedly did not see Ms. Norsworthy or even review any pictures of the results of her previous surgery in issuing the letter. Instead, as Dr. Bowers admitted, she conducted her review "based upon chart review, operative records, reports and office examinations 2015-2019. I have not seen this patient nor have I seen pictures of any outcomes." Dr. Bowers then questioned the quality of Dr. Satterwhite's prior work, and, apparently misapprehending the reason for the surgery and incorrectly believing it was to correct problems caused by the prior surgeries, recommended, "Prior to engaging in a qualitatively similar 3rd or 4th surgical procedure, I would recommend a second opinion with a new surgeon, if possible."

62. Based on this recommendation that was prepared by someone who has admittedly not even seen Ms. Norsworthy with respect to the surgery and did not know the reason the surgery was needed, CDCR decided to revoke its earlier approval for Ms. Norsworthy's surgery and require Ms. Norsworthy to go see a third doctor, for an invasive medical examination in the middle of the current coronavirus outbreak, for yet another medical opinion. Requiring Ms. Norsworthy to participate in such a medical examination at this point is particularly unreasonable and dangerous in light of the coronavirus outbreak, for which prisoners like Ms. Norsworthy are particularly susceptible due to crowded living conditions, lack of protections, and her own underlying medical conditions that make her more vulnerable to the epidemic. Indeed, the California Attorney General's office indicated on March 16, 2020, that it agreed with Ms. Norsworthy's decision not to go forward with the medical exam at this time in light of the coronavirus outbreak, and indicated that the visit to the new doctor would not be rescheduled until after the coronavirus situation is under control. And even then, the California Attorney General's office indicated that, even if the new doctor also recommends the surgery that Ms.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

Norsworthy requires, she would then need to go through the approval process again, which would take another approximately 90 days to lead to a new approval.  As of the date of this filing, Ms. Norsworthy is not scheduled for a consultation with a surgeon qualified to perform for the foreseeable future.  In other words, it could be until the end of 2021 or later before Ms. Norsworthy can get back to where she was in December 2019, with approval for this necessary surgery.

63.     In an attempt to understand Dr. Bowers' recommendation, counsel for Ms. Norsworthy held a conference with both Dr. Bowers and Dr. Satterwhite in July 2020 to further discuss Dr. Bowers' evaluation of Ms. Norsworthy's file.  Dr. Satterwhite clarified to Dr. Bowers that the further surgery Ms. Norsworthy seeks is not for cosmetic purposes but to restore vaginal depth.  With this clarification, Dr. Bowers added an addendum to her report on July 17, 2020 to state the following:

> Upon receiving additional clinical information, it is apparent that the patient is satisfied with the cosmetic portions of her previous procedures with Dr. Satterwhite.  However, due to issues with confinement and lack of access to dilation capability, the patient has lost depth and currently has a non-functional vagina.  This should be addressed, in my opinion, with a surgical procedure such as Colovaginoplasty or peritoneal grafting.  It is the issue of vaginal depth that is essential to this patient's outcome and future well-being.

64.     On November 19, 2020, Ms. Norsworthy had another appointment with Dr. Graves, where her depth was again measured at 5 centimeters (approximately 2 inches, and consistent with Dr. Satterwhite's prior measurement).  This was merely another confirmation that Defendants' deliberate indifference towards Ms. Norsworthy's medical needs had by that point destroyed her body.

65.     In sum, Defendants have failed to provide Ms. Norsworthy with medically necessary medicine, hygiene products, dilation accommodations, and surgery to restore her almost complete loss of depth.  This deliberate indifference violated Ms. Norsworthy's constitutional rights and caused severe, possibly irreparable harm.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

66.     Over nearly two years in CDCR custody, Ms. Norsworthy has raised concerns about her medical care with CDCR/CCWF management, including CCWF Wardens Espinoza and Pallares; Associate Director Amy Miller, CDCR physicians Dr. Singh (Chief Medical Officer), Dr. Neumann (Chief of Psychiatry), Dr. Mitchell (Chief Medical Executive), Dr. Sammons (psychologist), Dr. Buzzini (psychologist), Dr. Glass (psychologist), Dr. Graves (gynecologist), Dr. Branch (primary care physician), Mr. Mallory, and staff member Captain Chenoa Dill (healthcare team captain), but to little avail.

**IV.     THE ANTI-TRANSGENDER CULTURE AT CCWF EXACERBATES MS. NORSWORTHY'S SUFFERING.**

67.     In addition to receiving inadequate medical care, Ms. Norsworthy has been forced to survive a blatantly anti-transgender environment at CCWF.

68.     Throughout Ms. Norsworthy's incarceration, certain CCWF custody staff and inmates have regularly insulted, degraded, and belittled Ms. Norsworthy by stating things such as "you are a man," "you sound like a man," "your voice is too deep," "you don't look like a woman," and "you don't belong here [at CCWF]."  Moreover, said staff and inmates often refer to Ms. Norsworthy using incorrect and disrespectful pronouns, i.e., "he" or "him."  And even when it is not CCWF staff making derogatory comments to Ms. Norsworthy, CCWF staff give tacit approval to the harassing inmates by failing to intervene or otherwise reprimand them.

69.     The bias of CCWF custody staff against Ms. Norsworthy has had real, practical consequences.  For instance, CCWF staff issued Ms. Norsworthy meritless Form 115 and 128-A disciplinary writeups (one for trying to use a tablet kiosk to send an email to her husband and another for doing boxing exercises (non-sparring) with a fellow inmate) that have, and will continue to, damage her chances of obtaining parole indefinitely.  Although the Form 115 writeups were later voided, the Form 128 writeups remained on Ms. Norsworthy's record.  These writeups appeared to form the basis of the parole board's decision to deny Ms. Norsworthy parole in August 2020, as the parole board even acknowledged at Ms. Norsworthy's parole hearing that she had done all that had been asked of her over the past 12 months.  To the contrary, other (cisgender) inmates who have harassed Ms. Norsworthy have received positive treatment from

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

CCWF staff.  For example, one inmate who has been  particularly hostile towards Ms. Norsworthy received her own Form 128 writeup for harassing Ms. Norsworthy.  However, Ms. Norsworthy later learned that one of the CCWF custody lieutenants later had the writeup removed from that inmate's file so it wouldn't negatively impact that inmate during any parole or clemency proceeding.

70.     Ms. Norsworthy lives in constant fear of receiving any additional 115s or 128 writeups, and this fear has further impacted her health.  For example, in August 2020, Ms. Norsworthy was assigned to a job assisting inmates with disabilities.  In connection with this job, she was tasked with pushing and transporting inmates in wheelchairs.  However, due to the delicate and fragile state of her vaginal area, her doctors—both her outside surgeon Dr. Satterwhite and CDCR gynecologist Dr. Graves—had directed that she not push, pull, or lift weight in excess of 20 pounds.  These restrictions are memorialized in Ms. Norsworthy's 128C-3 Medical Classification Chrono.

71.     Despite Ms. Norsworthy's medical restrictions, CCWF insisted Ms. Norsworthy spend months transporting patients weighing up to hundreds of pounds.  Ms. Norswothy typically performed at least 10 orders per day.  The excessive demands caused straining and bleeding in Ms. Norsworthy's vaginal area.  However, Ms. Norsworthy feared that complaining or refusing to work at any point would result in additional writeups—making it impossible for her to obtain parole in the future.  Ms. Norsworthy had to take it upon herself to file a CDCR 1824 Reasonable Accommodation Request to obtain relief from these duties, which was finally granted in January 2021.

72.     Accordingly, the anti-transgender culture at CCWF has only further contributed to the harm being done to Ms. Norsworthy's physical and emotional health during this already difficult time.

**COUNT ONE**

VIOLATION OF 42 U.S.C. § 1983 BASED UPON
DEPRIVATION OF EIGHTH AMENDMENT RIGHTS RESULTING
FROM FAILURE TO PROVIDE MEDICALLY NECESSARY CARE

73.     Ms. Norsworthy repeats and realleges the allegations of Paragraphs 1 through 64 as if fully set forth herein.

74.     In 2017, Ms. Norsworthy underwent sexual reassignment surgery to treat her gender dysphoria.  Since then, she has received four additional revision surgeries to treat complications from the original surgery.

75.     Upon being returned to CDCR custody on March 25, 2019, Ms. Norsworthy had met with numerous CDCR doctors, as well as an outside doctor, who all recommended that Ms. Norsworthy promptly receive SRS revision.

76.     Ms. Norsworthy's outside surgeon Dr. Satterwhite prescribed strong pain medication, antibiotics, and regular dilation for Ms. Norsworthy.  CDCR doctors, specifically Dr. Graves and Dr. Glass, agreed with Dr. Satterwhite's directives.

77.     Contrary to her doctors' orders, Defendants did not provide Ms. Norsworthy with gabapentin, or an equivalent pain reliever, from the time she entered CDCR custody in March 2019 until months afterwards.  Ms. Norsworthy had notified CDCR staff that she was in pain and that it hurt to even walk around the yard because the prison clothes rubbed against her genitals. In return, she was merely provided with over-the-counter ibuprofen and a drug to treat seizures.

78.     Additionally, Defendants failed to ensure that Ms. Norsworthy received her allotment of douches prescribed by both her outside surgeon and CDCR's gynecologist.  The pharmacy was notified of this request, but Ms. Norsworthy did not receive the douches for a period of roughly two months.  As a result, she was not able to adequately clean her genitals and her surgery wound, and she had a recurring infection.

79.     Finally, based upon Ms. Norsworthy's grievance and her doctor's orders, Defendants were aware of Ms. Norsworthy's need to dilate regularly.  However, in spite of that knowledge, Defendants did not provide Ms. Norsworthy a proper, adequate, private place to dilate.  Dilation is a medical necessity after SRS and SRS revision surgeries.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

80.     Each Defendant was and remains deliberately indifferent to Ms. Norsworthy's medical need for pain medication, antibiotics, and hygiene products, as well as Ms. Norsworthy's medical need to regularly dilate.  Each Defendant knew of Ms. Norsworthy's serious medical needs, disregarded Ms. Norsworthy's needs, and failed to take any reasonable measures to address Ms. Norsworthy's continued pain and suffering resulting from her medical needs.  The deliberate indifference of each Defendant is further demonstrated by Defendants' unreasonable actions contrary to the recommendations of multiple health care professionals with sufficient training and/or experience in the treatment of gender dysphoria, and by Defendants' disregard for providing pain management medications, antibiotics, and hygiene products, which were prescribed to Ms. Norsworthy by her doctors.

81.     Defendants' denial of sufficient accommodations to dilate, denial of pain medication despite having a prescription for that medicine, denial of hygiene products, including douches, to clean her surgery wound, and failure to treat the resulting vaginosis infection unreasonably and recklessly caused irreparable harm to Ms. Norsworthy, including severe anxiety and physical pain which Ms. Norsworthy experiences on a daily basis.

82.     Defendants, by acting deliberately indifferent to Ms. Norsworthy's need for her pain medication, antibiotics, and hygiene products to manage complications from her prior surgeries related to SRS, deprived Ms. Norsworthy of her right to medically necessary treatment guaranteed by the Eighth Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

83.     Enter injunctive relief enjoining Defendants from interfering with the discretion of the mental health and other medical professionals involved in Ms. Norsworthy's care;

84.     Enter injunctive relief enjoining Defendants to provide Ms. Norsworthy with medically necessary surgery to try to restore her lost vaginal depth, adequate medical care, accommodations to dilate, accommodations to recover from surgery; and any other medical care, accommodations and/or medication which is, has been or will be prescribed by a doctor or other healthcare professional;

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB

85.     Award punitive and compensatory damages for the costs of maintaining potential future medical complications that are likely to arise due to Defendants indifference to Ms. Norsworthy's sever medical conditions, failure to treat vaginosis, and failure to provide medical care and prescribed medication to manage Ms. Norsworthy's severe pain pursuant to 42 U.S.C. § 1983;

86.     Award reasonable attorneys' fees and costs to Ms. Norsworthy pursuant to 42 U.S.C. § 1988; and

87.     Other relief the Court finds appropriate in the interests of justice.

Dated:  May 14, 2021                          MORGAN, LEWIS & BOCKIUS LLP


                                              By  */s/ Christopher J. Banks*
                                                  Christopher J. Banks

                                              Attorneys for Plaintiff
                                              MICHELLE-LAEL B. NORSWORTHY

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

FIRST AMENDED COMPLAINT
Case No. 1:20-cv-00813-DAD-HKB