MORGAN, LEWIS & BOCKIUS LLP
KENT M. ROGER (Bar No. 095987)
PHILLIP J. WIESE (Bar. No. 291842)
TAYLOR D. HORN (Bar No. 329435)
One Market, Spear Street Tower
San Francisco, California 94105-1126
Telephone:  415.442.1000
Facsimile:   415.442.1001
kent.roger@morganlewis.com
phillip.wiese@morganlewis.com
taylor.horn@morganlewis.com

CROWELL & MORING LLP
CHRISTOPHER J. BANKS (Bar No. 218779)
Three Embarcadero Center
San Francisco, California 94111-1126
Telephone:     415.986.2800
cbanks@crowell.com

*Attorneys for Plaintiff*
MICHELLE-LAEL B. NORSWORTHY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE-LAEL B. NORSWORTHY, | Case No. 1:20-cv-00813-ADA-HBK |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR VIOLATION OF 42 U.S.C. § 1983** |
| v. | |
| JEFF MACOMBER, JANEL ESPINOZA, MICHAEL PALLARES, IKWINDER SINGH, ROBERT MITCHELL, ROSELLE BRANCH, LESLIE TAYLOR, CHENOA DILL, SERGEANT GIBSON, GERARDO GARCIA-TORRES, OFFICER SHOALS, and OFFICER GOETHE, | |
| Defendants. | |

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

DB2/ 45347083.3

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

Plaintiff Michelle-Lael B. Norsworthy ("Plaintiff" or "Ms. Norsworthy"), for her Complaint against Jeff Macomber in his official capacity as the Secretary of the California Department of Corrections and Rehabilitation[1] ("CDCR"), Janel Espinoza, Michael Pallares in both his individual capacity and official capacity as Warden of Central California Women's Facility ("CCWF"), Ikwinder Singh, Robert Mitchell, Roselle Branch, Leslie Taylor, Chenoa Dill, Sergeant Gibson, Gerardo Garcia-Torres, Officer Shoals, and Officer Goethe (collectively, "Defendants"), alleges as follows:

## NATURE OF THIS ACTION

1.      Plaintiff Michelle-Lael Bryanna Norsworthy brings this civil rights action under 42 U.S.C. § 1983 for damages, injunctive relief, and other appropriate relief based upon Defendants' deliberate indifference towards Ms. Norsworthy's medical needs and their failure to provide her with medically necessary care in violation of the Eighth Amendment to the U.S. Constitution.  Ms. Norsworthy is a post-operative, transgender woman, a founder of a nonprofit that provides transitional services for former transgender inmates, and a small business owner. Unfortunately, from March 25, 2019 to January 13, 2022, Ms. Norsworthy was also housed at CCWF in Chowchilla, California, by CDCR based on a finding that she violated the conditions of her 2015 parole from CDCR due to her possession of a can of pepper spray.

2.      Ms. Norsworthy brings this action because, after CDCR took her back into custody, Defendants repeatedly violated her civil rights.  Specifically, Defendants failed to provide Ms. Norsworthy in a timely manner with pain medication, antibiotics, and hygiene products that were prescribed by her doctors.  Defendants further failed to provide a private space for Ms. Norsworthy to dilate properly pursuant to her doctors' orders, causing her pain, suffering, possibly irreversible damage to her body (including a dramatic loss of depth in her vagina), and loss of consortium with her husband.  Moreover, even after Ms. Norsworthy received a revision surgery on August 13, 2019 in connection with her original sex reassignment surgery ("SRS"), Defendants failed to provide sufficient post-operative medical care.  These failures have caused

---

[1] On December 12, 2022, Macomber was appointed as the new Secretary of CDCR, replacing Kathleen Allison.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

1

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

Ms. Norsworthy extreme pain and hardship and made it so that she needs to undergo yet another surgery, this time either a colovaginoplasty or a peritoneum-vaginoplasty (both of which are high risk and extremely painful), to repair her lost vaginal depth and receive the full medical benefit of her SRS.

3.      This is not the first time Ms. Norsworthy has had to seek the assistance of the Federal Courts to protect her civil rights and receive appropriate medical care to treat her gender dysphoria.  Ms. Norsworthy began her transition to living her life as a woman during her initial incarceration, when she was housed in a male prison, after being diagnosed with what was then called "gender identity disorder."  Ms. Norsworthy had to fight CDCR to obtain basic gender-affirming medical treatment and supplies, such as hormone therapy and gender-affirming undergarments, and to change her name.  Ultimately, she sought her initial SRS based on her doctors' conclusions that it was medically appropriate and necessary as treatment for her gender dysphoria.  After her requests were denied, she filed suit against the doctors and CDCR staff who denied her the surgery and was granted a preliminary injunction ordering the defendants in that action "to provide Ms. Norsworthy with access to adequate medical care, including sex reassignment surgery as promptly as possible."  *See Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1195 (N.D. Cal. 2015).  The Northern District of California found that Ms. Norsworthy had presented compelling evidence "suggesting that prison officials deliberately ignored Ms. Norsworthy's continuing symptoms of gender dysphoria and the recognized standards of care" and that "they were deliberately indifferent to the recommendations of her treating health care provider."  *Id.* at 1189.  Ms. Norsworthy was then released on parole four months after the preliminary injunction issued and while the defendants' appeal of that order was pending, but before she was provided the court-ordered surgery. Ms. Norsworthy thereafter navigated the Medi-Cal insurance system to secure the previously ordered SRS on her own in February 2017, but due to complications from that original surgery, had to undergo three corrective surgeries (or revisions) while she was on parole.

4.      Now, after three years of additional incarceration by CDCR and Defendants' willful indifference to Ms. Norsworthy's medical needs, Ms. Norsworthy requires yet another

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

2

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

surgery, either a colovaginoplasty or a peritoneum-vaginoplasty as noted above, to repair the harm Defendants' caused to her vagina and womanhood and receive the full-benefit of the SRS Defendants' predecessors at CRCR were originally ordered to provide in 2015.

## PARTIES

5.      Plaintiff Michelle-Lael Bryanna Norsworthy is a post-operative transgender woman, a founder of a nonprofit that provides transitional services for former transgender inmates, and a small business owner. She is a citizen of California who was housed at CCWF from March 25, 2019 to January 13, 2022, in CDCR custody. Prior to that, Ms. Norsworthy was in CDCR custody from April 15, 1987 to August 12, 2015, at which time she was released on parole. After a finding that she had violated the terms of parole by possessing pepper spray, Ms. Norsworthy was incarcerated for approximately three more years at CCWF in Chowchilla, California. Ms. Norsworthy was released from CCWF on January 13, 2022 on parole, and currently resides in San Francisco, California.

6.      Upon information and belief, Defendant Jeff Macomber is a resident of California. Since his appointment by Governor Gavin Newsom on December 12, 2022, Macomber has served as Secretary of CDCR. In his position as Secretary, Macomber possesses ultimate responsibility and authority regarding CDCR's operations, including the implementation of policies governing medical care. Upon information and belief, Defendant Macomber has ultimate authority for implementing CDCR's policies regarding medically necessary treatment and would be able to respond to an order granting injunctive relief. Accordingly, Macomber is a proper defendant in his official capacity. *See, e.g.*, *Rouser v. White*, 707 F. Supp. 2d 1055, 1066 (E.D. Cal. 2010) (proper defendant for injunctive relief in suit seeking implementation of CDCR policy is the CDCR Secretary in official capacity).

7.      Upon information and belief, Defendant Janel Espinoza is a resident of California. Upon information and belief, Espinoza was appointed as Warden of CCWF in July 2017 and served in that position until around September 2019. During her time as Warden of CCWF, Espinoza oversaw CCWF's policies governing inmates' medical care and custodial conditions. Upon information and belief, Warden Espinoza was aware of, but did not remediate, deficiencies

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

3

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

1   in the medical care provided to Ms. Norsworthy, and, during the time that Defendant Espinoza

2   was warden at CCWF, is responsible for the actions of CDCR towards Plaintiff as alleged herein

3   during that time.  Ms. Norsworthy's chief complaint against Warden Espinoza is her failure to

4   ensure that Ms. Norsworthy had adequate accommodations to dilate, even though, as discussed in

5   further detail below, Espinoza was made aware of Ms. Norsworthy's inability to dilate for

6   months.

7          8.     Upon information and belief, Defendant Michael Pallares is a resident of

8   California.  Pallares has served as Warden of CCWF since 2019 and prior to that, served as Chief

9   Deputy Warden to Warden Espinoza.  As Warden of CCWF, Pallares oversees CCWF's policies

10  governing inmates' medical care and custodial conditions.  During his time as both Warden and

11  Chief Deputy Warden, Pallares was aware of, but did not remediate, deficiencies in the medical

12  care provided to Ms. Norsworthy.  As with Defendant Espinoza, Ms. Norsworthy's chief

13  complaint against Pallares is his failure to ensure that Ms. Norsworthy had adequate

14  accommodations to dilate, even though, as discussed in further detail below, Pallares was made

15  aware of Ms. Norsworthy's inability to dilate for months.  For these reasons, and by virtue of his

16  role as Deputy Warden and then Warden of CCWF, during which time he was responsible for

17  Plaintiff's medical care, Defendant Pallares is responsible for the actions of CDCR and the other

18  Defendants towards Plaintiff as alleged herein.  Upon information and belief, Ms. Norsworthy

19  also brings suit against Pallares in his official capacity as Warden of CCWF, to the extent that

20  Pallares has the authority to implement an order from the Court granting injunctive relief.  *See*

21  *McQueen v. Brown*, 2018 U.S. Dist. LEXIS 66377, *10-11 (E.D. Cal. Apr. 18, 2018).

22         9.     Upon information and belief, Defendant Ikwinder Singh, M.D., is a resident of

23  California.  Upon information and belief, at all relevant times, Dr. Singh was the Chief Physician

24  and Surgeon at CCWF.  Dr. Singh's regular duties include evaluating inmates' medical care

25  issues, reviewing medical records, diagnosing inmate complaints, providing direct and supervised

26  medical care, and facilitating recommendations for medical treatments.  Upon information and

27  belief, Dr. Singh, along with Defendant Dr. Mitchell, is responsible for Ms. Norsworthy's

28  medical care.  Upon information and belief, Dr. Singh consulted with Ms. Norsworthy's primary

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 45347083.3

4

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

care physician Dr. Branch and other of Ms. Norsworthy's medical practitioners at CCWF regarding Ms. Norsworthy's medical care.  Upon information and belief, Dr. Singh also participated in decisions concerning Ms. Norsworthy's medical care, including with respect to Ms. Norsworthy's requests for surgery and decisions regarding CDCR 602 Patient/Inmate Health Care Appeals submitted by Ms. Norsworthy.  Consequently, Dr. Singh is responsible for the failure at CDCR to provide Ms. Norsworthy with medically necessary care, as alleged herein, in violation of the Eighth Amendment to the U.S. Constitution.

10.     Upon information and belief, Defendant Robert Mitchell, M.D., is a resident of California.  Upon information and belief, at all relevant times, Dr. Mitchell was the Chief Medical Executive of CCWF.  Upon information and belief, Dr. Mitchell participated in decisions concerning Ms. Norsworthy's medical care, including with respect to Ms. Norsworthy's requests for surgery and decisions regarding CDCR 602 Patient/Inmate Health Care Appeals submitted by Ms. Norsworthy.  Consequently, Dr. Mitchell is responsible for the failure at CDCR to provide Ms. Norsworthy with medically necessary care, as alleged herein, in violation of the Eighth Amendment to the U.S. Constitution.

11.     Upon information and belief, Defendant Roselle Branch, M.D., is a resident of California.  At all relevant times, Dr. Branch served as Ms. Norsworthy's primary care physician at CCWF.  As described in further detail below, Dr. Branch deprived Ms. Norsworthy of suitable care by not providing her with appropriate prescription pain medications and by restricting Ms. Norsworthy's access to post-surgical needs, including access to a wheelchair.  Consequently, Dr. Branch is responsible for the failure at CDCR to provide Ms. Norsworthy with medically necessary care, as alleged herein, in violation of the Eighth Amendment to the U.S. Constitution.

12.     Upon information and belief, Defendant Leslie Taylor, M.D., is a resident of California.  Upon information and belief, Dr. Taylor was an Assistant Deputy Medical Executive at CDCR and the chair of the Statewide Medical Authorization Review Team ("SMART").  In that capacity, on or about January 21, 2020, Dr. Taylor authored the memorandum that memorialized SMART's wrongful rejection of the decision of the Gender Affirming Surgery Review Committee ("GASRC") to provide Ms. Norsworthy with an additional revision surgery.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

5

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

1   Consequently Dr. Taylor is responsible for the failure at CDCR to provide Ms. Norsworthy with

2   medically necessary care, as alleged herein, in violation of the Eighth Amendment to the U.S.

3   Constitution.

4         13.     Upon information and belief, Captain Chenoa Dill, healthcare team captain at

5   CCWF, is a resident of California.  Upon information and belief, Ms. Norsworthy complained

6   about her inability to dilate to Healthcare Captain Dill more than 20 times. Captain Dill attended

7   almost daily meetings among then-Warden Espinoza, then-Chief Deputy Warden Pallares, the

8   associate wardens, and other staff captains.  Although Ms. Norsworthy asked Captain Dill to raise

9   these issues at these meetings, Defendants did not take any action that improved Ms.

10   Norsworthy's conditions.  Consequently, Dill is responsible for the failure at CDCR to provide

11   Ms. Norsworthy with medically necessary tools to dilate as prescribed by Ms. Norsworthy's

12   doctor, in violation of the Eighth Amendment to the U.S. Constitution.

13         14.     Upon information and belief, Sergeant Gibson is a resident of California.  He was

14   the healthcare team sergeant when Ms. Norsworthy originally returned to CCWF.  Gibson was

15   ordered by Defendant Dill to train Defendants Garcia-Torres, Shoals, and Goethe, who Gibson

16   oversaw Ms. Norsworthy directly, to provide privacy and adequate time to Ms. Norsworthy for

17   dilation to maintain vaginal depth.  That Ms. Norsworthy had neither privacy nor time to dilate

18   demonstrates that either Gibson did not actually train the officers reporting to him, or that his

19   training was insufficient to comply with Ms. Norsworthy's medical needs.  Consequently, Gibson

20   is responsible for the failure at CDCR to provide Ms. Norsworthy with adequate medical care in

21   violation of the Eighth Amendment to the U.S. Constitution.

22         15.     Upon information and belief, Officer Gerardo Garcia-Torres is a resident of

23   California.  Garcia-Torres, along with Defendants Shoals and Goethe, was a correctional officer

24   responsible for Ms. Norsworthy's cells when she first arrived at CCWF.  According to documents

25   produced in this litigation, Defendant Gibson was purportedly ordered to instruct Garcia-Torres,

26   Shoals and Goethe to provide Ms. Norsworthy with privacy for dilation by erecting a privacy

27   screen in her cell three times per day for her to dilate.  Garcia-Torres, Shoals and Goethe failed to

28   do so.  Consequently, Garcia-Torres is responsible for the failure at CDCR to provide Ms.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

6

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

Norsworthy with adequate medical care in violation of the Eighth Amendment to the U.S. Constitution.

16.     Upon information and belief, Officer Shoals is a resident of California. Shoals, along with Defendants Garcia-Torres and Goethe, was a correctional officer responsible for Ms. Norsworthy's cells when she first arrived at CCWF. According to documents produced in this litigation, Defendant Gibson was purportedly ordered to instruct Garcia-Torres, Shoals and Goethe to provide Ms. Norsworthy with privacy for dilation by erecting a privacy screen in her cell three times per day for her to dilate. Garcia-Torres, Shoals and Goethe failed to do so. Consequently, Shoals is responsible for the failure at CDCR to provide Ms. Norsworthy with adequate medical care in violation of the Eighth Amendment to the U.S. Constitution.

17.     Upon information and belief, Officer Goethe is a resident of California. Goethe, along with Defendants Shoals and Garcia-Torres, was a correctional officer responsible for Ms. Norsworthy's cells when she first arrived at CCWF. According to documents produced in this litigation, Defendant Gibson was purportedly ordered to instruct Garcia-Torres, Shoals and Goethe to provide Ms. Norsworthy with privacy for dilation by erecting a privacy screen in her cell three times per day for her to dilate. Garcia-Torres, Shoals and Goethe failed to do so. Consequently, Goethe is responsible for the failure at CDCR to provide Ms. Norsworthy with adequate medical care in violation of the Eighth Amendment to the U.S. Constitution.

## JURISDICTION AND VENUE

18.     This court has jurisdiction over the claims pursuant to 42 U.S.C. §§ 1331 and 1343(a)(3).

19.     Ms. Norsworthy filed her original complaint in the Northern District of California on the basis that a substantial part of the events giving rise to the claim occurred in the Northern District, including, specifically, the actions of Defendants to send Ms. Norsworthy's records to Burlingame, California, for Dr. Bowers to review Dr. Satterwhite's recommendations, and for Defendants to rely on the letter Dr. Bowers generated from her Burlingame office to justify the revocation of their prior approval of Ms. Norsworthy's surgery and decision to make Ms. Norsworthy obtain a second opinion for the previously approved surgery. Defendants filed a

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

7

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

Rule 12(b)(3) motion to dismiss or transfer the action.  On June 10, 2020, the court denied

Defendants' motion to dismiss but granted Defendant's request to transfer the action.  The case

was transferred to this Court on June 11, 2020.

## FACTUAL BACKGROUND

### I.    MS. NORSWORTHY'S HISTORY OF GENDER DYSPHORIA

20.    Ms. Norsworthy was born in 1964 in Detroit, Michigan.  While she was still an

infant, her parents divorced, and she was sent to live with her grandmother.  Approximately ten

years later, Ms. Norsworthy's mother retook custody of her and moved the family to the West

Coast, eventually settling in California.  Throughout childhood and adolescence, Ms. Norsworthy

never felt comfortable in the male gender assigned to her at birth.  She attempted to

overcompensate for feeling weak and less than a man as a result of her feminine characteristics

and gender confusion by acting out aggressively, owning guns and turning to alcohol.  At age

sixteen, Ms. Norsworthy dropped out of high school and moved to Hollywood, California,

eventually working as a police informant in her late teens and joining the military.

21.    On December 4, 1985, Ms. Norsworthy encountered a male acquaintance at a bar

in Fullerton, California.  Ms. Norsworthy and this acquaintance had a contentious history due to

Ms. Norsworthy's work as an informant for law enforcement.  While both were intoxicated, an

argument began in the bar and Ms. Norsworthy left the bar to go to her car.  The acquaintance

followed Ms. Norsworthy to the car, and Ms. Norsworthy retrieved a loaded rifle from the car.

She fired a warning shot but the acquaintance reached for the gun and a struggle ensued.  During

the struggle, the acquaintance was shot in the neck.  Ms. Norsworthy immediately attempted to

administer first aid and, upon police arriving, stated "I shot my friend."  The acquaintance was

taken to the hospital, but died a few days later as the result of a blood clot from the gunshot

wound.  Ms. Norsworthy was convicted of second degree murder and sentenced to seventeen

years to life.  She was placed under the custody of CDCR on or about April 15, 1987.

22.    Since at least adolescence, Ms. Norsworthy has experienced significant distress

and anxiety as a result of the discrepancy between the male sex assigned to her at birth and her

own female gender identity.  In the 1990s, her feelings and understandings surrounding her

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

8

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

1    gender began to consolidate and Ms. Norsworthy came to understand and accept that she is a

2    transsexual woman.

3            23.    In 1999, Ms. Norsworthy underwent several weeks of testing by a psychologist,

4    Dr. Carl Viesti, at a CDCR facility.  "The results of all test instruments were consistent with the

5    profile of a transsexual" and she was diagnosed with gender identity disorder – "the only DSM-

6    IV diagnosis available for this condition."  Subsequent to her initial diagnosis, the American

7    Psychiatric Association published a revised version of its Diagnostic and Statistical Manual of

8    Mental Disorders ("DSM-V") in 2013, which replaced the now-antiquated "gender identity

9    disorder" diagnosis with "gender dysphoria."  The DSM-V characterizes the diagnosis of gender

10   dysphoria as follows: "[i]ndividuals with gender dysphoria have a marked incongruence between

11   the gender they have been assigned to (usually at birth, referred to as natal gender) and their

12   experienced/expressed gender."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of

13   Mental Disorders 453 (5th ed. 2013) ("DSM-V").  In addition to this marked incongruence,

14   "[t]here must also be evidence of distress about this incongruence."  Id.  Hereinafter this

15   Complaint will generally refer to the condition as gender dysphoria even when referring to

16   diagnoses prior to 2013.

17           24.    Upon receiving this diagnosis in early 2000, it was determined that it was

18   medically necessary for Ms. Norsworthy to receive treatment for her condition that would help to

19   bring her body into greater conformity with her gender identity.  Toward this end, Ms.

20   Norsworthy was prescribed feminizing hormone therapy and injections of a progestin (Depo-

21   Prevera) to accomplish chemical castration.  She received these treatments beginning in January

22   2000.

23           25.    In 2012, Ms. Norsworthy's treating psychologist, Dr. Reese, expressly prescribed

24   SRS as medically necessary for Ms. Norsworthy, finding that "it is clear that clinical medical

25   necessity suggest and mandate a sex change medical operation before normal mental health can

26   be achieved for this female patient."  Dr. Reese repeatedly renewed his opinion with regard to the

27   necessity of SRS for the following six months, at which time she was removed from his care by

28   CDCR.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 45347083.3                                      9                SECOND AMENDED COMPLAINT
                                                                      Case No. 1:20-cv-00813-ADA-HKB

26.     By early 2014, Ms. Norsworthy had not received the medically necessary SRS, and so she filed a lawsuit against the CDCR doctors and officials who denied her request for the surgery. *See Norsworthy v. Beard*, No. 14-cv-695-JST (N.D. Cal. 2014). Ms. Norsworthy sought, and on April 2, 2015 was granted, a preliminary injunction requiring the defendants in that action to promptly provide her with SRS. *See Norsworthy*, 87 F. Supp. 3d at 1195.

27.     The defendants in *Norsworthy v. Beard* appealed the preliminary injunction order and, while that appeal was pending, CDCR surprisingly granted Ms. Norsworthy's parole and she was released August 12, 2015—one day before the hearing on the defendants' appeal. *See Norsworthy v. Beard*, 802 F.3d 1090, 1092-93 (9th Cir. 2015). Although Ms. Norsworthy's release mooted the appeal, the Ninth Circuit, suspicious of the timing of Ms. Norsworthy's parole, remanded the case to the Northern District for further proceedings to determine whether the defendants in that case had influenced Ms. Norsworthy's parole and release to moot the appeal. *Id*, at 1092 & n. 1. The parties thereafter entered into a settlement agreement in which CDCR agreed to give Ms. Norsworthy monetary compensation.

28.     Upon her release, Ms. Norsworthy experienced the ups and downs of adjusting to life after a long period of incarceration, including success both personally and professionally. Ms. Norwsorthy took pride in engaging with her community. While on parole, she attained ham radio and drone pilot's licenses and started an aerial photography business that specializes in drone photography. She also founded a nonprofit organization, Joan's House Shelter, with the goal of providing support and services to transgender women. She also married and secured a job at the University of California, San Francisco.

29.     After being released, in February 2017 Ms. Norsworthy successfully navigated Medi-Cal and received SRS from recognized surgeon Dr. Thomas Satterwhite. Unfortunately, she experienced complications and had to undergo three revision surgeries as a result. Following those surgeries, Dr. Satterwhite instructed Ms. Norsworthy dilate her vagina three times per day to ensure she maintained appropriate vaginal depth. She was also instructed to douche regularly because her vagina has no way to self-clean. Dr. Satterwhite told Ms. Norsworthy that she would have to take these measures for the rest of her life. Dr. Satterwhite also recommended a fourth

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

10

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

follow-up surgery to treat complications related to the original surgery, which surgery Ms. Norsworthy anticipated undergoing in the first half of 2019. According to medical records, Ms. Norsworthy maintained a vaginal depth of around six inches, comparable to the depth of many non-surgical vaginas, before incarceration.  None of these original revision surgeries had to do with the depth of her vagina.

30.     On October 17, 2018, Ms. Norsworthy entered a bar and restaurant near her home in Suisin City, CA to distribute business cards for her new aerial photography business.  Because Ms. Norsworthy had previously been physically attacked on multiple occasions and orally threatened for being a post-operative, transgender woman, Ms. Norsworthy had a habit of carrying pepper spray for protection.  While inside the establishment, multiple other patrons started verbally harassing Ms. Norsworthy and the pepper spray was inadvertently discharged when Ms. Norsworthy backed into a pool table.  To prevent the situation from escalating, Ms. Norsworthy exited, but several patrons followed and aggressively approached her.  Concerned for her safety, Ms. Norsworthy sprayed her pepper spray at the ground in front of her to create some distance between herself and the hostile group.  She then immediately returned home.

31.     Local police came to the establishment and spoke to one of the patrons, who alleged that Ms. Norsworthy sprayed him in the face with the pepper spray.  The patron told the police that he knew where Ms. Norsworthy lived and directed them to her home.  Despite Ms. Norsworthy denying that she sprayed the patron, she was arrested and held in Solano County Jail.

32.     At Ms. Norsworthy's preliminary hearing, the same patron testified that Ms. Norsworthy did *not* spray him in the face with pepper spray, but that the mist created by the spray irritated his eyes.  Nonetheless, Ms. Norsworthy was found have violated her parole because she entered an establishment that allegedly had a primary purpose of serving alcohol and was in possession of the pepper spray.  Ms. Norsworthy pleaded to a misdemeanor count in violation of Penal Code Section 22900.  Ms. Norsworthy served time in Solano County Jail until she was transferred to CDCR custody and sent to the Central California Women's Facility (CCWF) in Chowchilla, California on March 25, 2019.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

11

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

## II.   MS. NORSWORTHY RECEIVED INSUFFICIENT MEDICAL CARE IN THE MONTHS LEADING UP TO HER MOST RECENT SURGERY.

33.     Post-SRS vaginal dilation is an integral part of recovery and maintenance of Ms. Norsworthy's neovagina.  Without proper post-operative dilation, Ms. Norsworthy suffered from further vaginal stenosis, a condition in which the vaginal canal becomes narrower and shorter, causing intense pain.  Accordingly, Dr. Satterwhite previously directed Ms. Norsworthy to dilate three times per day.  Further, the only way to regain depth after vaginal stenosis is for the patient to get another surgical procedure.  As a result, dilation is typically done for life following SRS as a way to maintain proper vaginal depth and avoid the excruciating pain and loss of function associated with vaginal shortening.

34.     CCWF prison officials, including Defendants Espinoza, Pallares, Mitchell, Branch, Dill, Gibson, Garcia-Torres, Shoals, and Goethe, knew and were on notice about Ms. Norsworthy's need to dilate and douche regularly when she arrived at CCWF on March 25, 2019. Internal CCWF documents produced in this litigation reflect that prison staff knew that Ms. Norsowrthy arrived at CCWF with two dilators, and CDCR's own Transgender Care Guide recognizes that "ALL vaginoplasty procedures require ongoing dilation" and that "[i]f you have vaginoplasty surgery you will need to dilate . . . every day and possibly for life."  CDCR Care Guide: Transgender, Attachment 3, p. 2, *available at* https://cchcs.ca.gov/wp-content/uploads/sites/60/CG/Transgender-CG.pdf (*last visited* June 8, 2022).  CDCR and CCWF staff were also well-aware of Ms. Norsworthy and her medical needs from her prior incarceration and the preliminary injunction in *Norsworthy v. Beard*.  Finally, within three days of arriving at CCWF, Ms. Norsworthy filed a CDCR-0602 Health Care Grievance advising that she was not being provided "the time or place to dilate," and requesting "a place for me to dilate 3 times per day" because she was "post-operative transgender."  Defendants were on notice and knew well that Ms. Norsworthy would need to dilate to preserve the vaginoplasty she had received.

35.     But instead of placing Ms. Norsworthy in a single cell with privacy to dilate, Ms. Norsworthy was housed from March 25, 2019 through early June 2019 in the reception building with a roommate.  Ms. Norsworthy had no privacy, and consequently was only able to dilate

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

12

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

1  approximately once per day, during her daily showers.  Not only could Ms. Norsworthy not dilate

2  as frequently as needed, but having to dilate while standing was also unnecessarily painful and

3  likely not as effective.  Ms. Norsworthy estimates that she complained about her inability to dilate

4  to Healthcare Captain Dill approximately 20 times during this period. Captain Dill attended

5  almost daily meetings among then-Warden Espinoza, then-Chief Deputy Warden Pallares, the

6  associate wardens, and other staff captains.  Although Ms. Norsworthy asked Captain Dill to raise

7  these issues at these meetings, Defendants did not take any action that improved Ms.

8  Norsworthy's conditions.

9        36.     On April 16, 2019, Ms. Norsworthy spoke with Nurse Prisca Cholet Fontanilla.

10  As Nurse Fontanilla noted in Ms. Norsworthy's medical file, Ms. Norsworthy explained that her

11  surgeon told her she needed to use her dilator three times a day, but that Ms. Norsworthy was

12  only able to use it once per day (while her cellmate was sleeping) at that time due to lack of

13  privacy and prison regulations.  Nurse Fontanilla spoke to Captain Dill later that same day,

14  relaying the need for Ms. Norsworthy to have privacy three times per day to dilate.  Nurse

15  Fontanilla also recommended that Captain Dill work with Ms. Norsworthy on timing so that

16  custody could arrange for Ms. Norsworthy's cellmate to leave the room three times a day to allow

17  Ms. Norsworthy to dilate.  But, nothing actually changed.

18        37.     Eight days later, on April 24, 2019, Ms. Norsworthy again spoke to Nurse

19  Fontanilla, when they saw each other in the pill line.  Ms. Norsworthy quietly told Nurse

20  Fontanilla that her issue had not been resolved, and Nurse Fontanilla said she would follow-up.

21  Nurse Fontanilla then spoke to Captain Dill and Sergeant Gibson at approximately 10:00 am that

22  morning, regarding the need for Ms. Norsworthy to receive a privacy screen.  Per Nurse

23  Fontanilla's notes in Ms. Norsworthy's medical file, Captain Dill ordered Sergeant Gibson to

24  "resolve the issue today."  Sergeant Gibson reportedly went "immediately" to see Ms.

25  Norsworthy to "address the provision of privacy screen including timing."  Per Nurse Fontanilla's

26  notes, Sergeant Gibson reported back that the housing correctional officers responsible for Ms,

27  Norsworthy's cell (i.e., Defendants Garcia-Torres, Shoals, and Goethe) had been instructed to

28  provide a privacy screen to Ms. Norsworthy three times per day for 15 minutes duration.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

13

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

38.     These directives were also confirmed in notes in Ms. Norsworthy's medical file written by Nurse Angela Nevarez, who also spoke to Sergeant Gibson about the accommodation that day.  Per Nurse Nevarez's notes, Sergeant Gibson was also to document the specific times that the privacy screens were to be erected.

39.     Despite these purported orders and instructions, Defendants Garcia-Torres, Shoals, and Goethe did not erect the privacy screens as they were purportedly ordered to do, and nothing changed.

40.     While the mere use of privacy screens would have been an inadequate accommodation for Ms. Norsworthy anyway (they provide insufficient privacy for a person to dilate, which is an inherently intimate act, while others remain in the same room), the failure of Officers Garcia-Torres, Shoals, and Goethe even to provide Ms. Norsworthy the minimal privacy that they were purportedly instructed to give demonstrates that either Defendants Garcia-Torres, Shoals, and Goethe were not actually trained to provide her the screens, or that they disregarded the training.  Either conclusion demonstrates a willful indifference to Ms. Norsworthy's medical needs.

41.     Ms. Norsworthy also promptly requested the revision surgery she was supposed to get in the first half of 2019 to correct a complication from her previous SRS surgeries and to relieve intense, persistent pain she was experiencing.  At that time, Ms. Norsworthy notified CDCR and CCWF officials that the surgery had been already approved by her treating surgeon, Dr. Satterwhite.

42.     Ms. Norsworthy was also denied access to vaginal douches.  On April 3, 2019, *nine days* after arriving at CCWF, Dr. Richard Graves, a member of CCWF's medical staff, examined Ms. Norsworthy.  He noted, "Normally the patient would engage in a vaginal douche twice weekly but has not had access to this supply.  This is a routine postoperative treatment." He also diagnosed her with "bacterial vaginosis" and prescribed vaginal douches and antibiotics.

43.     Despite Dr. Graves' prescription, Ms. Norsworthy was not provided vaginal douches until two days later, April 5, 2019.  Ms. Norsworthy thereafter struggled to have consistent access to the vaginal douches.  After receiving some on April 5, she did not receive any

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

14

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

1   more douches until May 5, 2019, a month later.  Her inability to regularly clean herself, due to

2   Defendants' failure to provide douches, led to recurring vaginosis diagnoses.  After the initial

3   diagnosis on April 3, she was again diagnosed with vaginosis on June 10, 2019, and August 29,

4   2019.

5        44.     On April 5, 2019, a request for further revision surgery was submitted by CCWF's

6   chief physician and surgeon.  On April 9 and 16, 2019, Ms. Norsworthy met with Dr. Glass,

7   CDCR's psychologist who specializes in treatment of transgender inmates.  Dr. Glass also

8   recognized Ms. Norsworthy's need for additional revision surgery.

9        45.     Despite two CDCR doctors recommending surgery, in addition to the doctor who

10  previously operated on Ms. Norsworthy, Ms. Norsworthy's request for a consultation with an

11  outside specialist was not approved by CDCR until May 10, 2019.  On May 13, 2019, counsel for

12  Defendants asserted in a joint case management statement that the request for revision surgery

13  was still "under review at CDCR headquarters."

14       46.     In addition, in early April 2019, Ms. Norsworthy submitted two grievances

15  (CDCR 602 Patient/Inmate Health Care Appeals) to CDCR.  One request sought the revision

16  surgery that Dr. Satterwhite had already recommended, a decision with which the CCWF chief

17  physician and CDCR psychologist agreed.  The other request sought appropriate accommodations

18  to dilate her vagina, which was prescribed by her doctor and necessary to ensure that wounds

19  from her SRS and subsequent revisions healed properly.

20       47.     On May 3, 2019, prison officials and medical staff received a note from Dr.

21  Satterwhite (originally dated November 7, 2018) that reiterated the importance of providing Ms.

22  Norsworthy privacy to dilate three times per day:

23              Michelle-Lael Norsworthy has been under my care for several
24              years.  She has undergone gender confirmation surgery
                (vaginoplasty), and **as a crucial part of her post-operative care,**
25              **patient needs to be able to dilate the vagina.  Without self-**
                **dilation, the vagina will close in on itself completely, resulting in**
26              **a disastrous result.**  To maintain the size of the vaginal canal,
                Michelle will require the use of her dilators (they come in a set of
27              long plastic rods), lubrication, **and privacy** 3 times a day for 45
                minutes to allow herself to self-dilate.
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

15

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

**Once again, it is medically necessary that she be allowed to dilate, otherwise, she can have very serious consequences.**

(emphasis added).  Yet, still nothing changed.

48.     On May 31, 2019, Dr. Singh interviewed Ms. Norsworthy about her medical complaints, including the fact that she still could not dilate.  Ms. Norsworthy understood that Dr. Singh was interviewing her in connection with evaluating the CDCR 602 Appeal she had filed the month before.  During that meeting, Dr. Singh asked Ms. Norsworthy a series of questions relating to the condition of her vagina, pain level, and surgical history.  Based on that conversation, Dr. Singh was put on notice (if he was not already) that Ms. Norsworthy was in severe pain, unable to sufficiently dilate, and dissatisfied with her medical care.

49.     Defendants failed to act swiftly in response to Ms. Norsworthy's dilation-related 602 to transfer Ms. Norsworthy to appropriate housing.  Instead, in early June 2019 Defendants made the situation worse by moving Ms. Norsworthy to an *eight-person* unit in CCWF Building 509.  Defendants purported to accommodate Ms. Norsworthy by providing her with a room in the central kitchen at 7 a.m. and space in the primary health clinic to dilate at lunchtime.  But practically speaking, these accommodations were inadequate.  As Ms. Norsworthy explained to another nurse, Hoa Le, on June 25, 2019, this "accommodation" again failed because she was subjected to frequent delays and interruptions in those locations, and because she was harassed by other inmates when she had to display her dilators at every entrance and exit from her work changes.

50.     At the central kitchen in the morning, there was generally only one officer on site, and that officer was responsible for handing out medicine to the many women who have prescriptions.  For Ms. Norsworthy to dilate, that officer had to leave the medicine line, accompany Ms. Norsworthy to the dilation room, wait outside for her to dilate (which is supposed to take 45 minutes), and then return to the medicine line.  Meanwhile, the dozens of women or more who needed to pick up medicine had to wait for the officer to return.  It was Ms. Norsworthy's experience that the officer running the line demanded that Ms. Norsworthy wait until the medicine has been handed out before allowing Ms. Norsworthy to dilate, but Ms.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

16

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

1   Norsworthy was unable to wait because she had to be at her job at 7:30 a.m.  As a result, Ms.

2   Norsworthy frequently had no practical ability to dilate in the morning.

3   　　　51.　　Defendants' offer for Ms. Norsworthy to use the primary health clinic was no

4   better.  While Ms. Norsworthy had access to a room at the clinic to dilate at lunchtime, she did

5   not have priority to that room, because it was located in the emergency room, and Ms.

6   Norsworthy therefore had to wait for all other patients to be seen.  On some days, this took hours.

7   Other days, she was not able to use the room at all.

8   　　　52.　　Throughout June 2019 and early July 2019, in which Ms. Norsworthy lived in the

9   eight-person cell, she estimates that she was only able to dilate at most once per day for

10  approximately 10 minutes, during her brief showers.  Ms. Norsworthy estimated that she

11  complained to Captain Dill and other custody staff *dozens of times* about not being able to dilate

12  during this time.

13  　　　53.　　Defendants nevertheless continued not to provide Ms. Norsworthy adequate

14  accommodations for dilation and did not even schedule Ms. Norsworthy for an appointment with

15  Dr. Satterwhite until June 10, 2019.   During that appointment, Dr. Satterwhite wrote in his notes

16  that Ms. Norsworthy had not been able to dilate for *1.5 months* and only had a vaginal canal depth

17  of 4 inches.  He further wrote that absent regular dilation, Ms. Norsworthy would require a

18  deepening procedure using her colon.  As discussed below, the lack of sufficient dilation

19  accommodations would continue and later lead to a significant, possibly irreparable loss of depth.

20  Dr. Satterwhite also diagnosed Ms. Norsworthy with a reoccurrence of vaginosis at that

21  appointment.

22  　　　54.　　In addition, after Ms. Norsworthy returned to CDCR custody, Defendants did not

23  provide her with the medications that were prescribed by her doctors.  First, because of the pain

24  caused by her last SRS revision, Dr. Satterwhite had prescribed Ms. Norsworthy with gabapentin

25  to address pain and blood pressure issues.  Upon her arrival at CDCR, however, Dr. Branch

26  declined to provide Ms. Norsworthy with gabapentin because it was not on the CDCR formulary

27  for pain.  Instead, Dr. Branch prescribed tegretol, a seizure medication that was completely

28  unrelated to Ms. Norsworthy's needs.  Ms. Norsworthy did not need medication for seizures, and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO
DB2/ 45347083.3
17
SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

the tegretol did not alleviate her pain.  After that failed attempt, CDCR gave Ms. Norsworthy

ibuprofen, an over the counter drug, for her pain symptoms.  This was a far cry from the

prescription pain medication (gabapentin) that she needed.  To achieve a similar affect, Ms.

Norsworthy resorted to taking as much as one *bottle* of ibuprofen every two days.

55.     Defendants also did not take sufficient steps to ensure that Ms. Norsworthy had

enough douches to clean her vagina, which was required by Dr. Satterwhite and her CDCR

gynecologist Dr. Graves.  During Ms. Norsworthy's first meeting with Dr. Graves in early April

2019 while in CDCR custody, Dr. Graves prescribed a one-year supply of douches.  Ms.

Norsworthy received the douches for the first couple of weeks in custody, but CDCR abruptly

stopped providing them in approximately mid-May 2019.  Ms. Norsworthy confirmed with Dr.

Graves that the prescription had been sent to the pharmacy and the pharmacy was sending the

douches, but Ms. Norsworthy did not receive them for more than a month.  As a result, Ms.

Norsworthy has suffered from recurring bacterial vaginosis.  She received one round of

antibiotics to treat the infection in early April, but because she could not properly clean her SRS

wound, the infection returned by early June 2019.

### III.   DEFENDANTS CONTINUED TO BE DELIBERATELY INDIFFERENT TO MS. NORSWORTHY'S MEDICAL NEEDS FOLLOWING HER SURGERY.

56.     Before reincarceration, Ms. Norsworthy was in the process of scheduling a fourth

revision surgery with Dr. Satterwhite (which, per Dr. Satterwhite's directions, could not be

scheduled earlier, because Ms. Norsworthy was still recovering from her third revision surgery).

The purpose of the fourth revision surgery was to create a clitoral hood, without which, Ms.

Norsworthy's clitoris rubbed against her clothes and caused immense pain.  After her

reincarceration, Ms. Norsworthy requested the revision surgery almost immediately.  After

engaging in a lengthy review and approval process and the involvement of legal counsel and the

court (Northern District of California, Judge Tigar), it was arranged for Dr. Satterwhite to

perform Ms. Norsworthy's revision surgery on August 13, 2019.

57.     After the surgery, Defendants failed to provide Ms. Norsworthy with adequate

post-operative care as directed by Dr. Satterwhite and CDCR's own physicians.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

18

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

58.     Dr. Satterwhite directed that Ms. Norsworthy be allowed to shower as frequently as needed following her surgery, in order to keep the surgical site clean.  But during the first several days after Ms. Norsworthy's return to CCWF on August 16, CCWF custody staff only permitted her to shower at most once per day, and none of the Defendants did anything to remedy the situation.

59.     In addition, per Dr. Satterwhite's orders, Ms. Norsworthy was to douche daily for the first two weeks following surgery, and twice per week thereafter.  However, Defendants only provided Ms. Norsworthy with two douches *total* until after a follow-up appointment with Dr. Graves on August 29, when Dr. Graves ordered that sufficient douches be provided.

60.     Defendants, particularly Dr. Branch, also failed to provide Ms. Norsworthy with all prescribed pain medications as directed by her surgeon.  Dr. Branch did not consistently provide Ms. Norsworthy with the correct dosage of gabapentin or opioids recommended by Dr. Satterwhite.  Defendants' failure to ensure that Ms. Norsworthy received sufficient pain medication affected Ms. Norsworthy so severely that in the weeks following the surgery, she had difficulty controlling her bladder.

61.     Following the surgery, Defendants did, however, arrange for Ms. Norsworthy to be housed in a single-assignment cell without roommates (proving that such an accommodation had always been feasible), allowing her to begin dilating regularly.  However, the damage had already been done.

62.     During Ms. Norsworthy's follow-up appointment with Dr. Satterwhite on September 16, 2019, Dr. Satterwhite observed that, "Depth of vagina is quite limited despite dilation efforts.  ***Once again***, recommend eval and treatment with Dr. Maurice Garcia in Cedars Sinai for colovaginoplasty to reconstitute depth." (emphasis added). In his notes, Dr. Satterwhite noted that Ms. Norsworthy's vaginal canal depth was only 5 centimeters, or approximately 2 inches—about *half the depth Ms. Norsworthy had only three months earlier*.  As a result of her lost vaginal depth, Ms. Norsworthy can now no longer engage in meaningful sexual relations with her husband, who was visiting Ms. Norsworthy regularly until the coronavirus outbreak prevented visitations.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3                                    19                    SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

63.     Defendants did not schedule any appointments for Ms. Norsworthy with Dr. Branch until on or about September 16, 2019.  During that appointment, in which Dr. Branch saw Ms. Norsworthy via telemedicine only and thus did not physically examine Ms. Norsworthy's vaginal area, Dr. Branch declined to provide Ms. Norsworthy with pain medications prescribed by Dr. Satterwhite because she did not believe that Ms. Norsworthy was genuinely in pain.

64.     Dr. Branch also refused to extend Ms. Norsworthy's rest period and wheelchair use by another 30 days.  Fortunately, Ms. Norsworthy had an appointment with Dr. Graves on September 18, 2019, who rightfully extended Ms. Norsworthy's rest period and wheelchair restriction, even though those issues were within Dr. Branch's purview.

65.     Around September 26, 2019, Dr. Ikwinder Singh, the Chief Physician and Surgeon at CCWF, learned that Ms. Norsworthy had requested the vaginal lengthening surgery (i.e., the colovaginoplasty) but that Dr. Graves did not believe the surgery to be clinically indicated and so had not referred the request for approval.  Dr. Singh corrected Dr. Graves, noting, "Gender Affirming surgery requests are considered medically indicated for gender dysphoria patients as long as MH [mental health] validates that.  Provider referral is initial part of this process."  A few minutes later, she sent an email noting, "I spoke to Dr. Graves" who indicated that he would follow up with Ms. Norsworthy regarding the surgery.

66.     When an inmate requests a surgical procedure, a committee called the Statewide Medical Authorization Review Team ("SMART") reviews the request and provides final approval or denial.  The request is first considered by a subcommittee called the Gender Affirming Surgery Review Committee ("GASRC").  SMART may only decline to follow the GASRC's recommendations for one of several listed criteria.  On December 17, 2019, the GASRC met and recommend approving Ms. Norsworthy's request for a vaginal lengthening procedure.  On January 21, 2020, the SMART reviewed Ms. Norsworthy's request and declined to follow the GASRC's recommendation.  This decision was memorialized in a memorandum authored by Dr. Leslie Taylor.  Dr. Taylor and SMART initially failed to provide a basis for the decision.  However, when it was noted that SMART was violating its own procedures, SMART amended its report to offer a new rationale.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

20

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

67.     Ms. Norsworthy was told nothing about SMART's decisions or process.  Instead, she was told that CDCR had approved her for consultation for the surgery on December 17, 2019. A few weeks later, Dr. Satterwhite revised his initial recommendation, and indicated on January 13, 2020 that the lengthening surgery could be either a "colon-vaginoplasty or peritoneum-vaginoplasty."  Throughout the winter, and until March 12, 2020, CDCR, through the California State Attorney General's office, represented that it was searching for a surgeon to perform the surgery, even advising Ms. Norsworthy that the surgery would take place in November 2020. Although that news was disappointing at the time—it should not take nearly a year to have this surgery scheduled to repair the damage done by Defendants; own improper actions—at least Ms. Norsworthy understood that relief would eventually be coming.

68.     That all changed on March 12, 2020, when, another doctor working at CCWF, Chris Glass, Psy.D., advised Ms. Norsworthy that her paperwork had changed.  Whereas the papers originally showed that the follow-on surgery had been "Approved" since at least December 2019, Dr. Glass advised her that the word "Approved" was now crossed-out and replaced, in handwriting, with the word "denied."  Dr. Glass further informed Ms. Norsworthy that she was being referred another doctor to get a second opinion for the surgery.  Dr. Glass said that this was shocking and indicated he had never seen anything like it.

69.     The only explanation came from the Attorney General's office, which offered an entirely different justification.  Per the AG's office, Ms. Norsworthy's surgery was now a "technical denial" because Dr. Satterwhite had "changed" his initial recommendation for a colovaginoplasty by indicating that Ms. Norsworthy could also receive peritoneum-vaginoplasty as an alternative.  The AG's office also said the surgery was denied because of a February 25, 2020 recommendation that Defendants had "received" from another doctor, Marci Bowers, M.D. CDCR apparently approached Dr. Bowers in Fall 2019.  After Dr. Bowers responded that she did not perform the colonovaginoplasty that Dr. Satterwhite recommended, CDCR asked Dr. Bowers to review Ms. Norsworthy's file.  They then sent Ms. Norsworthy's medical file to Dr. Bowers, but without any documentation explaining why Ms. Norsworthy had lost vaginal depth or why the current surgery was needed.  Misapprehending the reason for the surgery and incorrectly

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

21

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

believing its purpose was to correct problems caused by Dr. Satterwhite's prior surgeries, Dr. Bowers recommended, "Prior to engaging in a qualitatively similar 3rd or 4th surgical procedure, I would recommend a second opinion with a new surgeon, if possible."

70.     Dr. Bowers admittedly did not see Ms. Norsworthy or even review any pictures of the results of her previous surgery in issuing the letter.  Instead, as Dr. Bowers admitted, she conducted her review "based upon chart review, operative records, reports and office examinations 2015-2019.  I have not seen this patient nor have I seen pictures of any outcomes."

71.     Dr. Bowers has since confirmed that she had not been told the real reason lengthening surgery was needed for Ms. Norsworthy, and that she had understood that Ms. Norsworthy was seeing a cosmetic surgery, not a lengthening procedure.  In a July 2020 teleconference, Dr. Satterwhite clarified to Dr. Bowers that the surgery being sought at that time by Ms. Norsworthy was not a cosmetic surgery, but rather one to restore vaginal depth that had been lost.  With this clarification, Dr. Bowers added an addendum to her report on July 17, 2020 to state the following:

> Upon receiving additional clinical information, it is apparent that
> the patient is satisfied with the cosmetic portions of her previous
> procedures with Dr. Satterwhite.  However, due to issues with
> confinement and lack of access to dilation capability, the patient has
> lost depth and currently has a non-functional vagina.  This should
> be addressed, in my opinion, with a surgical procedure such as
> Colovaginoplasty or peritoneal grafting.  It is the issue of vaginal
> depth that is essential to this patient's outcome and future well-
> being.

72.     Of course, Defendants' decision to deny Ms. Norsworthy's lengthening surgery had nothing to do with the change in Dr. Satterwhite's recommendations or the letter Dr. Bowers sent; the decision was made by the SMART Committee without medical justification and on account of Ms. Norsworthy's status as a post-operative, transgender woman and Defendants' intentional indifference to Ms. Norsworthy's medical needs.

73.     Based on internal documents produced in this litigation, it appears that while the California State AG's office was telling Ms. Norsworthy's representatives one thing (i.e., blaming the "technical denial" on Dr. Satterwhite and Dr. Bowers), the AG's office was secretly and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

22

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

frantically trying to get the SMART Committee to revisit its denial.  However, once again, it was too late.  By the time the AG's office was trying to fix the SMART Committee's improper denial and schedule a consultation between Ms. Norsworthy and a physician, the coronavirus pandemic was starting to hit in force.  Thus, Ms. Norsworthy was told in March 2020 that she would need to see yet another doctor, for an invasive medical examination in the middle of the emerging coronavirus outbreak, for yet another medical opinion.  Requiring Ms. Norsworthy to participate in such a medical examination at that point was particularly unreasonable and dangerous in light of the coronavirus outbreak, which at that time had no treatments, no vaccines, and little treatment information, and to which prisoners like Ms. Norsworthy were particularly susceptible due to crowded living conditions, lack of protections, and her own underlying medical conditions that made her more vulnerable to the epidemic.  Indeed, the California Attorney General's office indicated on March 16, 2020, that it agreed with Ms. Norsworthy's decision not to go forward with the medical exam at this time in light of the coronavirus outbreak, and indicated that the visit to the new doctor would not be rescheduled until after the coronavirus situation is under control.  And even then, the California Attorney General's office indicated that, even if the new doctor also recommended the surgery that Ms. Norsworthy requires, she would then need to go through the approval process again, which would take another approximately 90 days to lead to a new approval.

74.     On November 19, 2020, Ms. Norsworthy had another appointment with Dr. Graves, where her depth was again measured at 5 centimeters (approximately 2 inches, and consistent with Dr. Satterwhite's prior measurement).  This was merely another confirmation that Defendants' deliberate indifference towards Ms. Norsworthy's medical needs had by that point destroyed her body.

75.     In sum, Defendants have failed to provide Ms. Norsworthy with medically necessary medicine, hygiene products, dilation accommodations, and surgery to restore her almost complete loss of depth.  This deliberate indifference violated Ms. Norsworthy's constitutional rights and caused severe, possibly irreparable harm.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

23

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

76.     Throughout her time in CDCR custody, Ms. Norsworthy raised concerns about her medical care with CDCR/CCWF management, including CCWF Wardens Espinoza and Pallares; Associate Director Amy Miller, CDCR physicians Dr. Singh (Chief Medical Officer), Dr. Neumann (Chief of Psychiatry), Dr. Mitchell (Chief Medical Executive), Dr. Sammons (psychologist), Dr. Buzzini (psychologist), Dr. Glass (psychologist), Dr. Graves (gynecologist), Dr. Branch (primary care physician), Mr. Mallory, and staff member Captain Chenoa Dill (healthcare team captain), but to little avail.

## **COUNT ONE**

VIOLATION OF 42 U.S.C. § 1983 BASED UPON
DEPRIVATION OF EIGHTH AMENDMENT RIGHTS RESULTING
FROM FAILURE TO PROVIDE MEDICALLY NECESSARY CARE
(*Against Defendants Macomber, Espinoza, Pallares, Singh, Mitchell, Branch, Taylor, Dill, Gibson, Garcia-Torres, Shoals, and Goethe*)

77.     Ms. Norsworthy repeats and realleges the allegations of Paragraphs 1 through 85 as if fully set forth herein.

78.     In 2017, Ms. Norsworthy underwent sexual reassignment surgery to treat her gender dysphoria.  Since then, she has received four additional revision surgeries to treat complications from the original surgery.

79.     Upon being returned to CDCR custody on March 25, 2019, Ms. Norsworthy had met with numerous CDCR doctors, as well as an outside doctor, who all recommended that Ms. Norsworthy promptly receive SRS revision.

80.     Ms. Norsworthy's outside surgeon Dr. Satterwhite prescribed strong pain medication, antibiotics, and regular dilation for Ms. Norsworthy.  CDCR doctors, specifically Dr. Graves and Dr. Glass, agreed with Dr. Satterwhite's directives.

81.     Contrary to her doctors' orders, Defendants did not provide Ms. Norsworthy with gabapentin, or an equivalent pain reliever, from the time she entered CDCR custody in March 2019 until months afterwards.  Ms. Norsworthy had notified CDCR staff that she was in pain and that it hurt to even walk around the yard because the prison clothes rubbed against her genitals. In return, she was merely provided with over-the-counter ibuprofen and a drug to treat seizures.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

24

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

82.     Additionally, Defendants failed to ensure that Ms. Norsworthy received her allotment of douches prescribed by both her outside surgeon and CDCR's gynecologist.  The pharmacy was notified of this request, but Ms. Norsworthy did not receive the douches for a period of roughly two months.  As a result, she was not able to adequately clean her genitals and her surgery wound, and she had a recurring infection.

83.     Finally, based upon Ms. Norsworthy's grievance and her doctor's orders, Defendants were aware of Ms. Norsworthy's need to dilate regularly.  However, in spite of that knowledge, Defendants did not provide Ms. Norsworthy a proper, adequate, private place to dilate.  Dilation is a medical necessity after SRS and SRS revision surgeries.

84.     Each Defendant was and remains deliberately indifferent to Ms. Norsworthy's medical need for pain medication, antibiotics, and hygiene products, as well as Ms. Norsworthy's medical need to regularly dilate.  Each Defendant knew of Ms. Norsworthy's serious medical needs, disregarded Ms. Norsworthy's needs, and failed to take any reasonable measures to address Ms. Norsworthy's continued pain and suffering resulting from her medical needs.  The deliberate indifference of each Defendant is further demonstrated by Defendants' unreasonable actions contrary to the recommendations of multiple health care professionals with sufficient training and/or experience in the treatment of gender dysphoria, and by Defendants' disregard for providing pain management medications, antibiotics, and hygiene products, which were prescribed to Ms. Norsworthy by her doctors.

85.     Defendants' denial of sufficient accommodations to dilate, denial of pain medication despite having a prescription for that medicine, denial of hygiene products, including douches, to clean her surgery wound, and failure to treat the resulting vaginosis infection unreasonably and recklessly caused irreparable harm to Ms. Norsworthy, including severe anxiety and physical pain which Ms. Norsworthy experiences on a daily basis.

86.     Defendants, by acting deliberately indifferent to Ms. Norsworthy's need for her pain medication, antibiotics, and hygiene products to manage complications from her prior surgeries related to SRS, deprived Ms. Norsworthy of her right to medically necessary treatment guaranteed by the Eighth Amendment of the U.S. Constitution.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

25

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB

**PRAYER FOR RELIEF**

87.     Enter injunctive relief enjoining Defendants to provide Ms. Norsworthy with medically necessary surgery to try to restore her lost vaginal depth, adequate medical care, accommodations to dilate, accommodations to recover from surgery; and any other medical care, accommodations and/or medication which is, has been or will be prescribed by a doctor or other healthcare professional;

88.     Award punitive and compensatory damages for the costs of maintaining potential future medical complications that are likely to arise due to Defendants indifference to Ms. Norsworthy's severe medical conditions, failure to treat vaginosis, and failure to provide medical care and prescribed medication to manage Ms. Norsworthy's severe pain pursuant to 42 U.S.C. § 1983;

89.     Award reasonable attorneys' fees and costs to Ms. Norsworthy pursuant to 42 U.S.C. § 1988; and

90.     Other relief the Court finds appropriate in the interests of justice.

Dated:  April 27, 2023                          MORGAN, LEWIS & BOCKIUS LLP


                                                By */s/ Kent M. Roger*
                                                    Kent M. Roger

                                                Attorneys for Plaintiff
                                                MICHELLE-LAEL B. NORSWORTHY

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/ 45347083.3

26

SECOND AMENDED COMPLAINT
Case No. 1:20-cv-00813-ADA-HKB