1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   MICHELLE-LAEL B. NORSWORTHY,            Case No. 1:20-CV-00813-KES-HBK (PC)

12              Plaintiff,                   FINDINGS AND RECOMMENDATIONS TO
                                             DENY PLAINTIFF'S MOTION FOR
13        v.                                 PARTIAL SUMMARY JUDGMENT AND
                                             GRANT DEFENDANTS' MOTION FOR
14   JANELLE ESPINOZA, *et al.*,             SUMMARY JUDGMENT[1]

15              Defendants.                  FOURTEEN-DAY OBJECTION PERIOD

16                                           (Doc. Nos.  108, 110)

17

18        Pending before the Court are Plaintiff's Motion for Partial Summary Judgment and

19   Defendants' Motion for Summary Judgment.  (Doc. Nos. 108, 110).  On May 9, 2025, the Court

20   held a hearing on the respective motions.  (Doc. No. 127).  At the outset, the Court acknowledges

21   the sensitive nature of the claims and recognizes that the Eighth Amendment "embodies broad

22   and idealistic concepts of dignity, civilized standards, humanity, and decency," along with the

23   government's responsibility to ensure adequate medical care for those in its custody, including

24   those often marginalized by society.  *See Estelle v. Gamble*, 429 U.S. 97, 102–103 (1976)

25   (internal quotations and citation omitted).  The Court is nonetheless bound by precedent, the

26   standard of the law, and here, the demanding deliberate indifference standard, which requires

27   _____

28   [1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2023). (*See* Doc. No. 112).

1  Plaintiff to establish that "the course of treatment the official chose was medically unacceptable

2  under the circumstances and that the official chose this course in conscious disregard of an

3  excessive risk to [her] health." *See Edmo v. Corizon, Inc.*, 935 F.3d 757, 786 (9th Cir. 2019) (per

4  curiam) (cleaned up). For the reasons discussed *infra*, the undersigned recommends that the

5  District Court deny Plaintiff's Motion for Partial Summary Judgment and grant Defendants'

6  Motion for Summary Judgment.

## I. BACKGROUND

### A. Procedural History

9  Plaintiff Michelle-Lael B. Norsworthy is a former state prisoner represented by private

10  counsel in this civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiff proceeds on her

11  Second Amended Complaint. (Doc. No. 75, "SAC"). On August 30, 2024, Plaintiff timely filed

12  a Motion for Partial Summary Judgment, requesting that the Court find that, while incarcerated at

13  Central California Women's Facility ("CCWF"), she had the following serious medical needs

14  under 42 U.S.C. § 1983: (1) to dilate regularly and with privacy; and (2) to receive a vaginal

15  deepening procedure. (Doc. No. 110, "Plaintiff's MPSJ"). Defendants filed an Opposition (Doc.

16  No. 113), and Plaintiff filed a Reply (Doc. No. 118). On the same day, Defendants filed a merits-

17  based Motion for Summary Judgment on all claims raised in the SAC. (Doc. No. 108,

18  "Defendants' MSJ"). Plaintiff filed an Opposition (Doc. No. 114), and Defendants filed a Reply

19  (Doc. No. 117). On May 9, 2025, the Court held a hearing on the respective motions. (Doc. No.

20  127).

### B. Plaintiff's MPSJ

22  Supporting her MPSJ, Plaintiff submits: (1) a memorandum of points and authorities (Doc

23  No. 110-1); (2) a Separate Statement of Undisputed Material Facts (Doc. No. 110-2); (3)

24  Plaintiff's sworn declaration, accompanied by Exhibits A through C (Doc. No. 110-3); and (4)

25  Plaintiff's Counsel Philip J. Wiese's sworn declaration, accompanied by Exhibits A through X

26  (Doc. No. 110-4).

27  Defendants' Opposition includes: (1) a response to Plaintiff's Separate Statement of

28  Undisputed Material Facts (Doc. No. 113 at 1–28); (2) memorandum of points and authorities

1    (Doc. No. 113-1); (3) Deputy Attorney General ("DAG") Paul Kozina's sworn declaration (113-

2    2); and (4) Exhibits A through L to the Kozina Declaration. (Doc. No. 113-3).  Plaintiff's Reply

3    includes (1) Plaintiff's Counsel Anna Z. Saber's sworn declaration, accompanied by Exhibits A

4    and B.  (Doc. No. 118-1).

5           **C.  Defendants' MSJ**

6           Supporting their MSJ, Defendants submit: (1) a memorandum of points and authorities

7    (Doc. No. 108-1); (2) a Separate Statement of Undisputed Facts (Doc No. 108-2); (3) the sworn

8    declaration of DAG Kozina (Doc. No. 108-3); (4) Exhibits A through AS to the Kozina

9    Declaration (Doc. No. 108-4); (5) and Exhibits AT through CM to the Kozina Declaration (Doc.

10   No. 108-5).

11          Plaintiff's Opposition includes (1) a response to Defendants' Separate Statement of

12   Undisputed Facts (Doc. No. 114-1), (2) Plaintiff's sworn supplemental declaration, accompanied

13   by Exhibit D (Doc. No. 114-2); (3) and Plaintiff's Counsel Christopher J. Banks' sworn

14   declaration, accompanied by Exhibits A through OO.  (Doc. No. 114-3).  Defendants Reply

15   includes (1) the sworn declaration of DAG John Faulconer, accompanied by Exhibit A (Doc. No.

16   117-1); and (2) a reply to Plaintiff's response to Defendants' Separate Statement of Undisputed

17   Facts (Doc. No. 117-2).

18                                **II.  APPLICABLE LAW**

19          **A.  Summary Judgment Standard**

20          The "purpose of summary judgment is to pierce the pleadings and to assess the proof in

21   order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith*

22   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate

23   when there is "no genuine dispute as to any material fact and the movant is entitled to judgment

24   as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment should be entered "after adequate

25   time for discovery and upon motion, against a party who fails to make a showing sufficient to

26   establish the existence of an element essential to that party's case, and on which that party will

27   bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The

28   moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of

1    material fact.  *Id.* at 323.  An issue of material fact is genuine only if there is sufficient evidence

2    for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might

3    affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477

4    U.S. 242, 248 (1986).

5           If the moving party meets its initial burden, the burden then shifts to the opposing party

6    to present specific facts that show there to be a genuine issue of a material fact.  *See* Fed R. Civ.

7    P. 56(e); *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that

8    there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 587.  The

9    party is required to tender evidence of specific facts in the form of affidavits, and/or admissible

10   discovery material, in support of its contention that a factual dispute exists.  Fed. R. Civ. P.

11   56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party is not required to establish a

12   material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be

13   shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

14   *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.

15   1987).  However, "failure of proof concerning an essential element of the nonmoving party's

16   case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.

17          The court must apply standards consistent with Rule 56 to determine whether the

18   moving party demonstrated there is no genuine issue of material fact and showed judgment to be

19   appropriate as a matter of law.  *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

20   "[A] court ruling on a motion for summary judgment may not engage in credibility

21   determinations or the weighing of evidence."  *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir.

22   2017) (citation omitted).  The evidence must be viewed "in the light most favorable to the

23   nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving

24   party.  *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 772 (9th Cir. 2002).  A mere scintilla

25   of evidence is not sufficient to establish a genuine dispute to defeat an otherwise properly

26   supported summary judgment motion.  *Anderson.*, 477 U.S. at 252.  However, where "opposing

27   parties tell two different stories, one of which is blatantly contradicted by the record" courts

28   "should not adopt that version of the facts for purposes of ruling on a motion for summary

4

1    judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

2         "[W]hen parties submit cross-motions for summary judgment, each motion must be

3    considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*,

4    249 F.3d 1132, 1136 (9th Cir. 2001) (cleaned up).  While performing its obligation to examine

5    each cross-motion independently, "the court must review the evidence submitted in support of

6    each cross-motion." *Id*.  When reviewing evidence properly submitted with each cross-motion,

7    the court nevertheless remains obligated to determine whether a material factual dispute exists,

8    regardless of whether the opposing party has specifically identified the same evidence in its

9    opposing papers. *Id*.

10        A plaintiff's verified complaint may serve as an affidavit in opposition to summary

11   judgment if based on personal knowledge and specific facts admissible in evidence.  *Lopez v.*

12   *Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc).  However, a complaint's conclusory

13   allegations unsupported by specific facts, will not be sufficient to avoid summary judgment.

14   *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001).  And,

15   where a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may

16   be deemed to have admitted the validity of those facts.  *See* Fed. R. Civ. P. 56(e)(2).

17        The undersigned has carefully reviewed and considered all arguments, points and

18   authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any,

19   objections, and other papers filed by the parties.  The omission to an argument, document, paper,

20   or objection is not to be construed that the undersigned did not consider the argument, document,

21   paper, or objection.  Instead, the undersigned thoroughly reviewed and considered the evidence it

22   deemed admissible, material, and appropriate for purposes of issuing these Findings and

23   Recommendations.

24        **B.  Eighth Amendment Medical Deliberate Indifference**

25        The Constitution requires prison officials to provide inmates with reasonably adequate

26   medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  To hold an official liable for violating

27   this duty under the Eighth Amendment, the inmate must satisfy two prongs, an objective prong

28   and subjective prong.  First, the inmate must suffer from a serious medical need (the objective

1  prong); and second the official must be deliberately indifferent to the inmate's serious medical

2  need (the subjective prong).  *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in*

3  *part on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014); *Wilhelm v.*

4  *Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012).  A medical need is "serious" if the failure to treat

5  "could result in further significant injury or the unnecessary and wanton infliction of pain."  *Jett*

6  *v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).  The "second prong—

7  defendant's response to the need was deliberately indifferent—is satisfied by showing (a) a

8  purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm

9  caused by the indifference."  *Id.* (internal citations omitted).  This standard requires that the

10  prison official must not only "be aware of facts from which the inference could be drawn that a

11  substantial risk of serious harm exists," but that person "must also draw the inference." *Farmer v.*

12  *Brennan*, 511 U.S. 825, 837 (1994).  "If a [prison official] should have been aware of the risk, but

13  was not, then the [official] has not violated the Eighth Amendment, no matter how severe the

14  risk."  *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002).  This

15  "subjective approach" focuses only "on what a defendant's mental attitude actually was."

16  *Farmer*, 511 U.S. at 839.

17          Deliberate indifference is a higher standard than medical negligence or malpractice, and a

18  difference of opinion between medical professionals—or between a physician and the prisoner—

19  generally does not amount to deliberate indifference.  *See generally Toguchi v. Chung*, 391 F.3d

20  1051 (9th Cir. 2004); *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (A mere "difference

21  of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.").

22  To prevail on a claim involving choices between alternative courses of treatment, a prisoner must

23  show that the chosen course of treatment "was medically unacceptable under the circumstances,"

24  and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health."  *Jackson*,

25  90 F.3d at 332.

26          Neither will an "inadvertent failure to provide medical care" sustain a claim.  *Estelle*, 429

27  U.S. at 105.  Misdiagnosis alone is not a basis for a claim, *see Wilhelm*, 680 F.3d at 1123, and a

28  "mere delay" in treatment, "without more, is insufficient to state a claim of deliberate medical

1    indifference," *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).

2    Instead, a prisoner must show that a delay "would cause significant harm and that defendants

3    should have known this to be the case." *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002).

### III.  ANALYSIS

#### A.  Allegations in Plaintiff's Operative Complaint

6    Plaintiff's operative SAC alleges Eighth Amendment medical deliberate indifference

7    claims and seeks damages against the following Defendants in their individual capacities[2]: (1)

8    Janel Espinoza, the Warden of CCWF prior to September 2019; (2) Michael Pallares, the Warden

9    of CCWF beginning in September 2019[3]; (3) Ikwinder Singh, the Chief Physician and Surgeon at

10   CCWF; (4) Robert Mitchell, Chief Medical Executive at CCWF; (5) Roselle Branch, Plaintiff's

11   primary care physician at CCWF; (6) Leslie Taylor, Assistant Deputy Medical Executive at the

12   California Department of Corrections and Rehabilitation ("CDCR") and the Chair of the

13   Statewide Medical Authorization Review Team ("SMART"); (7) Captain Chenoa Dill,

14   Healthcare Team Captain at CCWF; (8) Sergeant Gibson, Healthcare Team Sergeant at CCWF;

15   (9) Officer Gerardo Garcia-Torres, Correctional Officer at CCWF; (10) Officer Shoals,

16   Correctional Officer at CCWF; (11) and Officer Goethe, Correctional Officer at CCWF.  (Doc.

17   No. 75 at 4–8).  The following allegations are set forth in the SAC.

#### 1.  Plaintiff's Medical History and Prior Litigation

19   Plaintiff is a post-operative transgender woman who previously litigated against the

20   CDCR to obtain gender-affirming surgery.  (*Id.* at 11 ¶ 26).  In *Norsworthy v. Beard*, 87 F. Supp.

21   3d 1104 (N.D. Cal. 2015), filed in 2014, Plaintiff secured a preliminary injunction in 2015,

22   requiring CDCR to provide sex reassignment surgery ("SRS"),[4] but was released before the

---

[2] Due to Plaintiff's release from CDCR, the parties stipulated to the dismissal of Defendant Jeff Macomber, the dismissal of Plaintiff's prayer for injunctive relief, and the dismissal of Plaintiff's claims against Defendant Pallares in his official capacity.  (Doc. No. 86).

[3] Plaintiff's SAC is contrary to the undisputed facts, which reflect that Pallares was the Deputy Chief Warden throughout the relevant period.  (*See* Doc. No. 108-3 at 2 ¶ 2; Doc. No. 108-4 at 11:12-20).

[4] Sex reassignment surgery ("SRS"), now commonly termed gender confirmation surgery ("GCS") or gender affirmation surgery ("GAS") is a medical procedure aligning physical characteristics with gender identity. The evolving terminology emphasizes affirmation rather than reassignment, reflecting shifts in medical practice and societal understanding. These terms are often used interchangeably in legal and medical discourse.

1    procedure was performed.  (*Id*. at 11 ¶¶ 26–27).  Prior to her reincarceration, Plaintiff underwent

2    SRS performed by Dr. Thomas Satterwhite in February 2017 through Medi-Cal.  (*Id*. at 11–12 ¶¶

3    28–29).  While on parole, she required three subsequent revision surgeries.  (*Id*. at 11–12 ¶ 29).

4    Before her reincarceration in March 2019, Plaintiff maintained a vaginal depth of approximately

5    six inches and was instructed by Dr. Satterwhite to dilate three times daily to preserve this depth

6    and to douche regularly to prevent infection.  (*Id*.).  Dr. Satterwhite also recommended that

7    Plaintiff undergo a fourth revision surgery to address remaining complications related to

8    Plaintiff's clitoral hood following the initial procedure.  (*Id*. at 11–12, 25 ¶¶ 29, 78).  The fourth

9    revision surgery was anticipated to take place in the first half of 2019.  (*Id*.).

10                **2.  Reincarceration and Alleged Deliberate Indifference to Medical Needs**

11             On October 17, 2018, Plaintiff was arrested for violating the terms of her parole and was

12    held in Solano County Jail until her transfer to CDCR custody on March 25, 2019.  (*Id*. at 12 ¶¶

13    30–32).  She asserts that Defendants failed to provide constitutionally adequate medical care,

14    leading to severe pain, loss of vaginal depth, and recurrent infections.  (*Id*. at 13, 15, 18–19 ¶¶

15    33–34, 41, 53, 55).

16                         **a.  Privacy for Vaginal Dilation**

17             The SAC alleges that Defendants failed to provide Plaintiff with sufficient privacy for her

18    to regularly dilate, leading to irreversible vaginal stenosis.  (*Id*. at 2–3, 13 ¶¶ 2, 33).  Upon arrival

19    at CCWF, Plaintiff was housed in a shared cell, preventing her from following prescribed dilation

20    in privacy, and her requests for private space were either ignored or inadequately addressed for

21    three months.  (*Id*. at 13–15, 18, 20 ¶¶ 35–40, 52, 61–62).  Specifically, Defendants failed to

22    place Plaintiff in a single cell for more than three months after her admission to CCWF, did not

23    implement a plan to remove Plaintiff's cellmate from their shared cell three times per day to

24    allow for dilation, and provided inadequate accommodations that deprived Plaintiff of meaningful

25    time and opportunity to dilate properly.  (*Id*. at 13–15, ¶¶ 35–39).  During this period, Plaintiff

26    was only able to dilate once daily for 10 minutes, often in a shower, rather than three times per

27    day for 45 minutes each session as recommended in Dr. Satterwhite's letter, originally dated

28    November 7, 2018, and received by prison staff on May 3, 2019.  (*Id*. at 13–14, 16–18 ¶¶ 35, 47,

52).

By the time Plaintiff received a single-cell accommodation in August 2019—following her fourth revision surgery, which altered her clitoral hood—her vaginal depth had diminished to only 5 centimeters.  (*Id*. at 20 ¶¶ 58–62).  Consequently, Plaintiff has a "non-functional vagina," preventing her from engaging in intimate relations with her husband during conjugal visits.  (*Id*. at 20, 23 ¶¶ 62, 71).  As a result, Plaintiff now requires either a colovaginoplasty or peritoneoplasty, both high-risk procedures, to restore her lost vaginal depth.  (*Id*. at 2–3, 20, 23 ¶¶ 2, 62, 71).

### b.  Denial of Vaginal Deepening Surgery

The SAC alleges that Defendants[5] improperly delayed approving Plaintiff's request for a lengthening procedure, which became necessary after CCWF staff failed to provide Plaintiff with adequate accommodations to dilate during her first three months at CCWF.  (*Id*. at 21–24 ¶¶ 65–73).  Initially, CDCR's Gender Affirming Surgery Review Committee ("GASRC") approved the request on December 17, 2019, but the Statewide Medical Authorization Review Team ("SMART") later overturned the approval on January 21, 2020, without clear justification.  (*Id*. at 21–22 ¶¶ 66–67).  Defendants subsequently required Plaintiff to obtain a second surgical opinion, further delaying treatment.  (*Id*. at 22–23 ¶¶ 68–69).  A mischaracterized medical assessment from nonparty Dr. Marci Bowers on February 25, 2020, contributed to the denial, but Dr. Bowers later corrected her recommendation on July 17, 2020, affirming that Plaintiff required surgical intervention.  (*Id*. at 22–23 ¶¶ 69–71).  Despite this clarification, Defendants continued to deny the procedure, forcing Plaintiff to endure prolonged harm.  (*Id*. at 24 ¶ 74).

### c.  Access to Douches

The SAC alleges that at multiple points during Plaintiff's first year at CCWF, Defendants

---

[5] Although at times the SAC describes the actions and inactions of specific individual Defendants, the SAC and Plaintiff's briefing on the instant motions are frequently vague as to which Defendants are responsible for which alleged constitutional violations.  (*See, e.g.*, Doc. No. 75 at 26 ¶ 84) (alleging that "[e]ach Defendant was and remains deliberately indifferent to Ms. Norsworthy's medical need for pain medication, antibiotics, and hygiene products, as well as Ms. Norsworthy's medical need to regularly dilate" even though the facts reflect that different groups of Defendants were involved in each of these alleged deficiencies).  Where Plaintiff does not specifically allege a claim as to one or more particular Defendants, the Court likewise refers to "Defendants" collectively.

1  did not provide her with prompt and regular access to douches, which were necessary to prevent

2  vaginosis, despite nonparty Dr. Richard Graves prescribing Plaintiff a one-year supply of

3  douches.  (*Id*. at 15–16, 19–20 ¶¶ 42–43, 55, 58–59).  After Plaintiff returned to CCWF after

4  undergoing a fourth revision surgery, Defendants again did not initially provide sufficient

5  douches, and did not allow Plaintiff to shower as frequently as needed, as directed by Dr.

6  Satterwhite to ensure Plaintiff's surgical site remained clean.  (*Id*. at 20 ¶¶ 58–59).  As a result,

7  Plaintiff suffered infections that were diagnosed on April 3, June 10, and August 29, 2019.  (*Id*. at

8  15–16 ¶ 43).

9  ### d.  Access to Pain Medication

10  The SAC asserts Dr. Roselle Branch did not provide Plaintiff with necessary pain

11  medications throughout her incarceration.  (*Id*. at 18–21 ¶¶ 54, 60, 63).  Specifically, Dr. Branch

12  failed to provide Plaintiff with the correct dosage of gabapentin or opioids as prescribed by Dr.

13  Satterwhite.  (*Id*. at 20 ¶ 60).  Dr. Branch also declined to grant Plaintiff an additional 30-day

14  extension for her rest period and wheelchair use following her fourth revision surgery; however,

15  Dr. Graves later granted approval on September 18, 2019.[6]  (*Id*. at 21 ¶ 64).

16  ### 3.  Requested Relief

17  As relief, in addition to monetary damages, Plaintiff initially sought an injunction ordering

18  Defendants to provide her with a deepening procedure and other medical care that she claims

19  Defendants denied her.  (*Id*. at 27 ¶ 87).  On August 22, 2023, the parties stipulated to the

20

21  [6] While the Court considers the alleged denial of Plaintiff's request to extend her rest period and
wheelchair use in relation to Dr. Branch's state of mind under the subjective prong of the deliberate

22  indifference analysis, it does not treat "wheelchair access" as a standalone claim.  At oral argument on
May 9, 2025, Plaintiff's counsel confirmed that wheelchair access is not an independent claim, clarifying

23  that Plaintiff was only alleging medical deliberate indifference regarding (1) privacy for vaginal dilation,
(2) denial of vaginal deepening surgery, (3) access to hygiene products, and (4) pain management.  Thus,

24  the Court does not consider arguments regarding wheelchair access raised in Defendants' MSJ or
Plaintiff's Opposition.  (*See* Doc. No. 108-1, at 28; Doc. No. 114, at 27).  Even if the Court were to do so,

25  a detailed analysis of the claim would be unnecessary, as Plaintiff fails to allege any injury resulting from
Dr. Branch's actions—an essential element in establishing a claim for deliberate medical indifference.  *See*

26  *Cortinas v. Gates*, 2020 WL 6075646, at *3 (E.D. Cal. Oct. 15, 2020) (noting that a cognizable Eighth
Amendment deliberate medical indifference claim requires showing "(a) a purposeful act or failure to

27  respond to a prisoners pain or possible medical need and (b) harm caused by the indifference"), *report and
recommendation adopted*, 2020 WL 7185644 (E.D. Cal. Dec. 7, 2020), *aff'd*, 2022 WL 1153926 (9th Cir.

28  Apr. 19, 2022).

1   dismissal of Plaintiff's claims for injunctive relief considering her release from CDCR custody.

2   (Doc. No. 83).  She continues to seek punitive and compensatory damages, and reasonable

3   attorney's fees and costs.[7]  (Doc. No. 75 at 27 ¶¶ 87–90).

4   **B. Defendants' Proposed Expert Testimony**

5   Defendants offer Dr. Alexander Sinclair's opinion testimony as expert testimony and seek

6   to qualify Dr. Sinclair as an "expert in the field of plastic surgery" based on his education,

7   background, training, knowledge, and experience, coupled with his review of Plaintiff's medical

8   records.[8]  (Doc. No. 108-4 at 213).  Fed. R. Evid. 702 requires that expert testimony be both

9   "reliable and relevant" whether based on "scientific, technical, or other specialized knowledge."

10  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999).

11  Dr. Sinclair received his medical degree from Michigan State University in 1980, is

12  licensed as a physician in Michigan, California, and New York, and Board Certified by the

13  American Board of Plastic Surgery.  (Doc. No. 108-4 at 216).  He regularly sees patients to

14  provide transgender surgery services, including vaginoplasty and colovaginoplasty procedures.

15  (*Id*. at 213, 220).  Dr. Sinclair has worked with transgender patients in prisons for the last three

16  years, providing consultations, gender confirmation surgery, and post-operative care.  (*Id*. at 220).

17

18  ───────────────

[7] A claim against any prison official in his or her official capacity is a claim against CDCR, a state entity.

19  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (when state officials are named in their official capacities for monetary damages the action is deemed against the state).  To the extent Plaintiff seeks

20  monetary damages against Defendants in their official capacity, her claim is barred by the Eleventh Amendment.  U.S. Const., Amend. XI; *see also Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *Penhurst*

21  *State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984); *Graham*, 473 U.S. at 169.  The Eleventh Amendment does not, however, bar suits for damages against state officials in their individual capacities.

22  *Monell v. New York Dep't of Social Services*, 436 U.S. 685, 690 n. 54 (1978).  If a plaintiff seeks damages from a state official without specifying capacity, courts presume a personal capacity suit due to sovereign

23  immunity barring official capacity claims for monetary relief. *See Shoshone-Bannock Tribes v. Fish & Game Comm'n, Idaho*, 42 F.3d 1278, 1284 (9th Cir. 1994).

24  [8] Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify

25  if the form of an opinion or otherwise if:

        (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

26          understand the evidence or to determine a fact in issue;

        (b) the testimony is based upon sufficient facts or data;

27      (c) the testimony is the product of reliable principles and methods; and

        (d) the witness has reliably applied the principles and methods to the facts of the case.

28  Fed. R. Evid. 702.

11

He has presented and published widely on topics related to post-operative care in plastic surgery and gender confirmation surgery. (*Id.* at 216–17). In preparing his report for this case, Dr. Sinclair reviewed Plaintiff's medical records from CCWF, Plaintiff's mental health records from CCWF, Plaintiff's SAC, the Transcript of Dr. Satterwhite's January 5, 2024 Deposition, and the transcript of Plaintiff's December 12–13, 2023 Deposition. (*Id.* at 226).

In pertinent part, Dr. Sinclair opines that Plaintiff likely suffered a shortening of her vaginal canal prior to her reincarceration in March 2019, due in part to a hematoma that developed during her initial surgery. (*Id.* at 221–22). Dr. Sinclair is skeptical of Plaintiff's "self-reported" depth of 6 inches prior to incarceration, and cites Plaintiff's suicide attempt in January 2018, which Plaintiff's mental health records indicate was prompted by her belief that her "vagina is short and ugly," and the fact that the first measurement of Plaintiff's vaginal depth at CDCR, relatively early in her incarceration, shows that her depth was 4 cm.[9] (*Id.* at 223–24). Dr. Sinclair also opines that Plaintiff had the necessary space and privacy to dilate, but apparently chose not to dilate. (*Id.* at 224–25). He states that dilation "is not a vigorous thrusting motion. [It] can be done under the cover of sheets without alarming or alerting anybody in the vicinity as to what you are doing." (*Id.* at 224). Based on his review of Plaintiff's deposition testimony and her psychiatric notes, he theorizes that Plaintiff "did not really know that much about dilation" and may have been doing it improperly in ways that hampered the effectiveness of the task. (*Id.*).

As discussed below, the Court accepts Dr. Sinclair's opinion as expert testimony under Federal Rules of Evidence 702 as to Plaintiff's post-operative condition, her medical needs, and ability to dilate while in prison, to the extent it is admissible and otherwise relevant.

### C. Plaintiff's Proposed Expert Testimony

Plaintiff offers Dr. Anandev Gurjala's opinion testimony as expert testimony. (*See* Doc. No. 114 at 19, 21; *see also* Doc. No. 118 at 8). Although not explicitly requested by Plaintiff, she implicitly seeks to qualify Dr. Gurjala as an expert based on his education, background, training,

---

[9] Four centimeters equates to 1.575 inches. As discussed *infra* and noted during oral arguments, this appears to be a typographical error and was likely intended to reflect four inches rather than four centimeters.

1  knowledge, and experience, as well as his review of Plaintiff's medical records.

2       Dr. Gurjala earned his bachelor's degree *magna cum laude*, a medical degree, and a

3  Master of Science degree, all from Northwestern University.  (Doc. No. 108-4 at 201).  He

4  completed a residency in Plastic and Reconstructive Surgery and a Research Fellowship at the

5  Laboratory for Wound Repair and Regenerative Medicine, both at Northwestern University's

6  School of Medicine.  (*Id*. at 202).  He has been performing gender affirmation surgeries since

7  2014 and is affiliated with several hospitals in the San Francisco Bay Area.  (*Id*.).  Dr. Gurjala is

8  Board Certified in Cosmetic and Reconstructive Surgery by the American Board of Plastic

9  Surgery.  (*Id*.).  In preparing his report for this case, Dr. Gurjala reviewed Plaintiff's medical

10  records, the November 23, 2020 stipulated protective order entered in this case, the SAC, Dr.

11  Sinclair's report, and the deposition testimony of Dr. Satterwhite and Norsworthy.  (*Id*. at 199).

12       Dr. Gurjala's report largely responds to and seeks to rebut Dr. Sinclair's expert report.  Dr.

13  Gurjala reviews the reported measurements of Plaintiff's vagina prior to and during her

14  incarceration and concludes that the data shows Plaintiff's inability to dilate while at CCWF was

15  likely the cause of her vaginal stenosis.  (Doc. No. 114-3 at 66–68).  He disagrees that the data

16  reflects a likelihood of vaginal stenosis prior to Plaintiff's incarceration, as Dr. Sinclair

17  hypothesizes.  (*Id*. at 68).  Further, Dr. Gurjala disagrees with Dr. Sinclair's opinion that a sheet

18  or bed covering provides sufficient privacy for a transgender inmate to dilate.  (*Id*. at 69).  He

19  states:

20            In my experience with patients, dilation can be a very difficult
          process, which in itself can be painful, can lead to bleeding, and can
21            be mentally and emotionally distressing even while under the ideal
          condition of privacy.  Even when done in privacy while outside of
22            one's home, patients report difficulty in such settings where out of
          necessity they must dilate (for example, in a bathroom stall while at
23            work, which many patients must unfortunately contend with). I can
          only imagine how distressing it might be to perform dilation in a
24            room without 4 walls, much less just under a blanket or a thin
          temporary screen.  Add to this difficulty inherent to routine dilation
25            that this patient in particular has been exposed to repeated traumas,
          such as sexual assault (1/29/18) or being involuntarily drugged
26            (reported 8/2/18), I do not think it is a reasonable expectation that
          Ms. Norsworthy dilate in a multiperson cell.  I would ask for any of
27            my patients that they be able to dilate in privacy, much less a patient
          with a significant trauma history and founded fears of safety from
28            her life experience.

13

1   (*Id.*).  As discussed below, the Court accepts Dr. Gurjala's opinion as expert testimony under

2   Federal Rules of Evidence 702 regarding the progression of Plaintiff's vaginal depth and her

3   ability to dilate while in prison to the extent it is admissible and otherwise relevant.

4         **D. Material Facts**

5               **1.  Undisputed Material Facts**

6         In support of her MPSJ, Plaintiff filed a Separate Statement of Undisputed Material Facts

7   ("Plaintiff's SSUF").  (Doc. No. 110-2).  Defendants filed a response to Plaintiff's SSUF.  (Doc.

8   No. 113).  In support of their MSJ, Defendants submit a Separate Statement of Undisputed Facts

9   ("Defendants' SSUF").  (Doc. No. 108-2).  Plaintiff filed a response to Defendants' SSUF (Doc.

10  No. 114-1), and Defendants filed a reply to Plaintiff's response (Doc. No. 117-2).  Defendants

11  point out that Plaintiff improperly includes a section in her response to Defendants' SSUF titled

12  "Additional Facts," which is largely duplicative of the facts cited in her response and in Plaintiff's

13  SSUF.  (See *id*. at 114).  This separate section of "Additional Facts," which is neither responsive

14  to Defendants' SSUF nor a "Separate Statement of Disputed Facts" as authorized by Local Rule

15  260(b), is procedurally improper and the Court will disregard it.

16        Each listed fact in Plaintiff's SSUF cites to either a declaration, Plaintiff's operative SAC,

17  or deposition transcripts.  (*See generally* Doc. Nos. 108-2, 110-2, 113, 114-1, 117-2).  A large

18  portion of Plaintiff's SSUF recounts to her history with struggling with gender dysphoria, past

19  trauma, or prior litigation with CDCR.  (*See* Doc. Nos. 110-2, 113).  To the extent these facts are

20  raised to support a finding of a serious medical need under the first prong of the deliberate

21  indifference analysis, the Court need not consider these facts because it assumes that Plaintiff had

22  a serious medical need for the purposes of this order.[10]  The Court, therefore, finds that many of

23  Plaintiff's facts prior to her reincarceration in March 2019 are merely colorable and not material

24  to Plaintiff's claim of medical deliberate indifference against the named defendants in this case.

25  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986) (Material facts are those "that

26  might affect the outcome of the suit under the governing law."); *McIndoe v. Huntington Ingalls*

27

28  [10] *See infra* Part III.E.2.

1  *Inc.*, 817 F.3d 1170, 1173 (9th Cir. 2016) ("If the evidence is merely colorable . . . summary

2  judgment may be granted." (internal citation and quotations omitted)); *T.W. Elec. Serv., Inc. v.*

3  *Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) ("Disputes over irrelevant or

4  unnecessary facts will not preclude a grant of summary judgment"); *see also, e.g., Speer v. Cnty.*

5  *of San Bernardino*, 2021 WL 5969521, at *3 (C.D. Cal. Aug. 9, 2021) ("[E]vidence of Plaintiff's

6  history of drug use has no likelihood of proving any material facts relevant to Plaintiff's claim

7  and . . . evidence which the officers were unaware is not relevant to evaluate the reasonableness

8  of the officers' actions . . ." (internal quotations and citation omitted)).

9          While Plaintiff identifies a genuine dispute regarding some facts in Defendants' SSUF,

10  many of her objections merely seek to add information for clarification or assert missing

11  "context," which the Court finds insufficient to demonstrate a factual dispute.  (*See generally*

12  Doc. No. 114-1).  Additionally, when Plaintiff objects to Defendants' SSUF or asserts her own

13  fact in Plaintiff's SSUF but relies solely on statements in her declaration that lack detailed factual

14  support—while Defendants provide specific facts and documentary evidence—the Court

15  generally does not find this sufficient to establish a genuine dispute of material fact.  *See Lopez v.*

16  *Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc); *see also FTC v. Publishing Clearing*

17  *House*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking

18  detailed facts and any supporting evidence, is insufficient to create a genuine issue of material

19  fact.").  Having reviewed the record, the undersigned finds the following facts to be material and

20  undisputed, unless otherwise noted.

21     •   Plaintiff Michelle-Lael Bryanna Norsworthy ("Norsworthy") is a post-operative

22         transgender woman who was initially incarcerated from 1987 to 2015.  She was on parole

23         and not in CDCR's physical custody from 2015 through March 25, 2019.  Norsworthy

24         was again an inmate in the custody of the California Department of Corrections

25         ("CDCR") at Central California Women's Facility ("CCWF") from March 25, 2019 to

26         January 13, 2022.  (Doc. No. 75 at 2, 4 ¶¶ 1, 5).

27     •   During all relevant periods, Defendant M. Pallares was the Chief Deputy Warden for

28         CCWF.  (Doc. No. 108-3 at 2 ¶ 2; Doc. No. 108-4 at 11:12-20).

- During all relevant periods, Defendant Dr. Mitchell was the Chief Medical Executive ("CME") of CCWF. As CME, his responsibilities included overseeing the medical operations of the institution and ensuring the medical providers maintained their licenses and certifications. (Doc. No. 108-3 at 2 ¶ 3, Doc. No. 108-4 at 25:5-20, 27:24-28:20; Doc. No. 75 at 6 ¶ 10).

- During all relevant periods, Defendant Dr. R. Branch was Norsworthy's primary care physician ("PCP") at CCWF. (Doc. No. 108-3 at 2 ¶ 4, Doc. No. 108-4 at 41:17-42:1; Doc. No. 75 at 6 ¶ 11).

- During all relevant periods, Dr. L. Taylor was the Assistant Deputy Medical Executive for Clinical Operations. Her responsibilities included managing clinical programs, developing medical policy, recruiting staff, and training medical providers. Dr. Taylor was the chair of the Statewide Medical Authorization Review Team ("SMART") while Norsworthy was in the custody of CDCR, but never met or examined her. (Doc. No. 108-3 at 2 ¶ 5; Doc. No. 108-4 at 49:8-15, 52:12-25, 55:10-21; Doc. No. 75 at 6–7 ¶ 12).

- During all relevant periods, Defendant C. Dill was the Healthcare Access Captain for CCWF. The job of the Healthcare Access Captain is custodial and was to ensure that inmates have access to the care that they need, including medications, but not to provide evaluations or treatment. (Doc. No. 108-3 at 2 ¶ 2; Doc. No. 108-4 at 3:24-4:11, 5:14-25, 7:8-8:13; Doc. No. 75 at 7 ¶ 13).

- During all relevant periods, Defendant R. Gibson was a Healthcare Access Sergeant at CCWF. The role of the Healthcare Sergeant was to make sure that inmates get to their medical and dental appointments on the yard and to track how many times inmates were seen daily. (Doc. No. 108-3 at 2 ¶ 6, Doc. No. 108-4 at 63:13-25; Doc. No. 75 at 7 ¶ 14).

- Defendants Shoals, Goethe, and Garcia-Torres were correctional officers at CCWF in Building 503. Building 503 correctional officers' responsibilities included sending inmates out to medical for appointments, providing yard time, clothing, and other needs to inmates, and monitoring the safety and security of the facility and inmates. (Doc. No. 108-3 at 2 ¶¶ 7–9, Doc. No. 108-4 at 78:13-20, 79:5-8, 83:10-14; 87:9-17; Doc. No. 75 at

16

1  7–8 ¶¶ 15–17).

2  • On February 10, 2017, nonparty medical provider Thomas Satterwhite, M.D., provided

3  Norsworthy with gender affirming surgery which included the creation of a neovagina.

4  (Doc. No. 110-3 at 6 ¶ 17; Doc. No. 108-3 at 2 ¶ 10, Doc. No. 108-4 at 93:14-22; Doc.

5  No. 75 at 8 ¶19).

6  • Dr. Satterwhite is a Stanford-educated, California licensed doctor who specializes in

7  plastic surgery and specifically in gender affirming surgery. He is a member of, and

8  board-certified through, the American Board of Plastic Surgery, and is a member of the

9  World Professional Association for Transgender Health, the U.S. Professional Association

10  for Transgender Health, the American Society of Plastic Surgeons, the Aesthetics Society,

11  and the California Society of Plastic Surgery. (Doc. No. 110-3 at 6 ¶ 17; Doc. No. 110-4

12  at 62–63).

13  • A hematoma arose during the February 10, 2017, surgery, which required Dr. Satterwhite

14  to conduct a revision surgery on February 12, 2017.  (Doc. No. 110-4 at 70–71, 76; Doc.

15  No. 108-3 at 2–3 ¶¶ 10–11; Doc. No. 108-4 at 104:11-19; 125:4-10).

16  • On March 1, 2017, Dr. Satterwhite recorded that Norsworthy suffered skin loss to the

17  right labia which was not going to survive.  On October 11, 2017, Norsworthy underwent

18  a second surgery to address aesthetic concerns which included a labiaplasty.  (Doc. No.

19  108-3 at 2 ¶ 10; Doc. No. 108-4 at 105:6-106:20, 107:2-13, 109:15-21).

20  • On January 24, 2018, Dr. Satterwhite examined Norsworthy who told him that she was

21  dissatisfied with the depth of her vagina despite having a depth deeper than most patients.

22  Dr. Satterwhite scheduled a further reconstruction surgery for April 2018.  Dr. Satterwhite

23  intended to check whether deepening or scarring removal was possible, which he doubted.

24  Dr. Satterwhite advised that if Norsworthy was interested in a colovaginoplasty, she

25  would need to be referred to nonparty Dr. Maurice Garcia, and Norsworthy indicated that

26  she would await the results of the April 2018 surgery.  (Doc. No. 108-3 at 3 ¶ 12; Doc.

27  No. 108-4 at 177–78).

28  • On February 27, 2018, Dr. Chase, one of Norsworthy's mental health providers, informed

17

1   Dr. Satterwhite that Norsworthy had a recent history of alcoholic binges, suicide attempts,

2   sex/love addiction, and aggressive behaviors towards healthcare providers and was

3   unstable psychosocially.  As a result, Dr. Satterwhite determined that Norsworthy was not

4   a good candidate for surgery at that time.  As a result, a previously scheduled surgery did

5   not go forward.  (Doc. No. 108-3 at 2 ¶ 10; Doc. No. 108-4 at 113:14-114:9, 115:19-24).

6   • On August 22, 2018, Norsworthy underwent the third revision surgery, her fourth surgery

7   total.  (Doc. No. 108-3 at 3 ¶ 14; Doc. No. 108-4 at 182–85).

8   • On October 15, 2018, Norsworthy informed Dr. Satterwhite that her clitoral hood

9   retracted and Dr. Satterwhite planned for another revision surgery in April 2019.  (Doc.

10  No. 108-3 at 2 ¶ 10; Doc. No. 108-4 at 117:18-118:21).

11  • On October 17, 2018, Norsworthy was arrested following an incident at a bar when she

12  possessed pepper spray.  She was found to have violated her parole and was held in

13  Solano County Jail from that date until March 25, 2019 (approximately 22 weeks), when

14  she was transferred to CCWF in CDCR's custody.  (Doc. No. 110-3 at 6–7 ¶¶ 19–23; Doc.

15  No. 75 at 12 ¶¶ 30–32).

16  • After creating Norsworthy's neovagina, Dr. Satterwhite recommended she dilate.  Dilation

17  is a process where a patient places a lubricated, firm plastic dilator into her neovagina and

18  left in place for approximately 30 minutes.  The dilator is held in place without in-and-out

19  movements and is comparable to placing and leaving a tampon in place.  Generally, Dr.

20  Satterwhite recommended that patients dilate three times per day for the first three months

21  after the creation of the neovagina.  After those three months, the patients could generally

22  decrease the frequency of dilations.  (Doc. No. 110-4 at 68–69; Doc. No. 108-3 at 2 ¶ 10,

23  Doc. No. 108-4 at 94:9-95:3, 96:20-97:25).  Plaintiff disputes this characterization of the

24  dilation process as static, but her own surgeon, Dr. Satterwhite, agreed that dilation is like

25  placing a tampon and that the dilator is "is just placed and left in place."  (Doc. No. 108-4

26  at 97:21-25).

27  • The purpose of dilation is to prevent shrinkage through contracture of the newly created

28  neovagina.  (Doc. No. 110-3 at 7 ¶ 24; Doc. No. 108-3 at 2–3 ¶¶ 10, 15; Doc. No. 108-4 at

18

188:12-19, 98:16-24).

- Although some patients may be able to decrease the frequency and duration of dilation over time, dilation is required throughout the patient's lifetime; otherwise, the neovagina will close.  (Doc. No. 110-4 at 68, 71).

- Dilation can be physically performed while lying in a bed, under a sheet or blanket.  (Doc. No. 110-3 at 7 ¶ 24; Doc. No. 108-3 at 3 ¶¶ 16–17, Doc. No. 114-3 at 69; Doc. No. 108-4 at 224).

- Norsworthy had all the necessary medical equipment to dilate upon her incarceration at CCWF on March 25, 2019, but had no desire to dilate in front of other.  As reasons, Norsworthy cites to her limited privacy, embarrassment due to the presence of cellmates, and history of sexual trauma for her limited ability to dilate during her early months at CCWF; she was also concerned that she might be subject to a Prison Rape Elimination Act ("PREA") violation.[11]  (Doc. No. 110-3 at 8–9 ¶¶26–29; Doc. No. 108-3 at 3 ¶ 11, Doc. No. 108-4 at 129:5-130:22, 140:21-25; Doc. No. 75 at 13–14 ¶ 35).

- No CDCR personnel ever told Norsworthy that she could not dilate.  (Doc. No. 108-3 at 2 ¶ 11; Doc. No. 108-4 at 131:14-18).

- Custodial personnel were responsible for implementing the measures prescribed by medical and health care access staff to accommodate Norsworthy's privacy requests.  Any issues regarding moving equipment, furniture, housing assignments, privacy screens, or any other matter involving the safety and security of the facility is in the purview of custodial personnel.  (Doc. No. 108-3 at ¶ 3, Doc. No. 108-4 at 28:2-29:11).

- At CCWF, Norsworthy was held in Building 503 from March 25 until May 21, 2019. Building 503 is a reception center where inmates are temporarily housed until they are orientated and moved to a new building based on their classification status.  Norsworthy's status was general population inmate.  (Doc. No. 108-3 at 2–3 ¶¶ 2, 6, 11, 18; Doc. No. 108-4 at 128:4-23, 74:9-13; 19:17-21:4; 235).

---

[11] The record reflects that Plaintiff was never cited for a PREA violation.

- Inmates housed at Building 503 were housed in two-person cells, generally shared by two inmates. The cells contain bunks on top of one another, a window, and a toilet. Inmates were not allowed to cover the view of these locations. Inmates were required to use the bathroom in view of other people. (Doc. No. 108-3 at 2–3 ¶¶ 6, 11; Doc. No. 108-4 at 72:24-73:5, 131:24-132:5, 133:2-11).

- Correctional staff are responsible for the safety and security of inmates. Placement of a privacy screen in front of a cell implicates this security concern because it can block the total security view into and out of the cell creating a risk for the inmate or inmates within. (Doc. No. 108-3 at 2 ¶¶ 2, 9; Doc. No. 108-4 at 9:21-10:12, 88:14-89:8).

- Darrianne Stuckey was Norsworthy's cellmate when she was initially housed in Building 503. Stuckey did not care if Norsworthy dilated in front of her. (Doc. No. 108-3 at 3 ¶ 11; Doc. No. 108-4 at 128:7-23, 131:19-23).

- On March 28, 2019, Norsworthy submitted a healthcare grievance to request a "time [and] place" to dilate three times per day. (Doc. No. 110-3 at 61).

- On April 8, 2019, the March 28, 2019 grievance was assigned to nonparty Nurse Fontanilla. On April 16, 2019, at 10:45 AM, Fontanilla met with Norsworthy regarding the issue. The same day at 12:10 PM, Fontanilla spoke to Dill regarding accommodations to facilitate the use of the dilator three times a day and to have custody speak to Stuckey regarding leaving the cell during dilation. Dill asked Gibson to inform the correctional officers to allow Stuckey to leave the cell during dilation. (Doc. No. 108-3 at 2-3 ¶¶ 2, 19–21; Doc. No. 108-4 at 239; 241–42, 245:11-246:8, 15:11-22).

- On April 18, 2019, Sergeant Gibson contacted nonparty Captain Ratliff regarding the dilation procedures. Gibson advised Ratliff that Norsworthy was to dilate three times a day for approximately 20 minutes and officers would place a privacy screen three feet outside the cell so that inmates could not see in, but staff could still have a view. Ratliff did not believe that Norsworthy should be provided a privacy screen because it presented safety and security concerns. Dill confirmed that the screen should be used for dilation but testified that the screen could compromise safety and security if not monitored. (Doc.

No. 108-3 at 2–3 ¶¶ 2, 22; Doc. No. 108-4 at 9:14-10:15, 250).

- On April 24, 2019, Norsworthy informed Fontanilla that her dilation privacy issues were unresolved.  That same day, Fontanilla spoke to Dill, Gibson, and the Healthcare Associate Warden who told her to work with Gibson.  Gibson confirmed that the housing correctional officers were to provide the privacy screen three times a day for twenty minutes at specific times, 1000, 1400, and 1600, and Norsworthy confirmed this process and agreed to inform the officers when she was ready to dilate.  The housing officers were given instruction regarding this procedure that day.  (Doc. No. 108-3 at 3 ¶¶ 20–21; Doc. No. 108-4 at 241-42; 247:9-14).

- Gibson did not have control over any other building outside of Building 503 regarding privacy or movements.  (Doc. No. 108-3 at 2 ¶ 6; Doc. No. 108-4 at 74:4-20).

- On May 21, 2019, Norsworthy was transferred to Building 509 which is a general population eight-person cell.  She resided there until June 25, 2019.  Six or seven inmates, including Mayra Rangel, resided in the cell during that time.  (Doc. No. 108-3 at 2–4 ¶¶ 2, 18, 23; Doc. No. 108-4 at 235, 253:23-254:12; 16:22-17:2).

- Norsworthy's cell had four bunk beds, a big glass window in the front, a shower, and a toilet.  The shower has a stainless-steel door which blocks the person's body with approximately 15 inches at the bottom and top open.  (Doc. No. 108-3 at 3–4 ¶¶ 11, 23; Doc. No. 108-4 at 138:9-14, 255:8-24).

- Norsworthy claims that she was only able to dilate in the shower while housed in Building 509.  (Doc. No. 108-3 at 2 ¶ 11; Doc. No. 108-4 at 139:13-15).

- Norsworthy had unrestricted access to the shower when she was not otherwise at her prison job.  (Doc. No. 108-3 at 3–4 ¶¶ 11, 23; Doc. No. 108-4 at 141:18-20, 255:2-7).

- Norsworthy was able to dilate in the cell shower and testified that she did so once a day, but reported that it was uncomfortable and caused conflict with her cellmates.  (Doc. No. 108-3 at 3 ¶ 11; Doc. No. 108-4 at 134:13-135:6, 138:16-23).

- Around the time that she was placed in Building 509, Norsworthy was also provided the option to use the clinic near her housing to dilate twice a day.  Additionally, while she

1   worked in another part of the prison, during her lunch break she could use the triage

2   treatment area which had access to a skilled nursing facility, a licensed medical facility,

3   and an ER so that she did not need to return to the general population area to dilate.

4   Defendant Dill testified that this process was in place no later than June 10, 2019.  (Doc.

5   No. 108-3 at 2–4 ¶¶ 2, 11, 24; Doc. No. 108-4 at 141:22-142:15, 143:10-144:9; 145:9-13,

6   146:9-147:11; 12:7-13:10, 14:8-21, 258–59).

7   • On June 25, 2019, Norsworthy advised nonparty nurse Hoa Le that she was dilating once

8      per day in the shower.  Norsworthy did not want to use the medical offices because she

9      experienced "multiple delays and constant interruptions."  Norsworthy did not want to go

10     to Building 805 because she was being "harassed" by other inmates when she had to show

11     custody staff her dilators to enter or exit for work.  Norsworthy knew that she had been

12     searched because she was entering and exiting the yard and she had to be checked for

13     weapons and contraband but was embarrassed.  (Doc. No. 110-4 at 216:19-218:18; Doc.

14     No. 108-3 at 3–4 ¶¶ 11, 25; Doc. No. 108-4 at 262–64, 146:17-147:11).

15  • Norsworthy expressed an interest in moving to Building 509 rooms 9, 10, 11, or 12, which

16     were 8-person rooms reserved for overflow of reception inmates.  They were kept empty

17     in cases of overflow population emergencies.  She did not want to be housed in Building

18     503 because she did not want to lose yard time.  It was not normal prison practice to house

19     inmates alone in the overflow rooms in case those rooms became necessary for other

20     inmates.  (Doc. No. 108-3 at 2, 4 ¶¶ 2, 25; Doc. No. 108-4 at 262–64, 19:12-20:5).

21  • From June 25, 2019 until July 3, 2019, Norsworthy resided in an eight-person room in

22     building 509 by herself.  During this period, Norsworthy felt like she had sufficient

23     privacy and dilated.  (Doc. No. 108-3 at 3–4 ¶¶ 11, 18, 26; Doc. No. 108-4 at 136:13-21,

24     148:1-11, 266, 235).

25  • On July 3, 2019, Ms. Norsworthy was again housed in the Building 503 reception center.

26     Norsworthy was housed alone which was not a typical accommodation because general

27     population inmates do not usually mix with reception center inmates.  (Doc. No. 108-3 at

28     2–3 ¶¶ 2 11, 18; Doc. No. 108-4 at 136:14-137:1, 18:8-20, 235).

22

- After being rehoused in Building 503, Goethe, Shoals, and Garcia-Torres regularly provided Norsworthy the privacy screen, though sometimes Norsworthy needed to remind Shoals and Goethe to do so.  (Doc. No. 108-3 at ¶ 11; Doc. No. 108-4 at 152:10-153:6).

- After being single-housed, until her parole, Norsworthy had no further issues dilating.  (Doc. No. 108-3 at 3 ¶ 11; Doc. No. 108-4 at 148:1-11, 167:23-170:7).

- Building 503 was being used to quarantine inmates due to COVID for a period of time.  Norsworthy remained single-celled in 503 and was able to dilate.  Occasionally she was not provided a privacy screen, but this was not a problem and she continued to dilate.  She did not fault CDCR staff for not providing the screen because they were managing COVID issues and because "it can't always be about me.  Sometimes I can, you know, let it be about somebody who's got symptoms."  (Doc. No. 108-3 at 3 ¶ 11; Doc. No. 108-4 at 154:17-156:2).

- The SAC asserts that Norsworthy was not provided appropriate pain medication upon her arrival at CCWF in March 2019.  Norsworthy testified that, as of September 29, 2019, she received appropriate pain medication and CDCR staff "did what they needed to do" regarding pain management.  (Doc. No. 108-3 at 3 ¶ 11; Doc. No. 108-4 at 163:22-166:25; Doc. No. 75 at 18-21, 25 ¶¶ 54, 60, 63, 81;).

- Norsworthy conceded that, while in CDCR custody, primary care physicians, such as Dr. Branch, order medications and that outside doctors, such as Dr. Satterwhite, can only make recommendations.  (Doc. No. 108-3 at ¶ 11, Doc. No. 108-4 at 162:2-11).

- Dr. Satterwhite generally prescribed Gabapentin for postoperative pain management for about a month following surgery in coordination with nonsteroidal anti-inflammatory medications such as ibuprofen.  (Doc. No. 108-3 at 2 ¶ 10; Doc. No. 108-4 at 102:3-12, 103:13-24).

- On August 22, 2018, Following Norsworthy's third revision surgery, her fourth total, Norsworthy reported being in a lot of pain and Dr. Satterwhite prescribed Tylenol and ibuprofen, but not Gabapentin.  This was Norsworthy's last surgery before being reincarcerated.  (Doc. No. 108-3 at 2–4 ¶¶ 10, 14, 27; Doc. No. 108-4 at 116:10-25, 268,

1    182-85).

2    • The Medication Administration Record ("MAR") from CCWF shows that Norsworthy

3      consistently received three daily doses of Gabapentin from March 26, 2019, through April

4      23, 2019, except: on March 30 that she failed to appear for one does; on April 5 when she

5      refused two doses; and, on April 24 when she received two doses.  During this time,  she

6      also received aspirin and ibuprofen daily.  (Doc. No. 108-3 at 4 ¶ 28; Doc. No. 108-4 at

7      303–377).

8    • On April 4, 2019, Norsworthy reported not wanting to take Gabapentin after the present

9      dose expired and declined alternative medications. (Doc. No. 108-3 at 4 ¶ 29; Doc. No.

10     108-4 at 379–82).

11   • Norsworthy's MAR shows she consistently received prescriptions for aspirin from April

12     2019, through May 4, 2019.  (Doc. No. 108-3 at 4 ¶ 28; Doc. No. 108-4 at 295–99).

13   • On May 3, 2019, Norsworthy had a medical visit with Dr. Branch.  Norsworthy did not

14     report any problems with her pain medication but requested to keep the medication on her

15     person.  Dr. Branch renewed the prescription for aspirin from May 3, 2019, through July

16     3, 2019, and permitted Norsworthy to keep the medication on her person.  (Doc. No. 108-

17     3 at 4 ¶¶ 30–31; Doc. No. 108-4 at 384, 386–88).

18   • On May 13, 2019, Norsworthy submitted her first request for medical treatment regarding

19     severe vaginal pain.  On May 15, 2019, the triage nurse received the request and on May

20     16, 2019, Nurse Valenzuela assessed Norsworthy who reported a "tearing" pain and was

21     provided ibuprofen per the nursing protocol.  (Doc. No. 108-3 at 4 ¶¶ 32–33; Doc. No.

22     108-4 at 390; 392–95).

23   • Dr. Mitchell renewed Norsworthy's prescription for ibuprofen from May 16, 2019,

24     through May 19, 2019, to be kept on her person.  (Doc. No. 108-3 at 5 ¶ 34; Doc. No.

25     108-4 at 397).

26   • On May 24, 2019, Norsworthy submitted a second healthcare request to see her primary

27     care physician regarding severe vaginal pain.  That day, nonparty nurse Jackson evaluated

28     Norsworthy, informed her that she had an appointment with her PCP regarding the pain

                                      24

1    issue, and consulted with the primary care physician.  Norsworthy indicated that all she

2    needed to confirm with the nurse was the impending PCP appointment.  (Doc. No. 108-3

3    at 5 ¶ 35; Doc. No. 108-4 at 399–400).

4    • On May 30, 2019, Norsworthy met with nonparty nurse practitioner Attinello and they

5    discussed developing a pain medication plan including the use of carbamazepine which

6    was ordered for 360 days.  The MAR indicates that Norsworthy was administered

7    carbamazepine (Tegretol) twice daily from June 1, 2019, through June 24, 2019.  Tegretol

8    was eventually discontinued. (Doc. No. 108-3 at 4–5 ¶¶ 28, 34, 36; Doc. No. 108-4 at

9    402–03, 271–88, 397).  It is unclear whether Norsworthy refused it after that date or the

10    prescription expired.  (*Compare* Doc. No. 108-4 at 397 *with*, 108-4 at 271–88).  The Court

11    finds this not to be material for purposes of these Findings and Recommendation.

12    • On June 10, 2019, Dr. Satterwhite examined Norsworthy and noted that she was having

13    vaginal pain during dilation and planned to re-start her on gabapentin at 600 mg three

14    times per day.  (Doc. No. 108-3 at 5 ¶ 37; Doc. No. 108-4 at 405–06).

15    • On June 24, 2019, Dr. Graves visited with Norsworthy and reviewed Dr. Satterwhite's

16    recommendations including for gabapentin.  Dr. Graves noted that gabapentin (Neurontin)

17    was no longer considered appropriate for treatment other than herpetic neuropathy and

18    seizures.  Dr. Graves recommended Elavil and discussed the risk and benefits of the drug

19    with Norsworthy, who agreed, and it was ordered.  (Doc. No. 108-3 at 5 ¶ 38; Doc. No.

20    108-4 at 408–10).

21    • On June 30, 2019, the triage nurse staff received Norsworthy's third request for health

22    care services associated with vaginal pain which indicated that her new medication was

23    ineffective.  On July 1, 2019, Dr. Graves discontinued the Elavil due to Norsworthy's

24    problems with the side effects such as nausea and drowsiness.  Norsworthy was informed

25    of the medication's side effects and that she still could obtain over-the-counter ibuprofen

26    for her pain as needed if she did not want to continue the Elavil.  (Doc. No. 108-3 at 5 ¶¶

27    39–41; Doc. No. 108-4 at 412, 414, 416).

28    • On July 19, 2019, Dr. Branch examined Norsworthy to address her vaginal pain.

Norsworthy reported aggressively dilating to achieve her vaginal canal length goal.  Dr. Branch prescribed Cymbalta and ibuprofen to address Norsworthy's complaints of pain and recommended to be careful during dilation.  (Doc. No. 108-3 at 5 ¶ 42; Doc. No. 108-4 at 418–20).

- The MAR shows Norsworthy received Cymbalta daily from July 20, 2019, through August 19, 2019 (excluding August 12–16, when Norsworthy was at the hospital) and on August 23, 2019.  She was also provided ibuprofen on July 20 and July 30.  (Doc. No. 108-3 at 5 ¶ 43; Doc. No. 108-4 at 422–92).

- Per Dr. Satterwhite's directions, Norsworthy stopped receiving ibuprofen and aspirin on July 30, 2019, in preparation for her August 13, 2019, surgery.  (Doc. No. 108-3 at 5–6 ¶¶ 44–45; Doc. No. 108-4 at 494, 496–97).

- On August 7, 2019, Norsworthy met with Nurse Nevarez to discuss her groin soreness.  Norsworthy understood she could not take pain medication due to her pending surgery but asked about alternative treatment.  Nurse Nevarez provided a cold compress, instruction on elevating extremities, and told Norsworthy not to engage in strenuous exercise or activity including lifting objects.  (Doc. No. 108-3 at 6 ¶ 46; Doc. No. 108-4 at 499–500).

- Following the fourth revision surgery on August 13, 2019, Dr. Satterwhite prescribed Norsworthy 300 mg of gabapentin for three weeks to taper off in the fourth week, ibuprofen for two weeks, and Suboxone to be monitored by the prison medical personnel due to Norsworthy's opioid addiction history.  She was discharged back to CCWF on August 16, 2019.  (Doc. No. 108-3 at 6 ¶¶ 47–49; Doc. No. 108-5 at 2–4, 6–7, 9–10).

- The MAR shows that Norsworthy received morphine twice per day from August 17, through August 30, 2019, ordered by Dr. Branch and Dr. Garcia, and multiple doses of hydrocodone-acetaminophen daily from August 18 through August 24, 2019.  Norsworthy received three doses daily of 300 mg of gabapentin from August 19 through November 12, 2019, (excluding occasional medication no-shows).  On November 12, 2019, Dr. Graves examined Norsworthy and established a process to wean her off gabapentin (Neurontin).  Dr. Graves continued to prescribe ibuprofen for surgical site pain.  (Doc. No.

26

108-3 at 6 ¶¶ 50–51; Doc. No. 108-5 at 12–50, 52–53).

- Norsworthy claims that during her incarceration at CCWF, she was not provided adequate douche material to keep her neovagina clean.  As a result of the lack of douches she claims she developed vaginosis.  (Doc. No. 75 at 15–16, 19–20 ¶¶ 42–43, 55, 59).

- Dr. Satterwhite instructs his patients to douche daily for a month after the initial gender-affirming surgery with a decrease to once or twice a week thereafter.  There is some variance patient-to-patient.  (Doc. No. 108-3 at 2 ¶ 10; Doc. No. 108-4 at 100:14-101:1).

- On March 29, 2019, Norsworthy submitted a request for health care services regarding anbinfection at her surgical site.  (Doc. No. 108-3 at 7 ¶ 52; Doc. No. 108-5 at 55).

- On March 30, 2019, Norsworthy met with nonparty Nurse Hernandez regarding the infection.  Hernandez issued a package of cleansing wipes pending an appointment with Dr. Graves.  Hernandez advised Norsworthy to file another request if the condition changed.  (Doc. No. 108-3 at 6 ¶ 53, Doc. No. 108-5 at 57–61).

- On April 3, 2019, Dr. Graves, a gynecologist, examined Norsworthy for the first time.  Dr. Graves noted that she possibly had vaginosis and prescribed an antibiotic, Flagyl, for treatment.  Norsworthy reported having vaginal discharge since her surgery.  Dr. Graves prescribed acetic acid douche, Summer's Eve Extra Cleansing Douche, for use two times per week, to be distributed by the pharmacy.  Norsworthy could keep a weekly supply of douches on her person.  The prescription expired July 4, 2019.  (Doc. No. 108-3 at 2 ¶ 11, 7 ¶ 54–55; Doc. No. 108-5 at 63, 65–67; Doc. No. 108-4 at 126:22-127:24).

- Nonparty pharmacy, clinic, and nursing staff were responsible for distributing douche supplies.  (Doc. No. 108-3 at 2 ¶ 11; Doc. No. 108-4 at 160:19-161:11).

- The MAR shows that Norsworthy received supplies of Summer's Eve Extra Cleansing Douche from the pharmacy on April 5, May 16, May 30, June 24, July 4, August 19, August 29, and September 5.  On May 5, June 14, August 3, and September 29 no refills were requested at the pharmacy.  (Doc. No. 108-3 at 4–5 ¶¶ 28, 43; Doc. No. 108-4 at 270–492)

- On May 30, 2019, Norsworthy reported to Nurse Attinello that she was douching twice

weekly.  (Doc. No. 108-3 at 7 ¶ 56; Doc. No. 108-5 at 69).

- On June 24, 2019, Dr. Graves renewed the douche prescription of twice per week for a year and continued the Flagyl prescription indefinitely in a June 27, 2019 addendum.  As of her transfer to Building 509 on June 25, 2019, Plaintiff was able to douche as necessary.  (Doc. No. 108-3 at 3, 5 ¶¶ 11, 38; Doc. No. 108-4 at 408–10, 148:1-5, 149:22-150:2).

- Following her transfer back to Building 503 on July 3, 2019, Norsworthy had no issues receiving douches, apart from a brief period after her fourth revision surgery in August 2019, when Norsworthy claims she did not receive sufficient douches.  (Doc. No. 108-3 at 2 ¶ 11, Doc. No. 108-4 at 151:10-19, 156:19-157:4).

- After Norsworthy's fourth revision surgery on August 13, 2019, Dr. Satterwhite recommended she douche daily for two weeks and then reduce the frequency to twice a week and then could reduce her douche to twice per week after that.  (Doc. No. 108-3 at 6 ¶ 47; Doc. No. 108-5 at 2–4).

- Norsworthy met with Dr. Graves on August 19, 2019, shortly after returning from surgery.  Norsworthy reported that she had not yet received her vinegar douche and Dr. Graves placed an order for daily vinegar douches.  Norsworthy was provided a douche that day by nursing staff.  (Doc. No. 108-3 at 5, 7 ¶¶ 43, 57–58; Doc. No. 108-4 at 464; Doc. No. 108-5 at 71–73, 75).

- On August 29, 2019, Dr. Graves met with Norsworthy and ordered a supply of douches.  Norsworthy received a douche that day from the pharmacy.  (Doc. No. 108-3 at 5, 7 ¶¶ 43, 59; Doc. No. 108-4 at 447, Doc. No. 108-5 at 77–79).

- On September 16, 2019, Dr. Satterwhite directed Norsworthy to douche every other day.  On October 14 and November 12, 2019, Norsworthy informed Dr. Graves she was douching as ordered.  (Doc. No. 108-3 at 2, 6–7 ¶¶ 10, 51, 60–61; Doc. No. 108-4 at 121:22-24; Doc. No. 108-5 at 81–82, 52-53, 84–85).

- Norsworthy alleges that CDCR's lengthy review and approval process delayed the fourth revision surgery originally scheduled by Dr. Satterwhite prior to her incarceration to take

28

place in April 2019.  This resulted in her surgery being delayed until August 13, 2019.
(Doc. No. 108-3 at 2 ¶ 10; Doc. No. 108-4 at 117:20-118:21; Doc. No. 75 at 19 ¶ 56).

- Norsworthy testified that she does not believe CDCR staff took too long to get her the August 13, 2019 surgery.  (Doc. No. 108-3 at 2 ¶ 11; Doc. No. 108-4 at 158:6-159:19).

- For an inmate to receive gender-affirming surgery from an outside provider, the patient must first make the request to her PCP, who must compile the necessary information. This could include referrals to other care providers such as mental health providers.  The information is provided to the institution's clinical leadership which does not determine the appropriateness of the surgery.  The statewide gender-affirming surgery review committee ("GASRC") determines whether they support the request after review. GASRC forwards the request to SMART, which reviews the relevant medical factors and must determine whether the procedure is both safe and medically indicated for the patient to proceed.  GASRC is a committee under the umbrella of SMART.  (Doc. No. 108-3 at 2 ¶¶ 3, 5, Doc. No. 108-4 at 56:9-57:16, 30:23-31:4).

- On April 4, 2019, at CCWF, nonparty nurse practitioner Ezenwugo provided Norsworthy with an admission evaluation physical then Norsworthy submitted a request for service for a fourth revision surgery from a plastic surgeon.  (Doc. No. 108-3 at 4, 7 ¶¶ 29, 62–63; Doc. No. 108-4 at 379-81; Doc. No. 108-5 at 87, 89).

- Dr. Branch was informed of the request for services on May 2, 2019, and followed up with her nurse.  On May 6, 2019, she was provided further information by nonparty, Utilization Management RN, Mollie Rudich.  On May 10, 2019, Dr. Branch spoke with Dr. Satterwhite to get information regarding the revision surgery.  That day, Dr. Branch submitted the required SMART Requisition form, which requests SMART review, to Nurse Rudich, Dr. Singh, and Dr. Mitchell.  Nurse Rudich, as Utilization Management RN, was responsible for scheduling appointments with outside providers such as Dr. Satterwhite.  (Doc. No. 108-3 at 7–8 ¶¶ 62–68, Doc. No. 108-5 at 87, 89; 91, 93, 95, 97, 103:10-25, 109:14-23; Doc. No. 108-4 at 43:3-23).

- On May 22, 2019, Nurse Rudich advised Drs. Mitchell, Graves, and Branch, that she

required confirmation from Dr. Satterwhite regarding the medical plan before the form could be submitted to SMART.  Norsworthy was scheduled for an appointment with Dr. Satterwhite on June 10, 2019.  Dr. Satterwhite was scheduling revisions in September 2019, absent an urgent need.  (Doc. No. 108-3 at 7 ¶ 67; Doc. No. 108-5 at 115).

- On May 10, 2019, Dr. Singh, as secondary reviewer, approved follow-up appointments for Norsworthy with Dr. Satterwhite for consultation/follow up.  (Doc. No. 108-3 at 7–8 ¶¶ 67–68; Doc. No. 108-5 at 117–18; 100:12-101:5).

- On June 10, 2019, Dr. Satterwhite recommended an in-depth psychiatric evaluation and treatment for Norsworthy due to his concerns regarding her mental stability before the revision surgery.  The revision surgery was scheduled for September 10, 2019, the earliest possible date, but Dr. Satterwhite informed prison mental health providers that it was important that Norsworthy be stable on her psychiatric medication for six weeks before the surgery.  (Doc. No. 108-3 at 2, 5, 8 ¶¶ 10, 37, 71; Doc. No. 108-4 at 120:4-22; 405-06; Doc. No. 108-4 at 121-22, 124).

- Dr. Satterwhite performed Norsworthy's fourth revision surgery on August 13, 2019.  (Doc. No. 108-3 at 2, 6 ¶¶ 10, 47; Doc. No. 108-4 at 118:19-24; Doc. No. 108-5 at 2–4).

- Dr. Satterwhite testified that the fourth revision surgery was not urgent and the delay from April 2019 to August 2019 was reasonable and acceptable.  (Doc. No. 108-3 at 2 ¶ 10; Doc. No. 108-4 at 118:22-119:11).

- The SAC alleges that "Defendants" denied her a vaginal lengthening surgery.  (Doc. No. 75 at 21–24 ¶¶ 65–73).

- Norsworthy does not allege nor point to any evidence that the non-medical defendants (Dill, Gibson, Garcia-Torres, Shoals, Pallares, Espinoza, and Goethe) participated in the medical decisions regarding provision of the further deepening procedure.  (*See generally* Doc. No. 75).

- The only allegation in the SAC against Defendant Taylor is that Taylor, as chair of SMART, delayed and denied Norsworthy's request for a deepening procedure.  (Doc. No. 75 at 21–22 ¶¶ 66–67).

- During the June 10, 2019 evaluation, Dr. Satterwhite stated that if Norsworthy's depth did not improve with regular dilation, she would have to consider a colon vaginoplasty. On August 12, 2019, Dr. Satterwhite noted Norsworthy "will need reconstruction of her vaginal canal to restore depth" and "needs to be referred to Dr. Maurice Garcia of Cedars Sinai for colon procedure for consultation and treatment." On September 16, 2019, Dr. Satterwhite recommended an evaluation and treatment with Dr. Maurice Garcia regarding the deepening procedure.  (Doc. No. 108-3 at 3, 5, 7 ¶¶ 12, 37, 60; Doc. No. 108-5 at 6–7, 81–82; Doc. No. 108-4 at 177–78, 405–06).

- Dr. Mitchell's involvement with the GASRC and SMART review of Norsworthy's requests was to ensure that paperwork was timely submitted for review.  He did not create or review the required SMART requisition form.  (Doc. No. 108-3 at 2 ¶ 3; Doc. No. 108-4 at 31:19-32:1, 33:24-34:3).

- Dr. Branch's involvement, as Plaintiff's PCP, in SMART's process was to gather the necessary information regarding a patient's request for gender-affirming surgery, which include other referrals, and submit that information to the clinical leadership at the facility. Dr. Branch is without knowledge as to why SMART did not approve Norsworthy's request for a deepening procedure in January 2020.  (Doc. No. 108-3 at 2 ¶¶ 4–5; Doc. No. 108-4 at 44:14-45:1, 56:15-57:16).

- Dr. Singh reviewed requests for SMART review pursuant to his role as the Chief Medical Executive and forwarded the document to SMART without evaluating whether it should be approved or rejected.  It was SMART's role to review the request and decide if the procedure should go forward.  Dr. Singh did not participate in the GASRC or SMART review of Norsworthy's request for a deepening procedure.  (Doc. No. 108-3 at 8 ¶ 68; Doc. No. 108-5 at 102:16-25, 104:2-108:1).

- Dr. Satterwhite testified that a patient should wait between six months up to a year and a half between revision surgeries, depending on the patient.  (Doc. No. 108-3 at 2 ¶ 10; Doc. No. 108-4 at 108:9-23).

- On August 29, 2019, in response to a recommendation for a colovaginoplasty, Dr. Graves

31

wrote in Plaintiff's progress notes that the procedure was not currently medically indicated and had some potential side effects/complications which have yet to be reported as preventable in the surgical literature.  On September 23, 2019, Nurse Rudich reached out about submitting a request for services for Norsworthy's colovaginoplasty, but Dr. Graves initially declined because he did not believe that it was medically indicated.  (Doc. No. 108-3 at 7–8 ¶¶ 59, 73; Doc. No. 108-5 at 126, 77–79).

- On September 26, 2019, Dr. Singh wrote Nurse Rudich and Dr. Mitchell saying that "[g]ender [a]ffirming surgery requests are considered medically indicated for gender dysphoria patients as long as [mental health] validates that."  Dr. Singh and Dr. Graves spoke about the request and Dr. Graves then initiated the request for services.  (Doc. No. 108-3 at 3, 8 ¶¶ 15, 74; Doc. No. 108-5 at 132; Doc. No. 108-4 at 189:22-191:17).

- By October 2019, Dr. Singh transferred to the Substance Abuse Treatment Facility. Afterwards, he had no further input into or oversight regarding Norsworthy's care.  (Doc. No. 108-3 at 8 ¶ 68; Doc. No. 108-5 at 110:23-111:10).

- Dr. Satterwhite could not perform the colovaginoplasty, so a referral to another surgeon with the ability and willingness to perform the surgery was necessary.  Dr. Satterwhite was only aware of two doctors, including Maurice Garcia, who provided that procedure in California.  (Doc. No. 108-3 at 2 ¶ 10; Doc. No. 108-4 at 110:19-111:4; 112:17-21).

- On December 17, 2019, GASRC recommended a finding of "Approved" regarding a referral to a specialist for a consultation regarding the risks and benefits of vaginal deepening surgery, but noted Norsworthy had experienced ongoing complications from her previous gender-affirming surgeries and the surgery may not provide relief and Norsworthy was likely to experience ongoing gender dysphoria.  (Doc. No. 108-3 at 8 ¶ 75; Doc. No. 108-5 at 134).

- On January 21, 2020, SMART reviewed and declined the GASRC recommendation. After applying the Gender Affirming Care ("GAS") Guidelines and affording great weight to the GASRC recommendation, SMART declined to following the recommendation because there was no substantial evidence to support the decision of GASRC under the

guidelines.  SMART specifically cited to ongoing complications related to the four previous attempts at revising the initial gender-affirming surgery. SMART believed that there was insufficient evidence to show that the surgery would provide any benefit and posed a significant risk of failure and further complications. (Doc. No. 108-3 at 8 ¶ 76; Doc. No. 108-5 at 136).

- Due to SMART's denial of the GASRC recommendation, the chief medical executive or designee was required to review and resolve the discrepancy.  Deputy Director Dr. Renee Kanan was that individual.  By May 18, 2020, Dr. Kanan had approved Norsworthy's request for a consultation for the surgery.  (Doc. No. 108-3 at 2, 8 ¶¶ 5, 77; Doc. No. 108-4 at 58:8-59:3; Doc. No. 108-5 at 138–39).

- Concurrently to the SMART process, CCWF medical providers, including Dr. Mitchell, were seeking a specialist who could perform a colovaginoplasty.  Nonparty Deputy Medical Executive Dr. Grace Song indicated that a specialist was being sought as of November 26, 2019, while GASRC was reviewing Plaintiff's request.  (Doc. No. 108-3 at 2, 8 ¶¶ 3, 78; Doc. No. 108-4 at 37:11-24; Doc. No. 108-5 at 141).

- On March 3, 2020, Dr. Mitchell requested Dr. Branch contact Crane Medical regarding a consultation for a possible colovaginoplasty.  Dr. Branch and Nurse Rudich corresponded that day regarding setting up an appointment.  (Doc. No. 108-3 at 8–9 ¶¶ 79–80; Doc. No. 108-5 at 144–46, 149–50).

- On March 5, 2020, Dr. Song contacted Dr. Satterwhite to ask for information regarding alternative treatments for Norsworthy or to provide references for other surgeons.  As of that date, CDCR had reached out to and been rejected by a dozen surgeons regarding providing a colovaginoplasty, including Dr. Satterwhite's sole recommended surgeon, Dr. Maurice Garcia.  Dr. Satterwhite provided some alternative surgeons, who were mostly out-of-state, but reiterated he could not offer medical assistance.  (Doc. No. 108-3 at 9 ¶ 81; Doc. No. 108-5 at 152–53).

- Norsworthy was scheduled for an in-person consultation with Crane Medical on March 13, 2020, but she refused to attend due to COVID concerns.  She was informed of all the

risks and benefits from delaying the appointment, including delay in diagnosis and/or treatment, up to and including death.  (Doc. No. 108-3 at 9 ¶ 82; Doc. No. 108-5 at 155–56).

- On March 19, 2020, Dr. Wittenberg, who Dr. Satterwhite had recommended, declined to provide any medical care.  (Doc. No. 108-3 at 9 ¶¶ 81, 83; Doc. No. 108-5 at 158–59, 152–53).

- Norsworthy was rescheduled for an evaluation with Dr. Rodriguez at Crane Medical for June 1, 2020, but was rescheduled to August 10, 2020, due to COVID concerns.  On July 23, 2020, Crane Center indicated that they were not comfortable serving inmate patients at that time due to COVID and would need to reschedule the evaluation to January 2021.  (Doc. No. 108-3 at 9 ¶ 84; Doc. No. 108-5 at 161).

- On November 13, 2020, Norsworthy had a videoconference consultation with Dr. Rodriguez from Crane regarding possible procedures to resolve her loss of depth.  Dr. Rodriguez advised that a second exam was necessary for a vaginal depth measurement.  Dr. Rodriguez noted that Norsworthy might be a candidate for a colovaginoplasty or peritoneal pull through depending on the outcome of the second appointment.  (Doc. No. 108-3 at 9 ¶ 85; Doc. No. 108-5 at 163–65).

- As of Dr. Mitchell's May 20, 2021 deposition, CCWF medical providers were still looking for a specialist who could perform Norsworthy's deepening procedure, but Dr. Mitchell believed she had a virtual appointment pending.  (Doc. No. 108-3 at 2 ¶ 3; Doc. No. 108-4 at 35:4-36:4).

- On May 27, 2021, Norsworthy had a pre-consult phone call with Dr. Sinclair about a colovaginoplasty.  He recommended that she have a CAT scan and a colonoscopy, preferably before any future consultations.  Dr. Sinclair informed Norsworthy of the extensive risks, due in part to her surgical history, that could result from a colovaginoplasty including failure to meet her goal, transfusions, excrement and urine leaking through the vagina, additional surgeries, loss of sensation, loss of orgasmic capability, and inability to have sex.  (Doc. No. 108-3 at 9 ¶ 86; Doc. No. 108-5 at 167).

- Since being paroled on January 13, 2022, Norsworthy has not obtained deepening surgery as of December 12, 2023, which she reports she cannot afford.  Following release, she moved to West Virginia, where she is unaware whether gender-affirming care is available to her but thinks there might be somewhere to go in Virginia.  (Doc. No. 110-3 at 10 ¶ 36; Doc. No. 75 at 1 ¶ 1; Doc. No. 108-3 at 2 ¶ 11; Doc. No. 108-4 at 173:22-174:22).

- The SAC alleges in September 2019, Defendant Branch refused to extend her rest period and wheelchair use by 30 days following her August 13, 2019 surgery.  (Doc. No. 75 at 21 ¶ 64; Doc. No. 108-3 at 2 ¶ 11; Doc. No. 108-4 at 171:17-172:21).

- On August 16, 2019, the date Norsworthy returned from surgery to CCWF, Nurse Fontanilla recommended issuing Norsworthy a temporary wheelchair.  (Doc. No. 108-3 at 9 ¶ 87, Doc. No. 108-5 at 169).[12]

- Dr. Graves ordered a wheelchair for Norsworthy from August 17, 2019, through August 29, 2019.  On August 29, 2019, Dr. Meissner-Frisk provide a wheelchair extension through September 11, 2019.  On September 11, 2019, Dr. Graves provided a one-week wheelchair extension.  On September 18, 2019, Dr. Branch extended the wheelchair until October 15, 2019.  On October 14, 2019, Dr. Graves ordered a wheelchair extension through November 15, 2019.  On November 12, 2019, Dr. Graves provided a wheelchair extension through December 11, 2019.  On December 11, 2019, Norsworthy informed Dr. Graves she no longer required the use of a wheelchair and returned it.  (Doc. No. 108-3 at 9 ¶¶ 88–90; Doc. No. 108-5 at 171–72, 174–75, 177–78).

**E. Plaintiff's MPSJ – Objective Prong**

The Court first considers Plaintiff's MPSJ.  For the reasons outlined *infra*, the Court finds that the request for declaratory judgment is improper and Plaintiff's request for the Court to determine whether specific forms of treatment qualify as a serious medical need under the first prong of the deliberate indifference analysis fails as a matter of law.

*////*

---

[12] As noted *supra*, Plaintiff's counsel confirmed at the hearing that Norsworthy is not advancing a free-standing medical deliberate indifference claim relating to the wheelchair.

1

### 1. Request for Declaratory Relief

2      Through her MPSJ, Plaintiff "only" seeks the Court's limited determination that she had

3  two "serious medical needs under 42 U.S.C. § 1983" while in CCWF custody: (1) the right to

4  dilate regularly with privacy and (2) the right to a vaginal deepening procedure.[13] (Doc. No. 110-

5  1 at 6). Plaintiff states this request is based on the undisputed facts and does not require the Court

6  to consider "questions of liability, causation, or damages," as all factual disputes must be resolved

7  by a jury. (*Id*. at 5–6).

8      However, "[r]ights, constitutional and otherwise, do not exist in a vacuum. Their purpose

9  is to protect persons from injuries to particular interests, and their contours are shaped by the

10 interests they protect." *Carey v. Piphus*, 435 U.S. 247, 254 (1978). The courts generally prioritize

11 fact-specific inquiries into causation, harm, and liability rather than issuing broad declarations of

12 constitutional rights when governmental intervention is implicated. *See Los Angeles Cnty., Cal.*

13 *v. Humphries*, 562 U.S. 29, 37 (2010) ("Nothing in the text of § 1983 suggests that the causation

14 requirement contained in the statute should change with the form of relief sought."); *see also*

15 *Carey*, 435 U.S. at 259, 263 (1978) (rejecting the idea that a plaintiff could recover damages

16 solely based on the existence of a constitutional violation without proving causation and harm in a

17 § 1983 action); *Eccles v. Peoples Bank of Lakewood Vill., Cal*., 333 U.S. 426, 431 (1948) ("It is

18 always the duty of a court of equity to strike a proper balance between the needs of the plaintiff

19 and the consequences of giving the desired relief. Especially where governmental action is

20 involved, courts should not intervene unless the need for equitable relief is clear, not remote or

21 speculative.").

22      To the extent that Plaintiff requests declaratory judgement for alleged violation of her

23 constitutional rights, the Court in unable to consider this request because Plaintiff has failed to

24 plead this form of relief in her operative complaint. *Arizona v. City of Tucson*, 761 F.3d 1005,

25 1010 (9th Cir. 2014) ("Requests for declaratory judgment are not properly before the court if

26 raised only in passing, or by motion." (citing *Kam–Ko Bio–Pharm Trading Co. Ltd–Australasia*

27

28 [13] At oral argument, Plaintiff's counsel confirmed that she is seeking declaratory relief on these two issues.

1    *v. Mayne Pharma (USA) Inc*., 560 F.3d 935, 943 (9th Cir.2009))).  Plaintiff's SAC does not

2    include a prayer for declaratory relief or otherwise assert a request for declaratory judgment.  (*See*

3    Doc. No. 75 at 27).

4         Even if properly plead, a request for either retrospective or prospective declaratory

5    judgement is nonetheless inappropriate.  Plaintiff's alleged Eighth Amendment violations

6    occurred while she was in CCWF custody.  Now that Plaintiff is no longer in CCWF custody, the

7    alleged violations are no longer ongoing.  The declaratory relief sought is thus retrospective in

8    nature. When a plaintiff seeks retrospective declaratory relief, courts have declined to award such

9    relief where "the issuance of a declaratory judgment . . . would have much the same effect as a

10   full-fledged award of damages or restitution by the federal court[.]" *Green v. Mansour*, 474 U.S.

11   64, 73 (1985); *see also Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 848 n. 5 (9th Cir. 2002)

12   ("[W]e consider declaratory relief retrospective to the extent that it is intertwined with a claim for

13   monetary damages that requires us to declare whether a past constitutional violation occurred. In

14   such a situation, however, declaratory relief is superfluous in light of the damages claim."

15   (internal quotations and citations omitted)).  Thus, a claim for declaratory relief would be

16   superfluous in relation to her Eighth Amendment claims for damages.

17        As to any claim for prospective relief, Plaintiff would be unable to demonstrate a

18   likelihood of future harm.  Before the Court can award declaratory relief, it "must first inquire

19   whether there is an actual case or controversy within its jurisdiction." *Principal Life Ins. Co. v.*

20   *Robinson*, 394 F.3d 665, 669 (9th Cir.2005).  A "case or controversy" refers to Article III

21   standing.  *MedImmune, Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2007); *see also Krug v.*

22   *Woods*, 9 F.3d 1552 (9th Cir. 1993) ("Jurisdiction to award declaratory relief [ ] exists only in a

23   case of actual controversy." (citations and quotations omitted)).  "[A] plaintiff must demonstrate

24   standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't*

25   *Servs. (TOC), Inc*., 528 U.S. 167, 185 (2000).  To satisfy Article III jurisdictional requirements

26   with respect to declaratory relief, "a plaintiff mush show that he has suffered or is threatened with

27   a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be

28   wronged in a similar way." *Canatella v. State of Cal*., 304 F.3d 843, 852 (9th Cir.2002) (cleaned

37

1    up).  At most, Plaintiff can only demonstrate ongoing emotional and mental distress, which is

2    insufficient to establish Article III standing for the requested prospective relief.  *See City of Los*

3    *Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("The emotional consequences of a prior act

4    simply are not a sufficient basis for an injunction absent a real and immediate threat of future

5    injury by the defendant. Of course, emotional upset is a relevant consideration in a damages

6    action."); *see also Charleston v. Nevada*, 423 F. Supp. 3d 1020, 1026–27 (D. Nev. 2019)

7    (dismissing claims for declaratory and injunctive relief because, *inter alia*, plaintiffs' mere

8    allegations of ongoing dehumanizing and emotional harm were insufficient to establish a

9    cognizable Article III injury-in-fact), *aff'd*, 830 F. App'x 948 (9th Cir. 2020).

10    Because Plaintiff failed to plead declaratory relief in her operative complaint and cannot

11    establish Article III standing—whether based on past constitutional violations or future emotional

12    harm—this Court lacks authority to determine whether she is entitled to declaratory judgment on

13    the merits.  *See Barrett v. Belleque*, 475 F. App'x 653, 654 (9th Cir. 2012) (affirming the district

14    court decision finding that the plaintiff's claim for declaratory relief was moot because he was no

15    longer subject to the prison's policies at issue following his transfer to another facility); *see also*

16    *Matthews v. Pennsylvania Dep't of Corr.*, 827 F. App'x 184–87 (3d Cir. 2020) (dismissing

17    former prisoner claims for declaratory relief against prison officials, claiming they failed to

18    accommodate his tendinitis, for lack of standing because he had been released from custody

19    before initiating the action).

## 2.  Limits on Defining Medical Needs

21    Next, the Court considers Plaintiff's MPSJ to the extent she seeks adjudication as a matter

22    of law under "the first factor" of the deliberate indifference analysis on the following two issues:

23    (1) the right to dilate regularly with privacy and (2) the right to a vaginal deepening procedure.

24    (Doc. No. 110-1 at 20).

25    Courts generally define a serious medical need by the underlying condition, rather than by

26    the specific treatment sought.  *See, e.g., Estelle*, 429 U.S. at 107 ("The doctors diagnosed his

27    injury as a lower back strain . . . Respondent contends that more should have been done by way of

28    diagnosis and treatment . . . But the question whether an X-ray or additional diagnostic techniques

1   or forms of treatment is indicated is a classic example of a matter for medical judgment."); s*ee*

2   *also, e.g., Colwell v. Bannister*, 763 F.3d 1060, 1068–70 (9th Cir. 2014) (finding that issues of

3   fact existed where defendants were allegedly deliberately indifferent to the inmate's serious

4   medical need, monocular blindness, by denying his requests for cataract-removal surgery); *Boretti*

5   *v. Wiscomb,* 930 F.2d 1150, 1154–56 (6th Cir. 1991) (finding that post-surgical wound care and

6   pain management qualify as a serious medical need).

7        As the Ninth Circuit has explained, "[e]xamples of serious medical needs include the

8   existence of an injury that a reasonable doctor or patient would find important and worthy of

9   comment or treatment; the presence of a medical condition that significantly affects an

10  individual's daily activities; or the existence of chronic and substantial pain." *Lopez v. Smith*, 203

11  F.3d 1122, 1131 (9th Cir. 2000) (en banc) (cleaned up).  Unquestionably, the Ninth Circuit has

12  recognized that gender dysphoria is a serious medical condition and gender confirmation surgery

13  may be necessary to treat prisoners suffering from this condition.  *Edmo v. Corizon, Inc*., 935

14  F.3d 757, 767 (9th Cir. 2019).

15       With these legal concepts in mind, the Court declines to make the determination, as

16  explicitly requested by Plaintiff—that specific forms of treatments such as regular dilation with

17  privacy or a vaginal deepening procedure themselves qualify as serious medical need or condition

18  under the first prong of the deliberate indifference analysis based on four considerations.  First, a

19  self-directed care regimen and a surgical procedure do not fall within the Ninth Circuit's

20  enumerated examples of serious medical needs—such as an injury, medical condition, or chronic

21  and substantial pain.  *See Lopez*, 203 F.3d at 1131.  The Court is unaware of any case law directly

22  analogous to Plaintiff's position, nor has Plaintiff provided such authority.

23       Second, as it relates to Plaintiff's alleged right to regularly dilate in privacy, Plaintiff's

24  treating physician, Dr. Satterwhite, ordered her to do so "as a crucial part of [her] post-operative

25  care" otherwise "the vagina will close in on itself completely, resulting in a disastrous result."

26  (Doc. No. 110 at 14).  Plaintiff essentially argues that the prescribed preventative treatment—

27  dilation—is itself the underlying serious medical need.  However, accepting Plaintiff's argument

28  at face value—that the treatment alone constitutes a serious medical need—would be flawed.

1    *See, e.g.*, *Estelle*, 429 U.S. at 107; *see also, e.g.*, *Colwell*, 763 F.3d at 1068–70; *Boretti*, 930 F.2d

2    at 1154–56.  Based on the record, the Court notes that Plaintiff's serious medical need may be

3    accurately characterized as post-operative care to preserve vaginal depth.  To the extent Plaintiff

4    seeks a ruling on the right to *regularly* dilate with *privacy*—under the objective standard, the

5    Court declines to do so.  Indeed, a ruling predicated on the qualifiers "regularly" and "with

6    privacy," without considering liability and causation, would exceed the scope of a case-specific

7    adjudication and carry significant implications for correctional intuitional policy and

8    constitutional analysis.

9        Although Plaintiff frames her request as seeking a narrow determination, a judicial

10   recognition of this type of post-operative care—without a fact-specific inquire into "liability,

11   causation, or damages"—raises significant concerns regarding judicial overreach and the scope of

12   enforcement.  Courts adjudicate constitutional medical claims under the Eighth Amendment's

13   deliberate indifference standard, requiring an assessment of both the seriousness of the medical

14   need and the defendant's response to that need.  Issuing a ruling absent such an inquiry, risks

15   prematurely shaping institutional obligations while failing to consider the individualized

16   circumstances of Defendants conduct and Plaintiff's medical treatment needs. *See Kosilek v.*

17   *Spencer*, 774 F.3d 63, 95–96 (1st Cir. 2014) (prison officials retain discretion in determining

18   appropriate medical care when balancing security risks with treatment needs);

19       A ruling in Plaintiff's favor on this issue would effectively establish an independent

20   privacy right within the framework of a medical deliberate indifference claim, a position that

21   conflicts with well-settled precedent recognizing that incarceration inherently restricts many

22   fundamental rights, including privacy.  *Seaton v. Mayberg*, 610 F.3d 530, 534 (9th Cir. 2010)

23   (first quoting *Hudson v. Palmer*, 468 U.S. 517, 524 (1984) and then quoting *Bell v. Wolfish*, 441

24   U.S. 520, 537 (1979)); *see also Michenfelder v. Sumner*, 860 F.2d 328, 333–34 (9th Cir. 1988)

25   ("incarcerated prisoners retain a limited right to bodily privacy").

26       At oral argument, counsel for Plaintiff clarified that in Plaintiff's circumstances her

27   requested privacy accommodation could be achieved only by placing her in a private cell.  Such a

28   request implicates broader concerns regarding institutional security and resource allocation—

1    matters courts have historically deferred to correctional administrators.  *See Kosilek*, 774 F.3d at

2    95–96; *see also Meachum v. Fano*, 427 U.S. 215, 228–29 (1976) (prison officials have broad

3    discretion with inmate housing assignments). Further, the Supreme Court has long held that

4    prison inmates have no constitutional right to a private cell.  *Rhodes v. Chapman*, 452 U.S. 337,

5    348 (1981) (double celling did not violate the Eighth Amendment); *Bell v. Wolfish*, 441 U.S. 520,

6    542 (1979) (pretrial detainees have no due process right to a private cell); *see also Allen v.*

7    *Figueroa*, 56 F.3d 70, at *7 (9th Cir. 1995) (unpublished disposition) (inmates have no Eighth

8    and Fourteenth Amendment rights to be housed with certain individuals).

9         In light of the aforementioned legal standards governing constitutional claims, Plaintiff's

10    request can only be examined as to her specific allegation against each defendant.  *See Carey*, 435

11    U.S. at 254 ("Rights, constitutional and otherwise, do not exist in a vacuum. Their purpose is to

12    protect persons from injuries to particular interests, and their contours are shaped by the interests

13    they protect."). The Court, therefore, conducts its analysis solely under the appropriate subjective

14    prong, as discussed *infra*.

15         Third, as to Plaintiff's claim seeking the right to a vaginal deepening procedure, the Court

16    also declines to consider this claim under the first prong of the deliberate indifference analysis.

17    Plaintiff asserts that by the time she received a single-cell accommodation her vaginal depth had

18    diminished to 5 centimeters.  (Doc. No. 75 at 20 ¶¶ 58–62).  As a result, Plaintiff has a "non-

19    functional vagina," preventing her from engaging in intimate relations with her husband.  (*Id*. at

20    20, 23 ¶¶ 62, 71).  Plaintiff now requires either a colovaginoplasty or peritoneoplasty, both high-

21    risk procedures, to restore her lost vaginal depth.  (*Id*. at 2–3, 20, 23 ¶¶ 2, 62, 71).

22         The Court notes that the record supports the assertion that Plaintiff's purported serious

23    medical condition—a non-functional vagina—allegedly necessitates surgical intervention, rather

24    than the surgery itself constituting the serious medical need, as Plaintiff suggests.  Thus, a more

25    precise characterization would be that the vaginal deepening procedure constitutes the treatment

26    Plaintiff seeks to address her underlying serious medical condition: a non-functional vagina for

27    the purpose of engaging in sexual intercourse.

28         In support of her claim—that the treatment itself constitutes a serious medical need—

1     Plaintiff's MPSJ argument implicitly builds on a string of cases recognizing gender dysphoria as

2     a serious medical need.  (*See* Doc. No. 110-1 at 21 (first citing *Edmo*, 935 F.3d 757, 785 (9th Cir.

3     2019); then citing *Gonzales v. California Dep't of Corr. & Rehab.*, 2020 WL 1847491, at *6

4     (E.D. Cal. Apr. 13, 2020), *report and recommendation adopted*, 2020 WL 7388294 (E.D. Cal.

5     Dec. 16, 2020); then citing *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1186 (N.D. Cal.), *appeal*

6     *dismissed and remanded*, 802 F.3d 1090 (9th Cir. 2015); then citing *Kosilek*, 774 F.3d at 86; and

7     then citing *De'lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013)).  These cases, however, do not

8     support the proposition that the treatment of the serious medical need (gender dysphoria) is also a

9     serious medical need.  Rather, these cases support the recognition of gender dysphoria as a

10    serious medical condition and affirm that gender confirmation may be necessary to treat

11    incarcerated individuals suffering from this condition.

12         In her response to Defendants' SSUF, Plaintiff also cites the same series of cases to

13    explicitly refute Defendants' claim that a deepening procedure was medically unnecessary.  (Doc.

14    No. 114-1 at 43–44).  However, these cases do not support the explicit proposition that a patient

15    who had already undergone gender affirming surgery and four revision surgeries must receive a

16    deepening procedure that carries serious medical risks.  The Court notes that the cases relied upon

17    by Plaintiff for the proposition that a deepening procedure is necessary, were predominately

18    official capacity suits for injunctive relief that challenged the constitutionality of the prison's

19    policies or practices barring GAS.  *See Edmo*, 935 F.3d at 796–97, 799–800 (official capacity

20    claims may challenge *de facto* prison practices or policies denying GCS); *see also Gonzales*, 2020

21    WL 1847491, at *6 (individual capacity claims require allegations that defendants were aware of

22    the treatment's ineffectiveness or its side effects, whereas official capacity claims may challenge

23    the prison's review and approval mechanism for SRS as deliberately indifferent, either facially or

24    as applied).

25         Here, Plaintiff has dismissed her request for injunctive relief and cannot seek a

26    declaration.  The remaining claims pertain solely to Defendants in their individual capacities.

27    Thus, the Court must determine whether each Defendant acted with deliberate indifference in

28    denying or delaying Plaintiff's deepening procedure, rather than evaluating whether the SMART

1    committee collectively exploited procedural mechanisms to delay Plaintiff's procedure as a

2    "tactic" or "machination" as Plaintiff asserts.  (*See* Doc. No. 114 at 7; *see also* Doc. No. 114-1 at

3    63).

4            Plaintiff cites *Colwell* for the proposition that the loss of an organ's function, such as the

5    eyes, constitutes a serious medical need and asserts that the loss of vaginal function is equally

6    significant.  (*See* Doc. No. 110 at 20 (citing *Colwell*, 763 F.3d at 1066)).  However, Plaintiff's

7    reliance on *Colwell* may be misplaced.  In *Colwell*, the Ninth Circuit held "that [the plaintiff's]

8    total blindness in one eye is a serious medical need" under the objective prong of the deliberate

9    indifference analysis.  763 F.3d 1060, 1068.  In support of this holding, the Ninth Circuit

10   reasoned:

11               [T]he evidence showed that [the plaintiff] was not "merely blind" in
               one eye, but that his monocular blindness caused him physical injury:
12               He ran his hand through a sewing machine on two occasions while
               working in the prison mattress factory; he ran into a concrete block,
13               splitting open his forehead; he regularly hits his head on the upper
               bunk of his cell; and he bumps into other inmates who are not good-
14               natured about such encounters, triggering fights on two occasions.

15   *Id*. at 1067.  Here, aside from concerns regarding vaginal depth, the record indicates that Plaintiff

16   retained structural—and likely functional—integrity in other anatomical components of her

17   female genitalia following her August 2019 vulvovaginal surgery.  (*See, e.g*., Norsworthy Depo.

18   Tr. 195:13-196:1 (Plaintiff testifying that she experienced no complications from the August 2019

19   procedure and "was ecstatic with the [resulting] clitoral hood."); *see also, e.g*., Doc. No. 108-5 at

20   52–53 (Dr. Graves' November 12, 2019 clinical note stating that Plaintiff's "vulva is completely

21   healed at this point. There is a slight contracture to the right side of the pelvis which the patient

22   understands needs to be slowly manipulated to loosen it. The clitoral hood is loose and mobile

23   over the clitoris. The sulcus of the vulva appears to be normal."))[14]  In distinguishing *Colwell*

24   from the present matter, the Court finds that the complete loss of sight in one eye—causing

25   multiple physical injuries—presents a significantly different medical concern than the retained

26   function of a reproductive organ used for the sole purpose of intercourse.  *See, e.g., Lyons v.*

27   _____

28   [14] The Court refers throughout this Order to the complete deposition transcripts lodged with the Court
     pursuant to Local Rule 133(j).

1   *Brandly*, 430 F. App'x 377, 381 (6th Cir. 2011) ("erectile dysfunction cannot be said to be a

2   serious medical condition, given that no physician indicated its treatment was mandatory, it was

3   not causing . . . pain, and it was not life-threatening."); *see also, e.g., Michtavi v. Scism*, 808 F.3d

4   203, 206–07 (3d Cir. 2015) (holding that appellants were entitled to qualified immunity on the

5   issue of "whether the [officials were] obligated to treat conditions resulting in impotence and/or

6   infertility, such as retrograde ejaculation and erectile dysfunction.").  For these reasons, the Court

7   assesses the right to a vaginal deepening procedure solely under the second prong of the medical

8   deliberate indifference analysis as applied to each named Defendant, as discussed *infra*.

9       Fourth, it is undisputed that Plaintiff suffers from gender dysphoria.  (Doc. No. 117-2 at

10  85).  The Court notes that Plaintiff likely has a sufficient basis to establish a serious medical need

11  under the first prong of the medical deliberate indifference analysis, as every allegation in the

12  operative complaint regarding delayed or denied treatment directly relates to her condition.  *See*

13  *Edmo*, 935 F.3d at 767; *see also Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) ("gender

14  dysphoria is a serious medical condition"); *Beard*, 87 F. Supp. 3d at 1186 ("Norsworthy is likely

15  to succeed in establishing a serious medical need" because the evidence supports that "she

16  continues to experience severe symptoms of gender dysphoria."); *Clark v. Quiros*, 2024 WL

17  3552472, at *23 (D. Conn. July 26, 2024) ("determine[ing] that an injunction is necessary to

18  ensure that [the plaintiff] receives appropriate medical care for her gender dysphoria").

19      In sum, although Plaintiff's gender dysphoria most likely qualifies as a serious medical

20  need in this case, the Court declines to decide whether gender dysphoria, post-operative care to

21  preserve vaginal depth, or a non-functional vagina for purpose of engaging in sexual intercourse

22  qualifies as a serious medical need because the parties have not explicitly raised these issues in

23  their motions.  *See, e.g., KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 714 (9th Cir. 2020)

24  (explaining that granting *sua sponte* summary judgment to a nonmovant is generally disfavored).

25  The Court finds that the two issues related to the delay and denial of specific forms of treatment

26  are more properly addressed under the second prong of the deliberate indifference analysis and

27  considers Plaintiff's arguments when ruling on Defendants' MSJ under the subjective prong.

28  Further, the Court declines to rule on whether Plaintiff has a serious medical need under the

1  Eighth Amendment because the undisputed facts demonstrate that none of the Defendants acted

2  with deliberate indifference to any of Plaintiff's assumed serious medical needs, for the reasons

3  outlined in this order.

4        Accordingly, the undersigned recommends that the District Court deny Plaintiff's Motion

5  for Partial Summary Judgment, seeking either a declaration or a determination that the undisputed

6  facts support Plaintiff's claim that (1) the right to dilate regularly with privacy or (2) the right to a

7  vaginal deepening procedure qualifies as a serious medical need under the first prong of the

8  deliberate indifference analysis, as a matter of law.

9        **F. Defendants' MSJ – Subjective Prong**

10       The Court now turns to Defendants' MSJ, considering Plaintiff's arguments presented in

11  both her opposition to Defendants' MSJ and her own MPSJ.

12              **1. Defendants Pallares and Espinoza**

13       At the outset, the Court notes that Plaintiff's summary judgment briefings make no

14  mention of Defendants Pallares and Espinoza, who were the Deputy Chief Warden and Warden

15  of CCWF, respectively, during the relevant period, much less cite any evidence establishing a

16  genuine dispute of material fact as to any constitutional claim against them. (*See generally* Doc.

17  Nos. 110-1, 114, 118).  Defendants' MSJ points to the absence of any evidence for a claim

18  against Pallares or Espinoza based on the denial of Plaintiff's request for a lengthening procedure.

19  (Doc. No. 108-1 at 14).  Given that Plaintiff does not cite any facts establishing a genuine dispute

20  of material fact as to the liability of these two Defendants, the undersigned recommends

21  Defendants' MSJ be granted as to Defendants Pallares and Espinoza on that basis.

22              **2. Privacy to Regularly Dilate**

23       In response to Plaintiff's claims that she was denied the ability to regularly dilate with

24  privacy, Defendants argue that the undisputed evidence reveals that officials afforded Norsworthy

25  with reasonable privacy accommodations, including privacy screens, designated medical spaces,

26  and ultimately a single-cell assignment. (Doc. No. 108-1 at 18–20).  They contend, however, that

27  institutional security concerns must be weighed against Plaintiff's preferences and that case law

28  does not support a right to absolute privacy for medical procedures performed in a correctional

45

1   setting.  (*Id.* at 20-21; Doc. No. 113-1 at 7–8).  Defendants assert that Plaintiff was always

2   physically capable of dilating and declined to do so in available spaces.  (Doc. No. 113-1 at 8–11;

3   Doc. No. 117 at 4–8).

4       Plaintiff argues that the provided accommodations were inconsistent and inadequate.

5   (Doc. No. 110-1 at 21–23; Doc. No. 114 at 19–22).  She maintains that her inability to privately

6   dilate resulted in significant harm, including loss of vaginal depth and psychological distress.

7   (Doc. No. 114 at 21, 29; Doc. No. 118 at 6–9).  She relies on expert testimony, and her treating

8   physician Dr. Satterwhite, who repeatedly emphasized that failure to maintain a strict dilation

9   regimen would result in loss of vaginal depth and function.  (Doc. No. 110-1 at 22; Doc. No. 118

10   at 5).  Plaintiff further contends that Defendants' reliance on existing case law falls outside the

11   scope of her Eighth Amendment medical deliberate indifference claims and that Defendants'

12   reliance on institutional security considerations are overstated.  (Doc. No. 118 at 9–10).

13       At oral argument, Plaintiff clarified that she has a constitutional right to dilate with

14   privacy and that the required privacy could only be accomplished by providing her with a private

15   cell under the circumstances. Thus, the issue before the Court is whether Defendants were

16   deliberately indifferent to Plaintiff's right to dilate in a private cell.

17       **a.  Expert Reports**

18       The experts dispute two issues regarding dilation. First, they disagree on the cause of

19   Plaintiff's vaginal stenosis, with Dr. Sinclair attributing it to a pre-existing hematoma and early

20   medical records suggesting a reduction in vaginal depth, while Dr. Gurjala contends that

21   inadequate opportunities for dilation during her incarceration were the primary cause.  Second,

22   Dr. Sinclair maintains that Plaintiff had sufficient space and ability to perform dilation discreetly,

23   whereas Dr. Gurjala argues that the lack of proper privacy, coupled with Plaintiff's history of

24   trauma, made effective dilation unreasonably difficult in a multiperson cell.

25       As to the causation issue, the undisputed evidence, as well as Dr. Gurjala's report,

26   supports the finding that Plaintiff maintained the same depth shortly after her arrival at CDCR

27   until she received her requested accommodation of a cell without a cellmate.  After reviewing the

28   record, the Court lays out the relevant facts regarding prison housing assignments and vaginal

1    depth as documented in the record and in Dr. Gurjala's report.

2         Upon her transfer to CDCR's CCWF on March 25, 2019, Plaintiff arrived with her

3    dilators and was housed in a two-person cell in Building 503, a reception unit where inmates were

4    temporarily placed before reassignment.  (Doc. No. 108-4 at 19:17-21:4; 72:24-73:5; 74:9-13;

5    128:4-23; 131:24-132:5; 133:2-11; 235).  On March 28, 2019, Plaintiff submitted a grievance

6    stating that she was not provided with the sufficient "time or place to dilate," requesting a

7    designated location to comply with her medical treatment regimen.  (Doc. No. 110-3 at 61).

8         On April 3, 2019, Plaintiff's vaginal depth was recorded by Dr. Graves at either 4 cm, or

9    as Plaintiff's expert contends, 4 inches, marking a decrease from the 6-inch depth documented in

10   August 2018 following her third revision surgery.  (Doc. No. 110-4 at 67–68; Doc. No. 114-3 at

11   176; Grave Depo. Tr. 48:18–53:24).

12        On May 21, 2019, Plaintiff was transferred to Building 509, a general population facility

13   housing six to seven inmates per unit.  (Doc. No. 108-4 at 16:22-17:2, 235, 253:23-254:12).  On

14   June 10, 2019, Dr. Satterwhite recorded that Plaintiff had a depth of 4 inches.  (Doc. No. 108-4 at

15   405-06; Satterwhite Depo. Tr. 140:21–144:17).  On June 25, 2019 and thereafter, Plaintiff had her

16   own private cell, during which she was able to perform regular dilation without restriction.  (Doc.

17   No. 108-4 at 136:13-21, 148:1-11, 235, 266).

18        On July 19, 2019, Plaintiff self-reported to Dr. Branch that her depth was 4 inches. (Doc.

19   No. 108-4 at 418–20).  On August 13, 2019, Plaintiff underwent a fourth revision surgery to

20   repair the clitoral hood and remove scar tissue. (Doc. No. 108-5 at 2–4, 6–7, 9–10).  From this

21   point onward, her depth consistently measured at two inches or less. (Satterwhite Depo. Tr.

22   155:21–158:17; Doc. No. 108-5 at 81; Doc. No. 114-3 at 67). Around this period, Plaintiff's loss

23   of depth caused her vagina to become "non-functional." (*See* Doc. No. 110-4 at 231:23-233:10)

24        Assuming Plaintiff's expert is correct, Plaintiff's recorded vaginal depth was 4 inches

25   approximately six days after filing her initial grievance and nine days after entering CDCR

26   custody.  Subsequent measurements indicate that her depth remained unchanged through July

27

28

1    19.[15]  As Dr. Gurjala states, the "vaginal depth dimensions [ ] show [Plaintiff] having adequate

2    canal depth after March 25[ ] and, in fact, through July 19[ ]." (Doc. No. 114-3 at 66).  Prior to

3    July 19, Plaintiff received her requested accommodation of a single cell on June 25 and remained

4    housed alone until her release from custody.  Given the recorded stability in depth measurements

5    during this period, the evidence does not support a claim that the lack of private housing prior to

6    June 25 materially impacted her depth.

7          Additionally, Dr. Gurjala report states that "[b]ased on this review of the data, I must

8    conclude that the loss of canal depth was due to lack of dilation while at the CDCR facility."

9    (Doc. No. 114-3 at 68).   However, her decrease in depth occurred _after_ CDCR provided Plaintiff

10   with her requested accommodation of a private cell.  Thus, even assuming Plaintiff's broad

11   assertion is true—that her right to dilate with privacy was only satisfied when prison officials

12   provided her a cell without a cellmate—without considering Supreme Court precedent holding

13   that prisoners do not have a constitutional right to a private cell, the Court finds no genuine issue

14   of material fact that Plaintiff suffered physical harm (loss of depth) prior to receiving a private

15   cell.  The record fails to establish a genuine dispute of material fact regarding any physical injury,

16   such as loss of depth, before receiving her requested accommodation of a cell without a cellmate.

17   Based on the record, the only logical conclusion is that Plaintiff was not dilating, or dilating

18   improperly as asserted by Dr. Sinclair.  The record supports only allegations of emotional and

19   psychological distress.[16]  This undermines her claim that any of the Defendants were deliberately

20

21   [15] The Court notes that these are not all the dates reported in Dr. Gurjala's report, but they are consistent
     with deposition testimony and various reports on depth from the doctors who took measurements, apart
     from Plaintiff's self-reporting of depths on July 5, 2019, and July 19, 2019. (*See* Doc. No. 114-3 at 67).

22   [16] The fact that Plaintiff fails to establish a physical injury with respect to this claim may have implications
     pursuant to the Prison Litigation Reform Act ("PLRA").  The PLRA includes a provision that restricts

23   prisoners from bringing federal civil actions for mental or emotional injuries sustained while in custody
     unless they can show a prior physical injury.  Section 1997e(e) states: "[n]o Federal civil action may be

24   brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional
     injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  This

25   provision "requires a prior showing of physical injury that need not be significant but must be more than
     *de minimis*."  *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002); *see also Bell v. Williams*, 108 F.4th 809,

26   829 (9th Cir. 2024) ("The law does not require a prisoner to suffer a 'significant' physical injury. Rather,
     the injury need only be more than *de minimis*." (citations omitted)).  With respect to her Eighth

27   Amendment right to privacy claims, Plaintiff may be limited to seeking punitive damages for the alleged
     constitutional violation.  *See Oliver*, 289 F.3d at 630 ("To the extent that appellant's claims for

28   compensatory, nominal or punitive damages are premised on alleged Fourteenth Amendment violations,

1   indifferent to her medical needs.

2          As to the second contention, Dr. Gurjala acknowledges that dilation under a blanket in a

3   shared inmate space is technically feasible but views this expectation as both unreasonable and

4   uncompassionate given how "emotionally distressing" the process can be.   (Doc. No. 114-3 at

5   69).  Dr. Gurjala opines that he has patients that report difficulty while dilatating outside the

6   privacy of their home.  (*Id*.).  In the work setting, Dr. Gurjala has patients that must,

7   unfortunately, dilate "out of necessity" in a bathroom stall at work.  (*Id*.).  Dr. Gurjala states that

8   he "can only imagine how distressing it might be to perform dilation in a room without 4 walls"

9   especially for Plaintiff, who has been "exposed to repeated traumas." [17] (*Id*.).  However, the

10  salient issue for this inquiry is not whether the lack of privacy to dilate is unreasonable or

11  uncompassionate as Dr. Gurjala generally asserts.  Rather, the issue before the Court is whether

12  the Defendants were deliberately indifferent to Plaintiff's post-operative care to preserve her

13  vaginal depth and that care "was medically unacceptable under the circumstances." *See Edmo*,

14  935 F.3d at 786.

15         Generally, it is not the court's role on summary judgment to resolve factual disputes

16  arising from conflicting expert testimony.  *Scharf v. U.S. Atty. Gen*., 597 F.2d 1240, 1243 (9th

17  Cir. 1979); *see also Self-Realization Fellowship Church V. Ananda Church of Self-Realization*,

18  206 F.3d 1322, 1328 (9th Cir. 2000) ("a district court is entitled neither to assess the weight of the

19  conflicting evidence nor to make credibility determinations" at the motion for summary judgment

20  stage).  The conflicting expert opinions may have created a genuine issue of fact as to whether the

21  level of privacy for dilation is considered medically unacceptable given how "emotionally

22  _____

23  and not on emotional or mental distress suffered as a result of those violations, § 1997e(e) is inapplicable
    and those claims are not barred.").  However, the operative complaint was filed after Plaintiff's release
24  from CDRC custody.  Thus, it is uncertain whether the PLRA would apply in this case. *Compare Jackson
    v. Fong*, 870 F.3d 928, 934 (9th Cir. 2017) (holding prisoner's post-release supplemental complaint
25  replaced the earlier complaint filed during incarceration, before the administrative process concluded,
    eliminating the PLRA exhaustion requirement), *with Harris v. Garner*, 216 F.3d 970, 973 (11th Cir. 2000)
26  (en banc) (PLRA's personal injury requirement applicability depends on the prisoner's confinement status
    when the action was initially filed).

27  [17] The Court notes that Dr. Gurjala has patients who must dilate in a bathroom at work when necessary.
    Establishing an Eighth Amendment violation is a high bar, and a ruling in Plaintiff's favor on this issue
28  could have far-reaching and unintended consequences that extend beyond the correctional setting given the
    novelty of her privacy-related claim.  *See supra* Part III.E.2.

distressing" the process might be for Plaintiff,[18] but the conflict of opinions alone does not create an issue of material fact concerning whether each defendant acted "in conscious disregard of an excessive risk to [her] health," as discussed in further detail *infra*.  *See Edmo*, 935 F.3d at 786.

### b.  Individual Defendants

The Court now examines whether each relevant Defendant was deliberately indifferent to Plaintiff's post-operative care, specifically her need to preserve vaginal depth, by failing to allow her to dilate regularly and with privacy.  Under the subjective prong, the demanding deliberate indifference standard requires Plaintiff to show that Defendants' failure to provide adequate privacy was medically unacceptable due to the resulting emotional and psychological distress it caused her, and that each Defendant failed to provide adequate privacy "in conscious disregard of an excessive risk to [her] health."  *Id*.  The Court notes that Plaintiff's SAC alleges several claims of Eighth Amendment deliberate medical indifference based on the actions and inactions of different (though sometimes unspecified) Defendants.  The Court addresses each claim in seriatim, beginning with Plaintiff's claim that certain CCWF officials denied her the time and privacy necessary to dilate.

Plaintiff asserts that dilation is "an intensely personal and private task" and that "[a]s a survivor of a 6-hour, prison gang rape who now suffers severe PTSD from that experience and her previous 28 years of incarceration, Ms. Norsworthy's need for privacy during dilation is

---

[18] Defendants have not objected to Dr. Gurjala's expert report to the extent that Plaintiff seeks to rely on it for the proposition that dilation with adequate privacy—specifically, a single-cell accommodation—is medically necessary and the lack thereof unacceptable to protect Plaintiff's emotional and mental well-being, given her history of sexual trauma. While Dr. Gurjala is qualified to opine on the necessity of dilation, this qualification may not extend to his opinion regarding the extent to which privacy affected Plaintiff's mental and emotional state.  Dr. Gurjala is not a psychologist or psychiatrist, does not have a mental health specialty, and did not treat Plaintiff for any therapeutic issues. Neither Dr. Gurjala's expert report nor his curriculum vitae indicate that he possesses any specialized education, knowledge, experience, or skill concerning Plaintiff's mental condition or diagnosis. *Compare Hall v. Flannery*, 840 F.3d 922, 929–30 (7th Cir. 2016) (finding experts knowledge and qualifications regarding surgery, pediatrics, and neurology did not extend to his opinion regarding the field of cardiology), *with Parks v. Ethicon, Inc.*, 2020 WL 6118774, at *4 (S.D. Cal. Oct. 16, 2020) (finding expert's extensive clinical experience with mesh-related complications qualified him to testify on their impact, including future quality-of-life and mental health effects, despite lacking psychological credentials), *and Ransom v. Herrera*, 2019 WL 3996479, at *7 (E.D. Cal. Aug. 23, 2019) ("whether [expert's] experience is sufficient to allow him to opine on the subject of PTSD is a matter more suitable for inquiry in the first instance as part of Daubert *voir dire*, or, alternatively, goes to the weight of any opinions he is permitted to offer on the subject" despite not being psychologist or psychiatrist).

1   particularly acute."[19]  (Doc. No. 110-1 at 5).  At least one other court to consider the issue in dicta

2   has noted that "[d]ilation can be performed by the patient without medical assistance, and can be

3   performed in a prison setting, assuming that the patient has adequate privacy."  *Clark v. Quiros*,

4   2024 WL 3552472, at *8 (D. Conn. July 26, 2024).

5         Plaintiff's view is supported by the testimony of both Dr. Satterwhite and her expert Dr.

6   Gurjala.  Throughout his ten years of providing gender affirming surgery, Dr. Satterwhite testified

7   that he has observed "how difficult it can be to dilate without privacy, not just for [Norsworthy]

8   but for all of our patients".  (Doc. No. 118-1 at 7:13-18).  Dr. Satterwhite testified to the

9   multidisciplinary nature of providing medical care to transgender patients and stated that, based

10   on Ms. Norsworthy's history and his years of familiarity with her, he could attest to the

11   importance of privacy for her when dilating.  (*Id.*).  Plaintiff's expert, Dr. Gurjala, noted in his

12   report that "dilation can be a very difficult process, which in itself can be painful, can lead to

13   bleeding, and can be mentally and emotionally distressing even while under the ideal condition of

14   privacy."  (Doc. No. 114-3 at 69).  He noted that for a patient with a history of trauma, such as

15   Plaintiff, "it is [not] a reasonable expectation that Ms. Norsworthy dilate in a multiperson cell."

16   (*Id.*).

17         Defendants do not dispute that Plaintiff had a medical need to dilate, but challenge

18   Plaintiff's claim that she needed total privacy to do so.  (*See* Doc. No. 108-1 at 18–22; Doc. No.

19   113-1 at 7–12).  Defendants note that "[t]he dilation process does not involve a constant in-and-

20   out motion.  Dr. Satterwhite agreed it was comparable to leaving a tampon in a vagina, and

21   dilation can be physically performed under a sheet around other people."  (Doc. No. 108-1 at 18–

22   19).  Moreover, Plaintiff's initial cellmate, Darrianne Stuckey, "did not care whether Norsworthy

23   dilated in front of her."  (*Id.* at 19).  Defendants also point to the lack of evidence of the egregious

24   gang rape that Plaintiff cites in part as warranting her need for privacy, and note that her dental

25   records refute her claim that her teeth were kicked out by correctional officers during that

26

27   [19] Plaintiff does not allege, nor does the record support, that Defendants Dill, Gibson, Goethe, Shoals, and
Garcia-Torres were specifically aware that Plaintiff suffered from post-traumatic stress disorder. Plaintiff's

28   initial March 28, 2019 grievance requesting a time and place to dilate also does not reference any mental
or emotional condition she might suffer from.  (*See* Doc. No. 110-3 at 61).

1  purported sexual assault; the records indicate the teeth were in fact extracted in 2010 due to

2  advanced periodontitis.  (Doc. No. 117 at 9).

3       Further, Defendants' expert, Dr. Sinclair, opined that the privacy needs for dilation were

4  not as great, stating that dilation "can be done under the cover of sheets with out [sic] alarming or

5  alerting anybody in the vicinity as to what you are doing."  (Doc. No. 108-4 at 224).  He

6  concluded that, "Ms. Norsworthy had the ability to dilate in the privacy of her own bed under the

7  covers or the infirmary if she felt that she needed more dilation than twice a day."  (*Id*. at 225).

8       As previously discussed,[20] the Court declines to rule on whether Plaintiff's post-operative

9  care to preserve her vaginal depth constitutes a serious medical need under the Eighth

10  Amendment.  However, even assuming it does for the purposes of this analysis, the Court finds

11  the undisputed facts demonstrate that none of the relevant Defendants acted with a conscious

12  disregard to Plaintiff's post-operative care.

13                     i.  <u>Dill</u>

14       Defendant Chenoa Dill, serving as the Health Care Access Captain at CCWF during the

15  relevant time period, was responsible for ensuring that Plaintiff had access to the medical care she

16  needed.  (Dill Depo. Tr. at 15:24-16:11, 17:14-20, 28:3-29:13).

17       On March 28, 2019, while housed in the reception center in Building 503, Plaintiff

18  submitted a healthcare grievance to request a time and place to dilate three times per day.  (Doc.

19  No. 110-3 at 61).  On April 8, 2019, the grievance was assigned to nonparty Nurse Fontanilla.

20  (*Id*.).  On April 16, 2019, after speaking with Plaintiff, Fontanilla spoke to Defendant Dill about

21  accommodating Plaintiff's request to dilate three times a day.  (Doc. No. 108-4 at 241–42;

22  Fontanilla Depo. Tr. at 38:11-39:8).  Shortly thereafter, Dill directed her healthcare sergeant,

23  Defendant Gibson, and the supervising officer in charge of the housing unit, nonparty Captain

24  Ratliff, to inform the relevant correctional officers that Plaintiff's cell mate should be allowed to

25  leave the cell while Plaintiff was dilating and to put up a privacy screen outside the cell three

26  times per day for approximately twenty minutes.  (Doc. No. 108-4 at 241–42, 250; Dill Depo. Tr.

27

28  [20] *See supra* Part III.E.2.

at 57:21-58:12).

On April 18, 2019, non-party Captain Ratliff objected to the use of privacy screens, stating, "I don't believe that issuing a privacy screen to a R/C inmate in Building 503 is appropriate as it poses several safety/security concerns." (Doc. No. 108-4 at 250). Defendant Dill responded, "This is a medical mandate! She has already been in a settlement to access. We did this for [redacted] and we need to not make an issue." (*Id.*). However, Plaintiff testified in her deposition that during her initial housing in Building 503, the officers never provided her with a privacy screen. (Norsworthy Depo. Tr. 127:14-22, 130:7-18).

On April 24, 2019, Plaintiff informed nonparty Nurse Fontanilla that her dilation privacy issues were unresolved. (Doc. No. 108-4 at 237; Fontanilla Depo. Tr. at 107:9-13). The same day, Fontanilla spoke to Dill, Gibson, and the Healthcare Associate Warden who told Fontanilla to work with Gibson. (Doc. No. 108-4 at 241–42; Fontanilla Depo. Tr. at 107:9-22). Gibson confirmed that the housing correctional officers were to provide the privacy screen three times a day for twenty minutes at specific times, 1000, 1400, and 1600, and Plaintiff confirmed this process and agreed to inform the officers when she was ready to dilate. (*Id.*). The housing officers were given instruction regarding this procedure that day. (*Id.*). Again, however, there are no records indicating that the privacy screen was implemented during Plaintiff's initial housing in Building 503 from March 25 to May 21, 2019, and Plaintiff denied that it happened during that time period. (Norsworthy Depo. Tr. 127:14-22, 130:7-18).

The institutional level response to Plaintiff's March 29, 2019 healthcare grievance appears to imply that custodial staff provided a privacy screen during Plaintiff's initial housing in Building 503. However, the response only states that, "[t]he primary care provider . . . developed a plan of care, including being accommodated with a privacy screen placed in front of your door for a duration of 15 minutes three times per day." (Doc. No. 108-4 at 237). Other than referencing a "plan" to provide the privacy screen, the response does not indicate that it was ever implemented, and the unrefuted evidence is that it was not.

Plaintiff speculated, after learning of the emails between Dill, Gibson, and nonparty Ratliff, that Ratliff was the one who prevented the privacy screen plan from being implemented

1  during her initial housing in Building 503 in light of safety and security concerns.  (Norsworthy

2  Depo. Tr. 139:3-12).  Dill likewise testified that there was "pushback" from custodial staff

3  regarding the privacy screen, but indicated her understanding that the screen was implemented

4  after she gave the order to do so.  (Dill Depo. Tr. at 45:2-16).

5      The record reflects no genuine dispute of material fact that Dill took reasonable steps to

6  ensure that custody staff in Building 503 implemented the directive to provide Plaintiff with a

7  privacy screen two to three times per day, and permit Plaintiff's cellmate to leave the cell during

8  those times.  She told Ratliff the importance of doing so, and after learning on April 24, 2019 that

9  housing officers were not providing Plaintiff the screen, Dill sent Gibson to Building 503 to

10  ensure they did so.  (Doc. No. 108-4 at 241–42).  To the extent the housing officers did not follow

11  her and Gibson's directives, this does not appear to have been due to a lack of effort or deliberate

12  indifference on Dill's part, but rather due to resistance by the custody officers in charge of

13  implementing the measures.  At most, this amounts to negligence by Dill in not seeking the

14  involvement of CCWF leadership or more closely supervising the implementation of her

15  directives, but the Court does not find that it reflects deliberate indifference.

16      Dill was later involved in overseeing other accommodations provided to Plaintiff when

17  she was housed in Building 509 with seven other inmates from May 21 to June 25, 2019.  Dill

18  testified in her deposition that staff "made a special room with a bed, a hand washing sink, and a

19  medical facility for [Plaintiff] to utilize [to dilate], and she refused."  (Dill Depo. Tr. at 70:15-17).

20  Staff also "offered [Norsworthy] a locker to keep her dilators while she was at work, and she

21  would be the only one that had access to them in the medical facility, and she still refused that."

22  (*Id*. at 70:20-24).

23      Plaintiff testified that the accommodations were not practical.  One of her designated

24  times conflicted with medication distribution at the clinic, which meant that for her to dilate, a

25  large group of inmates would often have to wait for 30-45 minutes until she was finished, causing

26  resentment among her peers.  (Norsworthy Depo. Tr. 169:14-170:4).  Also, in one of the

27  designated spaces, Plaintiff often would have to share the room with other inmates there for

28  medical treatment, and was separated from them only by a curtain.  (*Id*. at 168:4-9).  Nurses

1  would often express their displeasure with Plaintiff needing to use the spaces or having priority

2  over their seemingly more urgent tasks.  (*Id*. at 169:1-13).  Due to the delays and challenges with

3  using the medical clinic, Plaintiff ultimately resorted to using the shower in her housing unit to

4  dilate.  (*Id*. at 153:13-15).

5         Defendant Dill denied remembering any conversation with Plaintiff about her challenges

6  dilating in the medical clinic while housed in Building 509.  (Dill Depo. Tr. at 131:9-24.)  The

7  record contains no evidence indicating that she was aware of those concerns, understood the

8  emotional distress they may have caused, or had any reason to believe that Plaintiff was unable to

9  dilate during that time.  Thus, there is no genuine dispute of material fact in the record that Dill

10  was aware of Plaintiff's problems with dilating and nevertheless failed to take reasonable steps to

11  permit Plaintiff to do so.  Rather, she communicated with her own healthcare access staff and

12  with custody staff on multiple occasions to arrange for Plaintiff to have a privacy screen set up, to

13  have Plaintiff's cellmate let out of the cell on a regular basis, and to provide Plaintiff

14  accommodations at the medical clinic to dilate.  Although these measures did not necessarily

15  succeed in providing Plaintiff with the ideal privacy and space she requested to dilate consistently

16  and for the required duration, this reflects the substantial challenges associated with

17  accommodating the needs of a transgender inmate in a highly complex custodial environment,

18  rather than deliberate indifference by Dill.  Accordingly, the undersigned recommends the

19  District Court grant Defendants' Motion for Summary Judgment as to Defendant Dill.

20                              ii.   Gibson

21         Plaintiff's SAC alleges that Defendant Gibson:

22         . . . was ordered by Defendant Dill to train Defendants Garcia-Torres,
           Shoals, and Goethe, who Gibson oversaw . . . directly, to provide
23         privacy and adequate time to Ms. Norsworthy for dilation to maintain
           vaginal depth.  That Ms. Norsworthy had neither privacy nor time to
24         dilate demonstrates that either Gibson did not actually train the
           officers reporting to him, or that his training was insufficient to
25         comply with Ms. Norsworthy's needs.  Consequently, Gibson is
           responsible for the failure at CDCR to provide Ms. Norsworthy with
26         adequate medical care in violation of the Eighth Amendment to the
           U.S. Constitution.

27

28

(Doc. No. 75 at 7 ¶ 14).  The undisputed record in this case does not support these assertions.  To the extent Gibson was responsible for ensuring Plaintiff had accommodations for her need to dilate, the record reflects that he took reasonable steps to do so.

On April 18, 2019, Gibson sent an email to Ratliff stating in pertinent part:

> Good Afternoon, Capt. Ratliff.  I am following up on our conversation about inmate Norsworthy . . . who per medical is to have a self-treatment as part of her medical treatment.  This treatment is three (3) per day approximately 20 minutes each treatment.  I have attached a CDC-128B for your review.  If you have any questions, concerns or a better procedure that allows the inmate as much privacy without compromising any safety or security procedures.  I was informed by P. Fontanilla, SRNII that this treatment may last one (1) year or more.  So I documented on the CDC-128B that this chrono will be reviewed by the medical provider after each encounter pertaining to this specific treatment.

(Doc. No. 108-4 at 250).  When Ratliff objected to "issuing a privacy screen to a R/C inmate," Gibson clarified:

> The privacy screen is not to be issued to the inmate, the privacy screen will stay approximately three feet <u>outside</u> the cell door only for the treatment time.  This would allow [sic] other inmates from becoming onlookers and would allow the housing staff a view of the cell.  Please provide input into how the procedure can [be] done.

(*Id*.) (emphasis original).  Dill then sent her own reply stating that the privacy measures were part of a "medical mandate" and effectively directed nonparty Ratliff to comply with the directive.  (*Id*.).  As noted, Plaintiff testified that the privacy screen procedure was not implemented during her initial time in Building 503.  (Norsworthy Depo. Tr. at 127:14-22, 130:7-18).  However, there is no evidence in the record to suggest that Gibson was aware, prior to April 24, 2019, that the privacy screen "mandate" had not been implemented by housing staff.

In his deposition, Gibson acknowledged that he learned around April 24, 2019, after speaking with Nurse Fontanilla and Dill, that Plaintiff reported continued difficulty having sufficient privacy to dilate, in part because housing staff were allegedly not providing the privacy screens as instructed.  (Gibson Depo. Tr. at 46:6-50:23).  Gibson then returned to Building 503 to "speak[] to the officers, locat[e] the privacy screen, and explain[] [his] expectations" about the procedure for setting up the privacy screen.  (*Id*. at 49:22-50:3).  Gibson testified that after speaking with the housing officers his understanding was that they would follow his instructions.

1    (*Id*. at 50:20-23).

2        The record does not establish any genuine dispute as to whether Gibson was deliberately

3    indifferent to Plaintiff's request to dilate privately.  Gibson is not even mentioned by name in

4    Plaintiff's opposition to Defendants' MSJ, Plaintiff MPSJ, or her reply.  (*See generally* Doc. Nos.

5    110-1, 114, 118).  Thus, Plaintiff fails to demonstrate any evidence refuting that Gibson took

6    reasonable steps to implement the privacy screen protocol; that record reflects that he emailed

7    with nonparty Ratliff to explain the reasonableness of the privacy screen and spoke directly with

8    the housing staff on April 24, 2019, to ensure they implemented the privacy screen.  Thus, the

9    undisputed evidence demonstrates that Gibson was not deliberately indifferent to Plaintiff's

10   serious medical needs.

11                       iii.   Goethe, Shoals, and Garcia-Torres

12       Plaintiff's SAC alleges that Defendants Goethe, Shoals, and Garcia-Torres were the

13   housing officers who were responsible for placing a privacy screen outside her door during the

14   two time periods she was being housed in Building 503, and that during the initial period they

15   failed to do so.  (Doc. No. 75 at 7–8, 14–15 ¶¶ 15–17, 37–40).

16       As an initial matter, the record does not reflect that any of these three Defendants were

17   aware that Plaintiff had a need to dilate with privacy.  None of them are medical staff or

18   healthcare access staff, and there is no evidence that they were briefed on Plaintiff's medical

19   history, the medical reasons she needed to dilate, or the consequences for not doing so with

20   regularity or privacy; there is no evidence to suggest they were otherwise privy to Plaintiff's

21   medical records or her grievances concerning her inability to dilate.  Thus, the Court finds that on

22   the undisputed record, these three Defendants did not have sufficient knowledge of Plaintiff's

23   serious medical need to be deliberately indifferent.  *See Farmer*, 511 U.S. at 837 (noting that to

24   show deliberate indifference a prison official must not only "be aware of facts from which the

25   inference could be drawn that a substantial risk of serious harm exists," but that person "must also

26   draw the inference.").  "If a [prison official] should have been aware of the risk, but was not, then

27   the [official] has not violated the Eighth Amendment, no matter how severe the risk."  *Gibson*,

28   290 F.3d at 1188.  This "subjective approach" focuses only "on what a defendant's mental

1    attitude actually was." *Farmer*, 511 U.S. at 839.

2           Even assuming they had such knowledge, the undisputed record does not reflect that

3    Defendants Shoals, Goethe, and Garcia-Torres failed to follow the relevant directions they

4    received regarding privacy accommodations for Plaintiff.  Plaintiff testified in her deposition that

5    during that initial period she:

6           [A]sked [Defendants Goathe, Shoals, and Garcia-Torres] every day
            when [she] was in 503 on orientation status if they had talked to the
7           sergeant or talked to the captain, or had anybody talked to them
            about, you know, what I needed.  You know, there was—they were
8           very evasive when I first met them.  But when I went back the second
            time, they were very cooperative, especially three of the officers,
9           very, very cooperative.  They had no problems with it.  It was an
            easy-peasy thing.  It wasn't that serious to them.
10

11   (Norsworthy Depo. Tr. At 149:8-17).  Plaintiff further testified her understanding that while the

12   healthcare access staff stated the housing officers had been trained, the officers themselves had

13   not received any formal orders directing them in the use of the privacy screens during her initial

14   orientation period:

15          I was only told they were trained, and they never did it.  And every
            time I asked the officers, "Am I going to get my screen today?" and
16          they said, "Not until we get something official.  We don't know what
            you're talking about until we get something official."  It was all – the
17          officers in the building, they act on memos . . . They want something
            in writing for liability's sake.
18

19   (*Id*. at 134:10-19).  The three officers' testimony appears to support these assertions, at least in

20   part.  When asked, "[p]rior to June 4, 2019, did you place privacy screens for Ms. Norsworthy in

21   front of her cell at CCWF?" (Garcia-Torres Depo. Tr. at 53:20-22) Defendant Garcia-Torres

22   replied, "I don't recall dates or times, but I do remember putting a privacy screen up at Inmate

23   Norsworthy's room when she was housed in Cell 107, *after she came back from another*

24   *building*." (Garcia-Torres Depo. Tr. at 53:23-54:1) (emphasis added).  When asked if he was

25   logging the use of the privacy screen, Garcia-Torres stated, "*When we were getting direction*,

26   when she came back to Building 503, Cell 107, we would automatically put the screen at her cell

27   front.  And it should be logged in." (*Id*. at 54:2-10) (emphasis added).  Indeed, the undisputed

28   record reflects that when she was rehoused in 503 in July 2019, Plaintiff received regular access

58

1   to the privacy screen.  When asked in her deposition, "Did you get the privacy screen . . .

2   consistently three times a day [upon being housed the second time in Building 503]?", Plaintiff

3   responded:

4           The answer to that question is yes. Okay? But sometimes, I would
            have to remind [Officer] Shoals.  He was a younger officer, or
5           Goethe, sometimes he would get distracted with other stuff.  But I'll
            tell you, Garcia-Torres, I didn't have to tell him nothing.  That man
6           put it in front of that cell like clockwork.  And if he worked overtime,
            the evening curtain went up there like clockwork.
7

8   (Norsworthy Depo. Tr. at 181:21-182:6).  When asked if there was ever a time she requested the

9   privacy screen and was denied during that time, Plaintiff stated there was not.  (*Id*. at 182:9-13).

10          Despite extensive questioning of numerous witnesses, the record remains unclear as to the

11  real reason(s) housing officers did not provide Plaintiff with use of a privacy screen during her

12  initial orientation period in Building 503, whether it was poor communication, resistance among

13  certain custody or health care access staff, or something else.  However, the record does not

14  support the inference that Defendants Goethe, Shoals, and Garcia-Torres were aware of a serious

15  medical need but nevertheless failed to attend to it; rather, the undisputed record reflects that

16  when they were provided clear direction on how to accommodate Plaintiff's need for privacy

17  when dilating, they consistently followed those directions and were responsive to Plaintiff's

18  requests.  Thus, the undersigned recommends the District Court grant Defendants' MSJ as to

19  Defendants Goethe, Shoals, and Garcia-Torres.

20                          **3.  Deepening Procedure**

21          Defendants argue that the vaginal deepening procedure was not medically necessary,

22  emphasizing that no clear medical consensus supports the procedure as essential for treating

23  Plaintiff's gender dysphoria.  (Doc. No. 108-1 at 25–26; Doc. No. 113-1 at 14–18; Doc. No. 117

24  at 13–14).  In the alternative, Defendants contend that significant efforts were made to secure a

25  qualified surgeon, including outreach to over a dozen specialists, and that Plaintiff's refusal to

26  attend a scheduled consultation ultimately hindered progress.  (Doc. No. 108-1 at 27-28; Doc. No.

27  117 at 14-15).

28          Plaintiff argues that her lost vaginal depth constituted a serious medical need that

                                            59

Defendants had an obligation to address.  (Doc. No. 110-1 at 23–25; Doc. No. 114 at 22–25; Doc. No. 118 at 10–17). Plaintiff highlights that CDCR's medical personnel, her treating physicians, and independent medical experts—including Dr. Bowers—agreed that a colovaginoplasty or similar procedure was medically necessary to restore vaginal function.  (Doc. No. 110-1 at 24; Doc. No. 118 at 10-14).  Plaintiff contends that Defendants misrepresented the conclusions of the Gender Affirming Surgery Review Committee and the availability of specialists, unjustifiably impeding access to care in a manner that reflects a deliberate delay strategy rather than a genuine medical decision.  (Doc. No. 110-1 at 24–25; Doc. No. 114 at 23–25; Doc. No. 118 at 13–17).

### a.  Individual Defendants

The Court now examines whether Defendants were deliberately indifferent to Plaintiff's medical need—a non-functional vagina for the purpose of engaging in sexual intercourse—by failing to provide her with a procedure to increase vaginal depth, beginning with Plaintiff's claim that the deepening procedure was necessary.

Plaintiff notes that both Dr. Marci Bowers, a specialist in gender-affirming surgery who reviewed Plaintiff's records, and Defendants' expert Dr. Sinclair, agree that Plaintiff now has a "non-functional" vagina, and that Bowers opined that restoring Plaintiff's "vaginal depth . . . is essential to this patient's outcome and future well-being."  (Doc. No. 110 at 16–17).  Plaintiff herself asserts in a declaration that:

> My loss of depth has been an emotional, physical and mental disaster for me. I spent years and years and years fighting to obtain gender affirming surgery to address my gender dysphoria, have undergone multiple surgeries to fix the external, aesthetic complications that arose during the initial surgery, but now I am left with essentially a non-functioning vaginal canal. I am unable to experience consortium with my husband, once again do not feel like a "real woman," and suffer trauma every day because I continue to feel trapped inside a body that is still, after all this time, incongruent with my feminine spirit and personality. Getting my vagina fixed is essential to my emotional and mental wellbeing.  I lose sleep, suffer from nightmares, anxiety, depression and anger because of the mental, emotional and physical harm the loss of vaginal depth has caused me. I am now 60 years old, and am left wondering whether I will ever have a body that matches who I truly am, and whether the CDCR and the State of California will ever participate in helping heal the 40 years of sexual abuse I suffered during my incarcerations.

(Doc. No. 110-3 at 11 ¶ 38).

1    Plaintiff cites to *Colwell* in support of her position.  (*See* Doc. No. 110 at 20 (citing

2    *Colwell*, 763 F.3d at 1066)).  However, as the Court previously noted, Plaintiff's reliance on

3    *Colwell* may be misplaced, as the loss of vision in one eye presents a distinct functional

4    impairment and potential for physical injury, whereas retaining full use of a reproductive organ

5    solely for intercourse likely does not constitute the same degree of physiological limitation under

6    Eighth Amendment precedence.[21]  The Court assumes, for purposes of this order, that the

7    emotional toll resulting from the loss of the ability to engage in sexual intercourse due to a

8    vaginal depth of two inches or less constitutes a serious medical need under this analysis.

9    Nevertheless, there is no evidence in the records to suggest that declining Plaintiff's request for a

10    deepening procedure "was medically unacceptable under the circumstances and that the

11    defendants chose this course in conscious disregard of an excessive risk to the plaintiff's health."

12    *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) (cleaned up).

13    The Court now addresses which Defendants were alleged to have acted with deliberate

14    indifference to Plaintiff's medical needs with respect to a deepening procedure.  It is undisputed

15    that Defendants Dill, Gibson, Garcia-Torres, Shoals, and Goethe were not involved in the

16    decisions regarding Plaintiff's request for a deepening procedure.  (Doc. No. 114-1 at 43).

17    Plaintiff does not refute this, and the Court agrees this claim has no relevance to these

18    Defendants.

19    Plaintiff fails to point to any facts indicating that any specific Defendant or Defendants

20    violated Plaintiff's rights, nor even specify which of their action(s) or inaction(s) amounted the

21    violation(s).  (*See generally* Doc. Nos. 110-1, 114, 118).  Plaintiff acknowledges that she was

22    ultimately approved for the deepening procedure, but only after an extensive process, some

23    confusion, and delay.  (*See id.*).  To the extent Plaintiff attributes the delay to any particular

24    Defendant, she appears to point to nonparty Dr. Graves, noting that "instead of approving the

25    surgery, Dr. Graves decided that the proposed surgery was not 'medically indicated' and set up

26    yet another follow-up visitation with Dr. Satterwhite."  (Doc. No. 114 at 14).  Plaintiff

27

28    ───────────────
[21] *See supra* Part III.E.2.

characterizes this as "stonewalling," but Dr. Graves, who is not a Defendant in this action, supports his conclusion by citing "potential side effects/complications which have yet to be reported as preventable in the surgical literature." (Doc. No. 108-5 at 78; Doc. No. 114 at 14).

Plaintiff also cites an email from Dr. Glass, a nonparty CDCR staff psychologist, to one of his colleagues, opining that SMART's actions in denying Plaintiff's request were "just a delay tactic." (Doc. No. 114 at 16) (citing Doc. No. 114-3 at 143). However, neither Dr. Glass nor Plaintiff specifies any Defendant(s) who are purportedly responsible for the alleged "delay tactic" other than the SMART committee as a whole. It is uncontested that Defendants Branch, Singh and Mitchell, among others, were invited to participate in the Gender Affirming Surgery Review Committee's ("GASRC") evaluation of Plaintiff's request, and that on December 17, 2019 GASRC recommended that Plaintiff be referred to a specialist for a consultation "regarding the risks and benefits of a vaginal deepening surgery." (Doc. No. 108-5 at 134; Doc. No. 141-3 at 141). Thus, the record indicates these Defendants were involved in *approving*, rather than denying Plaintiff's request. There are no facts suggesting that any of these Defendants were involved in SMART's decision to temporarily deny Plaintiff's request.

The Ninth Circuit stated:

> In deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to the judgment of prison doctors or administrators. Nor does it suffice for correctional administrators wishing to avoid treatment simply to find a single practitioner willing to attest that some well-accepted treatment is not necessary. In the final analysis under the Eighth Amendment, we must determine, considering the record, the judgments of prison medical officials, and the views of prudent professionals in the field, whether the treatment decision of responsible prison authorities was medically acceptable.

*Edmo*, 935 F.3d at 786 (cleaned up) (first quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) and then quoting *Kosilek*, 774 F.3d at 90 n.12)). Deliberate indifference is a higher standard than medical negligence or malpractice, and a difference of opinion between medical professionals—or between a physician and the prisoner— generally does not amount to deliberate indifference. *See Toguchi*, 391 F.3d; *see also Jackson*, 90 F.3d at 332 (A mere "difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.").

"But that is true only if the dueling opinions are medically acceptable under the circumstances." *Edmo*, 935 F.3d at 786 (citing *Toguchi*, 391 F.3d at 1058).  To prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment "was medically unacceptable under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's] health."  *Jackson*, 90 F.3d at 332.  There is no evidence in the record to suggest that declining Plaintiff's request for a deepening procedure was "medically unacceptable under the circumstances" and chosen "in conscious disregard of an excessive risk to [Ms. Norsworthy's] health." *See id*.

Rather, the record reflects that the SMART committee (and presumably Taylor) were concerned with the significant risks and potentially poor outcome of a deepening procedure.  (*See* Doc. No. 108-5 at 136 (noting the committee's views that "there was insufficient evidence to show that this fifth revision would provide any benefit yet posed significant risk of failure and further complications.")).  Other physicians to consider the question were likewise concerned about the potential complications and unfavorable risk-reward of a deepening procedure.  Dr. Graves, a gynecologist, noted that "the recommendation for a vaginal lengthening procedure using the intestines as Dr. Maurice Garcia performs as Cedars-Sinai is not currently medically indicated and had some potential side effects/complications which have yet to be reported as preventable in the surgical literature."  (*Id*. at 78).

Dr. Sinclair, who consulted with Plaintiff on May 27, 2021 regarding a potential colovaginoplasty, also had concerns about the procedure.  Dr. Sinclair informed Plaintiff of the extensive risks, due in part to her surgical history, that could result from a colovaginoplasty, including failure to meet her goal, transfusions, excrement and urine leaking through the vagina, additional surgeries, loss of sensation, loss of orgasmic capability, and inability to have sex.  (Doc. No. 108-5 at 167).  Thus, the record suggests that despite a difference of opinion between the GASRC committee and the SMART committee, the latter's denial was not "medically acceptable under the circumstances" but rather reflects concerns shared by other qualified physicians.

The only evidence in support of Plaintiff's theory that the denial was the result of a "delay

1  tactic" is an email by a CDCR staff psychologist who was not involved in SMART's decision-

2  making, has no expertise regarding the relevant clinical criteria for approving or disapproving a

3  deepening procedure, and was clearly speculating in an email to a colleague.  Nor did Dr. Glass's

4  comment attribute any wrongdoing to Dr. Taylor specifically, who is but one member of a multi-

5  person body that denied Plaintiff's request.

6        Accordingly, the Court finds no genuine dispute of material fact that Singh, Mitchell,

7  Branch, and Taylor were not deliberately indifferent to Plaintiff's serious medical needs and

8  therefore recommends that the District Court grant Defendants' MSJ.

9                          **4.  Access to Douches**

10       Plaintiff's SAC asserts that Defendants did not regularly provide Plaintiff with access to

11  vaginal douches, which were necessary to prevent infection to her neovagina.  (Doc. No. 75 at

12  15–16, ¶¶ 42–43).  Specifically, on April 3, 2019, nine days after Plaintiff was admitted to

13  CCWF, nonparty Dr. Graves noted, "Normally the patient would engage in a vaginal douche

14  twice weekly but has not had access to this supply. This is a routine postoperative treatment."

15  (*Id*. at 15, ¶ 42).  Dr. Graves diagnosed Plaintiff with bacterial vaginosis and prescribed vaginal

16  douches and antibiotics as treatment.  (*Id*.).  Plaintiff received an unspecified number of vaginal

17  douches two days later on April 5, 2019.  (*Id*. at 15–16, ¶ 43).  She received an unspecified

18  additional number of douches on May 5, 2019.  (*Id*.).  She was once again diagnosed with

19  vaginosis on June 10, 2019 and August 29, 2019, which Plaintiff attributes to Defendants failure

20  to provide her with a regular supply of douches.  (*Id*.).

21       However, the undisputed record reflects that pharmacy, clinic, and nursing staff, not any

22  of the Defendants, were responsible for distributing Plaintiff's prescribed douches.  (Norsworthy

23  Depo. Tr. at 201:19-202:11).  There are no facts in the record to suggest that any of the medical

24  staff were responsible for renewing Plaintiff's prescriptions and failed to do so.  There are no

25  facts in the record to suggest that custodial staff were in possession of douches but failed to

26  provide them to Plaintiff.  There are no facts in the record to suggest that the healthcare access

27  team (i.e. Defendants Dill and Gibson) were responsible for ensuring Plaintiff's prescriptions

28  were filled or were aware that she was not receiving regular access to her prescribed vaginal

1    douches.  Any time Plaintiff alerted one of the Defendants to her need for more douches, they

2    responded promptly.  Accordingly, the Court finds no genuine dispute of material fact that any of

3    the Defendants were not deliberately indifferent to Plaintiff's access to vaginal douches and

4    therefore recommends that the District Court grant Defendants' MSJ.

5                              **5.  Access to Pain Medication**

6          Plaintiff also asserts that during two time periods after being readmitted to CDCR

7    custody, she was not provided with necessary pain medications by medical staff.  Defendants do

8    not dispute that Plaintiff's pain after her third and fourth revision surgeries constituted serious

9    medical needs, however they contend that no Defendant was deliberately indifferent to her need

10   for pain management and provided appropriate treatment for her symptoms.  (Doc. No. 108-1 at

11   22–23).  For reasons set forth *infra*, the Court agrees that there is no genuine dispute of material

12   fact that CCWF physicians provided appropriate care for Plaintiff's pain.

13         Plaintiff alleges that upon being admitted to CCWF in March 2019, she was still suffering

14   pain from her most recent (third) revision surgery.  (Doc. No. 75 at 18–19, 25 ¶¶ 54, 81).  She

15   asserts that Dr. Satterwhite had prescribed her Gabapentin for the pain and her blood pressure

16   issues but that Dr. Branch declined to prescribe Gabapentin, which was not in the CDCR

17   formulary, and instead prescribed Tegretol, a seizure medication "that was completely unrelated

18   to Ms. Norsworthy's needs."[22]  (*Id*. at 18–19 ¶ 54).  After the Tegretol failed to alleviate her

19   symptoms, Plaintiff alleges "CDCR" only gave her ibuprofen.  (*Id*.).  Meanwhile, after she

20   underwent her fourth revision surgery on August 13, 2019, Plaintiff returned to CCWF and was in

21   significant post-operative pain from the procedure.  (*Id*. at 20, 26 ¶¶ 60, 84).  The SAC alleges

22
_____

23   [22] The Court takes judicial notice of the fact that both Gabapentin and Tegretol (a trade name for
     Carbamazepine) are used to treat seizures.  *See* "Gabapentin for Seizures: Drugs" [Internet]. Ottawa (ON):
     Canadian Agency for Drugs and Technologies in Health; 2024 Oct. Available from:

24   https://www.ncbi.nlm.nih.gov/books/NBK609608/ (last visited June 9, 2025); *see also* Maan JS, Duong
     TvH, Saadabadi A. "Carbamazepine." [Updated 2023 Jul 10]. In: StatPearls [Internet]. Treasure Island

25   (FL): StatPearls Publishing; 2024 Jan. Available from: https://www.ncbi.nlm.nih.gov/books/NBK482455/
     (last visited June 9, 2025).  Federal Rule of Evidence 201 permits a court to take judicial notice of facts

26   that are "not subject to reasonable dispute" because they are either "generally known within the trial
     court's territorial jurisdiction," or they "can be accurately and readily determined from sources whose

27   accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The Court may take judicial notice on
     its own or at the request of any party.  *Id*. 201(c). The Court also notes that the record reflects Plaintiff was

28   in fact being treated for seizures due to an earlier head injury.  (Doc. No. 108-4 at 379).

1  that Dr. Branch "did not consistently provide Ms. Norsworthy with the correct dosage of

2  gabapentin or opioids recommended by Dr. Satterwhite."  (*Id*. at 20 ¶ 60).

3      The undisputed facts, however, refutes Plaintiff's allegations in the SAC that CCWF

4  physicians did not provide Plaintiff with appropriate pain management.  In her briefing, Plaintiff

5  does not dispute that following her third revision surgery on August 22, 2018, the last surgery

6  before her reincarceration, Dr. Satterwhite prescribed Tylenol and ibuprofen, not Gabapentin,

7  despite Plaintiff's report of pain.  (Satterwhite Depo. Tr. at 123:10-25, Doc. No. 108-4, 182–185,

8  268).  Nevertheless, the Medication Administration Record ("MAR") for Plaintiff's time at

9  CCWF shows that she received Gabapentin, aspirin, and ibuprofen from March 26 through April

10  24, 2019, other than a few days where she missed or refused one or more doses, and aspirin

11  through May 4.  (*See* Doc. No. 108-4 at 303–377).  On May 3, 2019, Dr. Branch renewed

12  Plaintiff's prescription for aspirin through July 3, 2019, and allowed Plaintiff to keep it on her

13  person.  (*Id*. at 384, 386–88).  On May 13, 2019, Plaintiff submitted a healthcare treatment

14  request regarding vaginal pain; on May 15 the request was processed, and a nurse saw her the

15  next day.  (*Id*. at 390; 392–95).  Plaintiff reported a "tearing pain" and, per the nursing protocols,

16  the nurse provided ibuprofen and Dr. Mitchell renewed an ibuprofen prescription from May 16

17  through May 19, 2019.  (*Id*. at 393, 397).

18      In advance of her fourth revision surgery, Plaintiff stopped taking ibuprofen and aspirin

19  on July 30, 2019, but on August 7, 2019, she met with a nurse to discuss alternative treatment and

20  was provided a cold compress and instruction on physical activity and limits to avoid pain.  (*Id*. at

21  494, 499–500).

22      After the fourth revision surgery on August 13, 2019, Dr. Satterwhite prescribed

23  Gabapentin for three weeks to be tapered off in the fourth week, ibuprofen for two weeks, and

24  Suboxone which had to be monitored by prison staff due to Plaintiff's opioid addiction history.

25  (Doc. No. 108-5 at 2–4, 6–7, 9–10).  Upon her return to CCWF on August 17, 2019, Plaintiff was

26  provided multiple daily doses of morphine, ordered by Dr. Branch, from August 17 through

27  August 30, hydrocodone-acetaminophen from August 18 through August 24, and three doses of

28  Gabapentin daily from August 19 through November 12, 2019.  (Doc. No. 108-4 at 422–469;

1    Doc. No. 108-5 at 12–50, 52–53).  On November 12, 2019, Dr. Graves established a tapering

2    process for the Gabapentin which lessened in dosage amounts through November 25, 2019, when

3    the order ceased.  (*Id.*).

4         The record does not reflect that any CCWF physician was deliberately indifferent to

5    Plaintiff's pain.  Plaintiff contends that ibuprofen was insufficient to treat her significant pain and

6    that CCWF physicians should have prescribed something stronger.  However, Plaintiff does not

7    have a right to dictate what medications she is prescribed.  *Stiltner v. Rhay*, 371 F.2d 420, 421 n.3

8    (9th Cir. 1967) (allegations that a prisoner feels he is not receiving the "the kind and quality of

9    medical treatment he believes is indicated" does not demonstrate deliberate indifference).

10        Multiple district courts in this circuit have held that a plaintiff's denial of morphine or

11   other pain medication does not amount to deliberate indifference.  *See, e.g., Arellano v. Sedighi*,

12   2020 WL 5877832, at *46 (S.D. Cal. Oct. 1, 2020) ("Plaintiff's request for . . . Morphine is a

13   difference of opinion and preference by Plaintiff.  But failure to provide Plaintiff with the specific

14   medication he requested and differences in judgment regarding an appropriate medical treatment

15   is not enough to establish deliberate indifference."), *report and recommendation adopted*, 2021

16   WL 7711170 (S.D. Cal. May 7, 2021); *Gonzales v. Ugwueze*, 2014 WL 223506 at *9 (E.D. Cal.

17   Jan. 21, 2014) (plaintiff's opinion that he should have been provided other types of pain

18   medication does not create a dispute of material fact to preclude summary judgment), *aff'd*, 594

19   F. App'x 448 (9th Cir. 2015); *Parlin v. Sodhi*, 2012 WL 5411710, at *5 (C.D. Cal. Aug. 8, 2012)

20   ("[P]laintiff's claim is that he did not receive the type of treatment and pain medication that he

21   wanted when he wanted it.  His preference for stronger medication . . . represents precisely the

22   type of difference in medical opinion between lay prisoner and medical personnel that is

23   insufficient to establish a constitutional violation."), *report and recommendation adopted*, 2012

24   WL 5409833 (C.D. Cal. Nov. 5, 2012).

25        The undisputed record reflects that CCWF physicians provided Plaintiff some form of

26   pain medication whenever necessary throughout her incarceration, including opioids after the

27   acute pain from her fourth revision surgery.  At no time did any CCWF physician or other

28   medical personnel refuse treatment for Plaintiff's reports of pain.  The fact that she did not

67

1    receive the specific medication that she wanted at any given time does not amount to deliberate

2    medical indifference but rather reflects a difference of medical opinion. Therefore, the Court finds

3    no genuine dispute of material fact that Defendant Branch, or any of the Defendants, was

4    deliberately indifferent to Plaintiff's pain management. Accordingly, the Court recommends that

5    the District Court grant Defendants' MSJ.

6        **G. Qualified Immunity**

7        Defendants invoke qualified immunity, asserting that Plaintiff's claims present novel

8    constitutional questions for which no clearly established precedent exists. (Doc. No. 108-1 at 28–

9    30; Doc. No. 113-1 at 19–21).  Defendants argue that reasonable officials would not have

10    understood their actions to violate constitutional rights, given the lack of established authority

11    mandating heightened privacy for dilation or requiring a vaginal deepening procedure as a

12    medical necessity. (Doc. No. 113-1 at 20–21).

13        Plaintiff challenges Defendants' invocation of qualified immunity, arguing that the

14    relevant legal standards clearly establish her rights under the Eighth Amendment. (Doc. No. 114

15    at 23–27; Doc. No. 118 at 14–15). Plaintiff contends that the denial of medically necessary

16    treatment and privacy protections violates settled constitutional principles, and that Defendants

17    cannot reasonably claim to have acted in good faith when disregarding expert medical opinions

18    and established legal precedent. (Doc. No. 118 at 11).

19        A government official is entitled to qualified immunity under Section 1983 unless (1) the

20    official "violated a federal statutory or constitutional right, and (2) the unlawfulness of his

21    conduct was 'clearly established at the time.'"  *District of Columbia v. Wesby*, 583 U.S. 48, 62–

22    63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Harlow v. Fitzgerald*, 457

23    U.S. 800, 817 (1982).  To demonstrate that a right was "clearly established" requires a showing

24    that the statutory or constitutional question was "beyond debate," such that every reasonable

25    official would understand that what he is doing is unlawful.  *Wesby*, 583 U.S. at 63; *Vos v. City of*

26    *Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018).

27        This standard is "demanding" and protects "'all but the plainly incompetent or those who

28    knowingly violate the law.'"  *Wesby*, 583 U.S. at 63 (quoting *Malley v. Briggs*, 475 U.S. 335, 341

1   (1986)).  A court typically should "identify a case where an officer acting under similar

2   circumstances as [the defendant] was held to have violated" the constitutional right at issue.  *S.B*

3   *v. County of San Diego*, 864 F.3d 1010, 1015–16 (9th Cir. 2017).  "Even when no case is 'directly

4   on point,' courts may compare relevant factors to determine whether every reasonable officer

5   should have known the conduct in question was unlawful." *Anderson v. Virga*, 2018 WL

6   1556806, *2 (E.D. Cal. Mar. 30, 2018) (citing *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d

7   938, 946–47 (9th Cir. 2017)).  The plaintiff bears the burden of establishing that the right alleged

8   was clearly established.  *Moran v. State of Wash.*, 147 F.3d 839, 844 (9th Cir. 1998).

9         "Officials can still be on notice that their conduct violates established law even in novel

10   factual circumstances," *Irish v. Fowler*, 979 F.3d 65, 76 (1st. Cir. 2020) (cleaned up), so long as

11   the "contours [of the right] were sufficiently definite that any reasonable official in the

12   defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 584 U.S.

13   100 (2018) (internal quotations and citation omitted).  Moreover, "the more obviously egregious

14   the conduct in light of prevailing constitutional principles, the less specificity is required from

15   prior case law to clearly establish the violation." *Browder v. City of Albuquerque*, 787 F.3d 1076,

16   1082 (10th Cir. 2015) (internal quotations and citations omitted).

17         Here, Defendants assert that, even if the Court finds Plaintiff's constitutional rights were

18   violated by their alleged actions or inactions, they are entitled to qualified immunity because no

19   reasonable prison official would have been on notice that their conduct was unlawful.  (Doc. No.

20   108-1 at 29).  Plaintiff contends that, so long as the Court finds some genuine dispute of material

21   fact as to her claims, a finding of qualified immunity is not appropriate.  (Doc. No. 114 at 27–29).

22   Plaintiff misconstrues the qualified immunity analysis.  The question is not whether there is some

23   dispute of material fact, but whether, assuming Plaintiff's constitutional rights were violated,

24   Defendants were on notice that their conduct was unlawful because the applicable rights were

25   clearly established at the time.  *Wesby*, 583 U.S. at 63; *Vos*, 892 F.3d at 1035.

26         Accordingly, the Court finds the first prong of the qualified immunity analysis is met

27   because the undisputed facts show that Defendants were not deliberately indifferent to Plaintiff's

28   serious medical needs for the reasons stated *supra* and therefore recommends that the District

1    Court grant Defendants' MSJ.  Thus, the Court need not address the second prong.

2         Even if the Court were to reach the second prong, Plaintiff has not met her burden of

3    citing well-settled case law showing that any Defendants' actions or inactions violated her clearly

4    established constitutional rights.  *See Moran*, 147 F.3d at 844.  "While there does not have to be a

5    case directly on point, existing precedent must place the lawfulness of the particular action

6    beyond debate."  *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 44 (2019) (cleaned up).  As to

7    Plaintiff's claims regarding access to routine medical care, the Court does not find there to be a

8    colorable argument that any Defendant violated Plaintiff's clearly established rights, and Plaintiff

9    cites no existing precedent suggesting otherwise.  The undisputed record reflects that Defendants

10   provided Plaintiff with reasonable medical care or access to care for vaginal douches, and pain

11   medication, and no reasonable prison official in their respective roles would believe they were

12   violating Plaintiff's constitutional rights.

13        As to Plaintiff's more complex claims regarding her medical needs for space and privacy

14   to dilate and a deepening medical procedure, these are relatively novel issues.  Therefore, Plaintiff

15   need only establish that the "contours [of the right] were sufficiently definite that any reasonable

16   official in the defendant's shoes would have understood that he was violating it."  *Kisela*, 584

17   U.S. at 100 (internal quotations and citation omitted).  Here, the Court finds that Plaintiff has not

18   met this standard.  As an initial matter, the disagreement among the experts and physicians who

19   testified in this case regarding the appropriate accommodations for Plaintiff's needs undermines

20   the argument that any Defendants' actions were clearly established as unlawful at the time.  The

21   undisputed facts show that Defendants made good faith efforts to accommodate Plaintiff's needs

22   in a novel area without—at least as to custody and prison administration—clear guidelines or

23   policies.  (*See* Dill Depo. Tr. at 62:6-9; *see also* Gibson Depo. Tr. at 23:22-24:2 (discussing the

24   absence of policies governing dilation and privacy screens)).

25        Various courts, including the Ninth Circuit, cite the World Professional Association of

26   Transgender Health ("WPATH") Standards of Care for the Health of Transsexual, Transgender,

27   and Gender Non-Conforming People as the "internationally recognized guidelines" for the

28   treatment of individuals with gender dysphoria.  *Edmo*, 935 F.3d at 769; *see also De'lonta*, 708

1   F.3d at 522–23; *Beard*, 87 F. Supp. 3d at 1170; *Soneeya v. Spencer*, 851 F. Supp. 2d 228, 231–32

2   (D. Mass. 2012).  However, some courts have disagreed, noting that the WPATH Standards of

3   Care reflect not a universal consensus, but instead one perspective in the medical field.  *See*

4   *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019).  "[T]he community standard of care outside

5   the prison context is highly relevant in determining what care is medically acceptable and

6   unacceptable in relation to whether [a provider] was deliberately indifferent to [a plaintiff's]

7   serious medical needs." *Carley v. Aranas*, 103 F.4th 653, 661 (9th Cir. 2024) (cleaned up).

8   However, in the context of qualified immunity "the [community] standard of care is not the same

9   as clearly established law." *Id.* (internal quotations omitted) (reversing the district court's

10  decision and remanding the case with instructions to grant summary judgment in favor of the

11  medical provider on the basis of qualified immunity).

12          For pre-operative transgender inmates diagnosed with gender dysphoria, there is growing

13  consensus suggesting a right to gender confirmation surgery when it is deemed medically

14  necessary.  *See Cordellione v. Comm'r, Indiana Dep't of Correction*, 2024 WL 4333152, at *17

15  (S.D. Ind. Sept. 17, 2024) (collecting cases).  In *Edmo*, a seminal case on this issue, the Ninth

16  Circuit held that the failure to provide gender confirmation surgery to a transgender inmate with

17  severe gender dysphoria constituted deliberate indifference to serious medical needs.  935 F.3d at

18  794.

19          However, no case law or evidence suggests that, as of 2019–2020, it was clearly

20  established that a post-operative patient who had *already undergone* gender-affirming surgery

21  and four revision procedures must receive an additional procedure to restore vaginal depth for the

22  purpose of sexual intercourse, particularly when the procedure carries serious medical risks.

23  Under these circumstances, *Edmo* does not provide "the required level of specificity" to clearly

24  establish that Plaintiff was entitled to such a surgery.  *See Campbell*, 936 F.3d at 547 (holding

25  that defendants were immune from damages because the clearly established law at the time did

26  not require prison officials to provide the plaintiff with additional treatment for gender

27  dysphoria); *see also Michtavi*, 808 F.3d at 207 (holding that prison officials were shielded by

28  qualified immunity because "[t]here is no Supreme Court or appellate precedent holding that

prison officials must treat retrograde ejaculation, infertility, or erectile dysfunction; in fact, the weight of authority is to the contrary").

Nor does any case law support the position that Defendants' handling of Plaintiff's need for privacy to dilate violated clearly established law.  Defendants repeatedly testified that no policy existed at the time of Plaintiff's admission to CCWF to address such needs.  (*See, e.g.*, Dill Depo. Tr. at 62:6-9 ("Q: What was the policy at CCWF for providing a privacy screen for postoperative transgender inmates at this time, April 18, 2019? A: None that I'm aware of."); *see also* Gibson Depo. Tr. at 23:22-24:2 ("Q: During the time period between March 2019 and August 2019, do you know what the CDCR's policy for providing transgender inmates with time and space to dilate was? A: I – I don't recall that.")).

In her deposition, Defendant Dill testified, "when Norsworthy came and said she needed to dilate, that is not a normal process that we were all used to.  I had to ask."  (Dill Depo. Tr. at 28:16-18).  This Court has found no legal authority in any case law regarding how prison medical personnel, correctional officials, and administrators should handle such requests, much less a consensus as to what types of accommodations in terms of privacy satisfy a transgender inmate's constitutional rights.  Thus, the Court finds that no reasonable prison official would have been on notice that they violated Plaintiff's clearly established rights by providing imperfect accommodations for privacy and initially denying her request for a deepening procedure. Accordingly, the undersigned recommends that the District Court may grant Defendants' MSJ on alternative grounds under both prongs of qualified immunity.

Accordingly, it is **RECOMMENDED**:

1.  The District Court **GRANT** Defendants' Motion for Summary Judgment (Doc. No. 108).

2.  The District Court **DENY** Plaintiff's Motion for Partial Summary Judgment (Doc. No. 110).

3.  Judgment be entered in Defendants' favor and the case closed.

### NOTICE TO PARTIES

These Findings and Recommendations will be submitted to the United States District

72

Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

after being served with a copy of these Findings and Recommendations, a party may file written

objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

"Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

**(15) pages absent leave of court**.  The Court will not consider exhibits attached to the

Objections.  To the extent a party wishes to refer to any exhibit(s), the party should reference the

exhibit in the record by its CM/ECF document and page number, when possible, or otherwise

reference the exhibit with specificity.  Any pages filed in excess of the fifteen (15) page limitation

may be disregarded by the District Judge when reviewing these Findings and Recommendations

under 28 U.S.C. § 636(b)(l)(C).  A party's failure to file any objections within the specified time

may result in the waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839

(9th Cir. 2014).


Dated:    June 16, 2025

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE